UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 08-CR-00057-TNM |
| | § | |
| MIGUEL ANGEL TREVINO-MORALES (4) | § | |
| DEFENDANT | § | |

**DEFENDANT MIGUEL ANGEL TREVINO-MORALES'**
**MOTION FOR RELIEF FROM UNCONSTITUTIONAL SPECIAL ADMINISTRATIVE MEASURES**

NOW COMES the defendant Miguel Angel Trevino-Morales, by and through counsel, and presents this Motion for Relief from Unconstitutional Special Administrative Measures pursuant to the Fifth and Sixth Amendments to the U.S. Constitution and 28 U.S.C. § 2241. Through this Application, Mr. Trevino[1] seeks review and modification of pretrial detention restrictions that were imposed without evidentiary foundation or just cause, substantially exceed what is necessary, deprive Mr. Trevino of effective assistance of counsel, are harmful to Mr. Trevino, and are therefore punitive and constitutionally invalid. Critical to the analysis of Mr. Trevino's motion is the double level of violation: not only is the imposition of SAM based on an unsupported speculative conclusion of anticipated continued criminal conduct, but also, current restrictions imposed upon Mr. Trevino *exceed the self-imposed limits of severity described in the SAM*. That is, the government is imposing restrictions that exceed the SAM's self-described limits of severity and thus the government is acting in an arbitrary and unconstitutional manner.

## I.     Jurisdictional Foundation.

District courts are typically reticent to get involved in managing a jail or prison's detention procedures. Where such procedures are imposed without an evidentiary foundation or just cause,

---

[1] Defendant's formal name includes both the surname of his father (Trevino) and mother (Morales). It is a common practice, however, to address a person only by his father's surname. Accordingly, for purposes of this application, Defendant shall be referred to as Mr. Trevino.

however, district and appellate courts appropriately review and determine their constitutionality. This Court has jurisdiction under 18 U.S.C. § 2241 to evaluate the constitutionality of conditions of confinement imposed upon a pretrial detainee. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014) ("Our precedent establishes that one in custody may challenge the conditions of his confinement in a petition for habeas corpus . . . ."); *Hatim v. Obama*, 760 F.3d 54, 57–58 (D.C. Cir. 2014) (same); *Brooks v. Terrell*, No. CV 10-4009, 2010 U.S. Dist. LEXIS 144781 (E.D.N.Y. Oct. 14, 2010). Mr. Trevino submitted a request to the jail administrator to relieve him of the burden of solitary confinement and to provide the equivalent degree of contact with his family that other detainees are provided. The jail administrator rejected his request, and Mr. Trevino, in accordance with the jail's internal procedures, appealed the decision. The appeal remains pending, but officials have indicated that the jail will not modify conditions absent direction from the U.S. Marshal Service. Undersigned counsel has attempted to resolve issues with government counsel, but to date the government is not modifying any of the oppressive conditions described below.

## II.  Factual Background: Detention in Mexico Detention Centers

### A) Detention in Mexico.

Mr. Trevino-Morales was initially arrested in Mexico in July 2013. From that date, he was held in custody in various detention centers around Mexico. Mr. Trevino-Morales's preventive detention was ordered in numerous legal proceedings, including two proceedings in which the government of the United States requested his extradition. From July 2013 to February 2025, Mr. Trevino-Morales was held in the custody of six different detention centers. During his twelve years of imprisonment in Mexico, there is no evidence that Mr. Trevino-Morales committed any institutional infractions (escapes, acts of violence, or other institutional infractions) justifying the

imposition of an administrative sanction in any of those detention centers. This is stated in an official letter issued by the detention facility.[2]

During his incarceration, Mr. Trevino-Morales completed a variety of courses on subjects such as values, origami, oil painting, sculpture, psychology, and yoga. Detention center records show that he worked in various capacities, including agriculture, hydroponics, and maintenance, all without incident or inappropriate behavior. Notably, during his incarceration at the Federal Social Rehabilitation Center No. 2 "Occidente" (between December 19, 2013, and March 26, 2015), Mr. Treviño-Morales participated in school programs where he completed the requirements to certify his educational level as "*secundaria*."[3] During those fifteen months, Mr. Trevino-Morales also reviewed "*preparatoria*" content,[4] requested books from the library, and read a total of 165 books on literature, philosophy, and general topics. He also participated in sports activities and occupational therapy, as demonstrated by a different official letter issued by a prison facility in Mexico.[5] In fact, during his 12 years of imprisonment in Mexico, he read more than a thousand books.

### B. Acquittal of criminal charges

In relation to the pending criminal charges in the District of Columbia, it is important to note that the federal courts in Mexico heard evidence related to these same charges and found the factual allegations against Mr. Trevino-Morales to be unfounded in terms of allegedly leading a cartel (Zetas, Golfo, Compania, or whatever other name it may be called) and committing criminal acts. In other words, the federal courts in Mexico heard the evidence, observed the serious contradictions and

---

[2] *See* Exhibit A, official certified apostilled letter issued by the federal prison, "Federal Social Rehabilitation Center No. 4 Noreste." (certified Spanish letter and English translation).
[3] Level of education equivalent to *middle school* in the United States of America.
[4] Level of education equivalent to "high school" in the United States of America.
[5] *See* Exhibit B, copy of official certified apostilled letter issued by the "Technical Director of the Federal Social Rehabilitation Center No. 2 Occidente." Memorandum No. DT/131/2018 (certified Spanish letter and English translation).

inconsistencies of alleged witnesses and, consequently, acquitted Mr. Trevino-Morales of committing the same criminal acts with which he is now charged in the United States.

"The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law." *Coffin v. United States*, 156 U.S. 432, 453 (1895). In Mr. Trevino-Morales's case, this presumption is bolstered by the fact that he has been found innocent in another court. Consequently, there must be a strict review of detention restrictions that are purportedly justified by the same allegations of which he has been acquitted. In this regard, the SAM is based on an assumption that is mistaken and consequently arbitrary and irrational, as Mr. Trevino has been found not guilty in Mexico of having participated in the acts on which the Department of Justice bases its punitive measure disguised as an administrative one. He is entitled to the presumption of innocence relative to the acts alleged by the Department of Justice in its SAM. Specifically, if the SAM restrictions are based on acts he allegedly committed in Mexico, and in Mexico he was acquitted of having committed those acts, the SAMs lack a valid foundation.

### III.    Mexico & United States Agree to Sidestep Extradition Procedures

Despite the pendency of the United States' formal request for extradition, in February 2025 members of the Mexico military seized Mr. Trevino and transported him to the United States.  Prior to this forced removal, Mr. Trevino had been contesting an extradition request that the United States had presented to Mexico. Title 18, United States Code, Section 3181, *et. seq.,* is the statutory basis for the United States seeking extradition of a Mexico citizen from his home country of Mexico. The United States presented to Mexico on or about December 23, 2013, a request for the extradition of "Miguel Trevino Morales, alias 40, alias Zeta 40, alias Cuarenta." Mr. Trevino, a citizen of Mexico, was subsequently arrested in Mexico pursuant to a warrant for arrest arising from the U.S.'s extradition request. Mr. Trevino was detained in custody from 2013 through his forced delivery to the

United States in February 2025, contesting the propriety of the U.S.'s extradition request, including the fact that he is not the person named in the extradition request.

When Mr. Trevino was forcibly removed from Mexico in February 2025, not only was such removal outside the bounds of the statutory extradition proceedings (and indeed in contravention of Mexico court orders prohibiting his expulsion or removal from Mexico to the United States), he had been already been acquitted by a Mexican court of allegations that he had purportedly was involved in a cartel and had committed drug trafficking and violent crimes.

## IV.    Initial Six-Week Period of Detention in the United States

Upon arrival to the United States in February 2025, Mr. Trevino was transported to and detained at Northern Neck Regional Jail in Warsaw, Virginia (this detention facility hereinafter "DF"). Mr. Trevino is a federal detainee, but DF has a contract with the United States Marshals Service for the placement of pretrial detainees.  He remains detained there to the present date. During the first month and a half of his detention (February through April 2025), Mr. Trevino was held in "general population." His conditions of confinement entailed the same restrictions, privileges, and concessions afforded to other detainees. For example, Mr. Trevino was allowed to petition the jail for communications with his family and attorneys and then communicate with approved relatives by telephone and videocall to the same extent as other detainees. Similarly, like other detainees, he was allowed to visit his lawyers in person, by telephone, and by videoconference, including lawyers in Mexico with whom he has worked for twelve years in connection with various legal proceedings.

It should be noted that the communication system used by all detainees in the DF (the same system used by Mr. Trevino during the first month and a half of his pretrial detention) does not allow detainees to freely call anyone at any time. Rather, the people with whom a detainee wants to communicate must register their details and prove their identity. Following this system, each of Mr. Trevino's phone contacts had to be verified and authorized. Once a contact was authorized, Mr.

Trevino could make phone calls using the *Nextplus* app, which tracks and monitors the calls. Similarly, contacts for Mr. Trevino's videocalls had to be verified and authorized. Specifically, contacts had to register in the *Securus Mobile* app and schedule a visit at least twenty-four hours in advance to obtain permission for a twenty-minute videocall. For both forms of communication, the DF has the discretion to approve or disapprove contact and, of course, to consult with the U.S. Marshals Service ("USMS") with any questions or concerns. Additionally, the DF monitors and records all detainee communications, including those of Mr. Trevino-Morales.

While housed in general population during the first six weeks of detention, the DF (and presumably the USMS, which oversees the management of its detainees) approved Mr. Trevino's communications with family and attorneys in the same manner it approved other detainees' requests. Discovery material provided by the government indicates that Mr. Trevino participated in over 2,500 communications during this six-week period, and all were monitored and recorded by the DF.

Notably, in over 2,500 approved communications, there was not one instance of impropriety by Mr. Trevino—not one record of suspicious activity, not one instance in which Mr. Trevino was suspected of using another inmate to send improper communications, and not one violation of any rule or regulation. Similarly, all members of Mr. Trevino's family and attorneys from Mexico who were approved by the DF followed the required procedures to the letter. Just as was the case in his twelve years of detention in Mexico, Mr. Trevino was not alleged to have committed any misconduct in the DF—not any act of administrative misconduct, criminal violation, or otherwise.

The lack of inappropriate behavior in Mr. Trevino's communications is consistent with not only his record as a model detainee, but also the background of his immediate family. Mr. Trevino's immediate family are honest people dedicated to work and study. One of his daughters is studying at a university, two are in high school, and the other is in middle school. His four eldest children are college graduates, two of whom work in the United States (one as an elementary school teacher and

the other in the administrative department of a company), and the other two are working professionals in Mexico. In sum, Mr. Trevino-Morales's first six weeks in detention demonstrate that he is committed to having healthy, supportive, non-criminal relationships with his family and attorneys. Mr. Trevino never tried to contact any person other than his family, attorneys and attorney assistants, all of which were authorized and recorded without incident.

## V.    **Imposition of SAM.**

### *A. Standard of Evidence for the Imposition of SAMs.*

Despite the absence of evidence that Mr. Trevino violated any condition of confinement during the first six weeks of his pretrial detention, the DOJ unilaterally and without prior notice to Mr. Trevino or his counsel imposed severe restrictions of confinement via written "Special Administrative Measures." [6] The imposition of Special Administrative Measures ("SAM") is governed by rule 28 C.F.R. § 501.3. Subsection (a) establishes that SAM "may" be directed by the Attorney General when there is a "a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." The reach of "Special Administrative Measures" is limited to restrictions "as is *reasonably necessary* to protect persons against the risk of acts of violence or terrorism." *Id.* (emphasis added).

The Justice Manual ("JM") sets forth the procedures for requesting SAMs. According to JM § 9-24.100(A):

> The requesting entity *will submit a letter or memorandum to the Attorney General setting forth the request which must include:*
> - *A full and complete statement of the inmate's background and proclivity for violence or for ordering or inciting crimes of violence.*
> - *A discussion of why special measures should be implemented.*
> - *A description of what special measures (e.g., no visitors except attorneys, no contact with the news media) should be imposed with a justification for each.*

---

[6] *See* Exhibit C, attached hereto (copy of written "Special Administrative Measures").

This request is subsequently processed by the Director of the Bureau of Prisons' Office of Enforcement Operations ("OEO"), which is supposed to also obtain "information necessary to indicate clearly to the Attorney General how the inmate's confinement conditions would be altered by the imposition of the requested special administrative conditions." JM § 9-24.100(C). To implement the SAMs, the Attorney General must review the evidence presented about the inmate's background, his or her proclivity for violence, the discussion and description of what special measures should be implemented, and how the SAMs would alter the inmate's conditions.28 C.F.R. § 501.3 does not provide the Attorney General with limitless discretion to impose SAMs. Rather, in finalizing the interim SAMs rule, the BOP noted that "the application of these measures is likely to affect only a minute portion of the inmate population" and that the "measures will be subject to strict controls." Scope of Rules: National Security; Prevention of Acts of Violence and Terrorism, 62 FR 33730–01, 1997 WL 334553 (F.R.), at *33730. One of these controls is supposed to be the finding "that there is a substantial risk that a prisoner's communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." *Id.* Although 28 C.F.R. § 501.3 does not define "substantial risk," the BOP made clear that it "finds this standard consistent with the commenter who suggests, '*At a minimum*, the standards for restrictive inmate privileges such as those described in the regulation should be that there is *clear and convincing evidence* of a substantial risk to death or serious bodily injury.'" *Id.* at *33730–31 (emphasis added).

The "clear and convincing" evidence standard is a high one. The United States Supreme Court has defined "clear and convincing" evidence as evidence that "place[s] in the ultimate factfinder an abiding conviction that the truth of [the movant's] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (citation omitted); *see also Cruzan by Cruzan v. Director, Mo. Dept. of Health*, 497 U.S. 261, 285 n.11 (1990) (describing "clear and convincing

evidence" as "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue" (citation omitted) (alteration in original).

The DOJ's justification for the imposition of the SAM's severe restrictions is stated within the SAM:  a speculative assertion that Mr. Trevino is likely to (1) communicate messages to others to further illegal activity of a cartel, and/or (2) use other detainees to communicate the same type of messages to persons outside the DF. In this case, however, there is no clear and convincing evidence of a substantial risk sufficient to justify the imposition of SAMs. Prior to the imposition of the SAM, Mr. Trevino did not commit a single act to justify the speculative assertions described by the government. That is, the Attorney General has provided no evidence that would allow for "a clear conviction, without hesitancy," that the SAMs are necessary— out of the more than 2,500 communications recorded and supervised before the SAMs, there was not a single communication posing a substantial risk of death or serious bodily injury to anyone, belying the need for the SAMs. Simply put, there is no clear and convincing evidence that Mr. Trevino's communications pose a substantial risk of death or serious bodily injury. The SAM imposes punitive measures disguised as administrative on a person who not only is presumed innocent in the United States but also has been acquitted of the same conduct by a federal court in Mexico.

Instead, Mr. Trevino's SAMs are based on an indictment allegation that he belonged to and was the leader of a criminal group and that, during his imprisonment in Mexico, he maintained control of that organization.  Not only is Mr. Trevino presumed innocent of such conduct, Thus, it bears emphasis that Mr. Trevino has already been tried and acquitted in Mexican courts on the charge of being a criminal leader and directing a criminal group. This was decided by the Tenth District Court in the State of Tamaulipas, Mexico, in criminal case number 2/2008, and affirmed on appeal by the Seventh Unitary Court of the Nineteenth Judicial Circuit in Mexico. One by one, it was proven that

the facts tried in the aforementioned judicial file 2/2008 were consistent with the facts alleged in the various other criminal cases. Thus, dismissals were obtained[7] on double jeopardy grounds in all criminal cases in which Mr. Trevino was accused of having belonged to or led a criminal organization. In sum, the SAMs are based not on clear and convincing evidence, but rather on unproven speculation that is contradicted by consistent evidence in Mexican court rulings.

### B. The SAM's Specific Restrictions.

The current SAM imposes punitive measures disguised as administrative ones, establishing a severe punishment for Mr. Trevino before trial has begun. Despite the absence of evidence that Mr. Trevino violated any condition of confinement during the first six weeks of his pretrial detention, the DOJ unilaterally and without prior notice to Mr. Trevino or his counsel ordered that the following new restrictions be imposed:

**Severe Limitations on Communication with Family and Attorneys:**

- Mr. Trevino cannot speak regularly with his wife, children, or siblings. Instead, he has been limited to one, or sometimes two short, monitored phone calls per month.

- Mr. Trevino's monitored video visits with his family have been limited to total of sixteen communications (between phone calls and video visits) in the last 274 days, markedly different the number of video visits allowed other detainees. Plus, his video visit is limited to twenty minutes, markedly lower than what other detainees are permitted.

- In those months in which Mr. Trevino has been permitted a short, monitored video visit, his monthly phone call with family is not permitted.

---

[7] In Mexican law, criminal dismissal is a judicial decision that ends criminal proceedings, either definitively or provisionally, without reaching a verdict. It occurs when there is insufficient evidence to continue, such as lack of evidence, the act was not committed, or the innocence of the accused is clear. There are two main types: dismissal without prejudice, which is equivalent to an acquittal and does not allow the case to be reopened for the same facts, and dismissal with prejudice, which suspends the proceedings but allows them to be resumed if new evidence appears. In the case at hand, all criminal cases were dismissed without prejudice.

**Severe Isolation from Human Contact.**

- Mr. Trevino was removed from general population and placed in solitary confinement, isolating him from human contact and constituting a form of torture.

- His cell does not have a window through which he can see people and is in a hallway that is not close to where any human is situated. Thus, his communication with humans is limited to visits with his legal counsel and, conversely, he is prevented from engaging in social communication and interaction with others.

- Mr. Trevino also is denied the opportunity to listen to human communication through a Spanish-language radio or television station.

- Unlike other detainees in this DF, Mr. Trevino is shackled and chained by his hands and feet when he needs to be transferred to the shower, room for video visits, recreation area, or room where he consults with legal counsel. When allowed to visit with legal counsel in a locked room which is unable to be unlocked from the inside.

- The light in Mr. Trevino's cell is kept on 24-hours/day, affecting his ability to fall asleep and the depth of his sleep, constituting cruel and degrading treatment. As reflected below, prolonged exposure to constant light affects the quality of psychological and psychiatric health.

- He is restricted to eating three meals per day in his cell, delivered by security personnel through a small slot in the door.

The SAM restrictions effectively seal off avenues of social human contact, consumption of news, and communication, resulting in unwarranted psychological, emotional and physical harm. All this without prior notice, due process, and the absence of evidence that Mr. Trevino has engaged or will engage in the feared conduct described in the SAM while detained.

*C. The SAM's Express Limitations on the Severity of Restrictions.*

By its own words, however, the SAM is not an open ticket to impose any severe restriction possible. In two different places within the SAM where the DOJ sought to explain the mechanism of the SAM, it expressly contains several limitations on the degree of restrictive conditions that may be imposed on Mr. Trevino. The first limitation is detailed on page 3 of the SAM:

> ***Adherence to Usual USMS, Federal Bureau of Prisons (BOP, and Detention Facility (DF Policy Requirements –*** *In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF Policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.*

Here, the SAM expressly sets a maximum degree of restriction that applies to all of Mr. Trevino's communications. That is, it sets as the "maximum" permissible severity of restrictions: that is, the maximum severity is that which is the more severe restriction between (a) the express restrictions in the SAM or (b) the restrictions set by the DF's internal policies. Stated differently, on page 3 of the SAM, it prohibits the imposition of any restriction that is *more severe* than ***both*** the SAM and the "usual" rules and regulations of detention facilities. Any restriction on Mr. Trevino's communications, confinement, and other privileges ***cannot be more severe*** than the most severe restriction imposed by either (1) the SAM or (2) "the usual policies of USMS/BOP/DF."

But this language is not the only limitation. With respect to Mr. Trevino's communications with persons outside the DF, the SAM expressly sets forth a different, second type of limitation:

> ***Inmate Communications Prohibitions –*** *The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other violence-related information.*

In addition to the limitation of severity of restriction outline on page 3 of the SAM, Mr. Trevino's communications are allowed to be limited only to the extent those communications "could reasonably foreseeably" result in threats or violence. Mr. Trevino respectfully submits that there is a chasm between "reasonably foreseeable" and *solitary confinement.*

For brevity, the two express limitations of severity expressed on pages 3 and 4 of the SAM shall be referred to below as the "two categories of severity limitations." Imposition of solitary confinement and severe curtailing of communications can only by because there is identifiable evidence, not conjecture, that the prohibited communications fall within the bounds of these two categories of severity limitations, and no more. There is no evidence, much less clear and convicting evidence, that Mr. Trevino committed acts while detained which reach the standard of *reasonably foreseeable* misconduct and thus justify the severity of these restrictions.

## VI. Imposed Restrictions Exceed the DF's Policies.

Despite the express limitations contained in the SAMs, Mr. Trevino has been subjected to restrictions of unwarranted severity. Immediately after the SAM was imposed, Mr. Trevino was removed from the general population, placed in solitary confinement, denied communications with defense attorneys based in Mexico, and subjected to significantly reduced direct communication with his family (wife, children, and siblings).[8] In solitary confinement, Mr. Trevino has been deprived of

---

[8] With regard to the restriction on Mr. Trevino's ability to communicate regularly with his family, the SAM establishes that Mr. Trevino is authorized to make "legally non-privileged telephone calls to his immediate family," defined as his spouse, children, parents, and siblings. Before being placed in solitary confinement, Mr. Trevino (like all other detainees in the DF) was able to speak with his family daily, have daily video visits, and exchange daily communications by email, including photographs of his family (all of which were examined by DF officials before being delivered to Mr. Trevino). However, for more than six weeks after he was placed in solitary confinement, the Department of Justice denied Mr. Trevino's numerous written requests to communicate with his family.

Once he was placed in solitary confinement in April pursuant to the SAM, he was not allowed to communicate with his family in any way. On June 4, he was allowed a thirty-minute phone call with his wife, but not a video visit. On June 26, he was allowed another thirty-minute phone call with his wife, but not a video visit. On July 9, 2025, he was only allowed a shorter fifteen-minute call; and, on July 23, for the first time since he was placed in solitary confinement, he was allowed a video visit of only twenty minutes. Also, on August 7, he was allowed another 30-minute phone call. On August 28, he was allowed a short two-minute call because his call was scheduled for 3:00 p.m. and at that time the DF communication system is shut down for lunch; this call was compensated on August 29 with

social interaction, exposure to current events and social enjoyment via the tablets provided to other detainees, and other privileges granted to pre-trial detainees. As referenced above, Mr. Trevino does not speak English, so his limited access to one English language station on a television provides no substantive relief. He has no one to casually talk to about non-legal matters and no opportunity to listen to Spanish speakers on Spanish-language television programming. In summary, Mr. Trevino-Morales is unjustifiably *isolated* from meaningful human interaction and communication, which constitutes psychological torture. In addition, the SAM do not order isolation or require detention in a segregated cell. It only requires the imposition of restrictions to prevent Mr. Trevino to have contact with any other inmate that "***could reasonably foreseeably result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other violence-related information, that could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.***" The imposition of isolation is a violation of the SAM's own verbiage in the sense that it exceeds the SAM's own limitation regarding the severity of the restrictions. The SAM does not order isolation, and it does not prohibit communication with others in the jail population, but only with those in a specific situation in which could reasonably foreseeably result in communicating an improper message. Consequently, what the Department of Justice should do is evaluate the inmate's classification to determine which inmates have the characteristics referred in the SAM. By doing so, Mr. Trevino would then be prevented from having contact with which inmates who could pose such a problem or risk. Since the

---

a thirty-minute call. He was allowed two calls in September, one on the 12th and another on the 26th, and one video visit in October. Throughout the month of August, he was not allowed any video visits. In fact, since the imposition of the SAMs on April 15, to date (more than 274 days), Mr. Trevino has only been allowed a total of sixteen communications (telephone calls and video visits). All of which only 8 have been phone calls (1 of one minute, another of 15 minutes, and 6 of 30 minutes), and 8 video-visits (one of 10 minutes and 7 of 20 minutes). This is disproportionate and excessive and violates Mr. Trevino's rights. In summary, even though prior to the SAMs, he was allowed to have daily video visits with his family and did so without any inappropriate behavior, he has only been allowed sixteen communications with his family in the more than 274 days since his transfer to solitary confinement.

SAMs do not impose a total prohibition from contact or housing, it only requires a partial restriction in that it prohibits communication with a certain type of people and not with the total of the population.

The severity of these conditions exceeds not only the two categories of severity limitations outlined by the express language of the SAM, but also the strictest measures imposed by the DF measures on detainees who commit criminal and/or administrative violations of prison policies. As discussed in more detail below, the fact that Mr. Trevino-Morales's conditions are more severe than the DF's strictest punitive measures indicates that they are unconstitutional. Thus, the DF'S usual rules are relevant to assessing the severity of the restrictions imposed on Mr. Trevino and whether those restrictions rise to the level of being punitive under the standards established by the Supreme Court. *The Northern Neck Regional Jail Rules and Regulations Manual*[9] is a published description of the rules and regulations that apply to all detainees. These are relevant given the first of the SAM's two categories of severity limitations, where restrictions cannot exceed the SAM nor the DF's "usual" policies and restrictions. In the Manual, the DF sets forth its policies regarding detainees who commit "major" and "minor" violations, the maximum penalties for such violations, and other procedures related to restrictions. The following regulations are most relevant to the issues before this Court:

| § 12 | **Segregation**: "Special purpose housing" is the term designated by the DF to refer to persons placed in segregation. The Manual indicates that two different types of segregation may be imposed: "Administrative segregation" and "Punitive detention." In particular, the Manual provides the following information: |
|---|---|
| | - "Special Purpose Housing is an area normally used to house inmates who are segregated for administrative reasons or as a disciplinary measure. This space is also used temporarily when there is no adequate space to place inmates elsewhere. |
| | Inmates who are segregated for administrative reasons are normally confined to their cells. However, they may participate in programs and enjoy the privileges and services offered in the Regional Prison if their behavior does not pose a threat to themselves, others, or the security of the facility. The status of prisoners segregated for administrative reasons is reviewed regularly to decide whether they should be transferred and when they should be assigned to the general population. |
| | Solitary confinement is a punishment that can be imposed on an inmate convicted of committing an offense in prison. To place the inmate in solitary confinement, they are transferred when convicted to a special area of the facility to serve their sentence . . .." |

---

[9] Although Mr. Trevino was provided with a copy of the manual, he is not permitted to give it to the undersigned attorney to make copies for review by the court. For brevity, a summary of relevant provisions is presented in the following table. Some pertinent clauses are quoted.

|  |  |
|---|---|
|  | - **"Administrative segregation"**: inmates are "normally" restricted to a cell, but nevertheless "may participate in programs and enjoy the privileges and services offered" at DF "if their behavior is such that they are not a threat to themselves, others, or the security of the facility." The status of this form of segregation is "reviewed regularly to determine if and when they can be assigned to the general population."<br><br>Individuals under administrative segregation imposed by the DF are allowed to use the telephone to make as many daily calls as they wish without restriction, and they may also receive video visits scheduled by their family daily without restriction.<br><br>Although SAM is at first glance designated as an "administrative" measure, the reality is that it is a punitive measure disguised as an administrative one, as Mr. Trevino is not allowed to participate in any program or service offered at the DF, even though his "behavior" has given no indication that he poses a "threat" to anyone or to the security of the facility.<br><br>- **"Punitive confinement"**: The Manual makes it clear that this form of segregation "is a penalty that may be imposed on an inmate who has been convicted of a rule violation." If found guilty, the sentence "involves the transfer of the inmate so sentenced to a special housing area for the term of his sentence." Mr. Trevino has not been "sentenced" for any violation of any kind, yet he is experiencing the same form of "punitive detention" described in this section. |
| § 16 | **#7 Authorized disciplinary sanctions**: This section outlines the sanctions imposed at the DF for disciplinary violations. Violations are categorized as "major" or "minor." The "sentences" or "sanctions" that may be imposed for such violations are as follows:<br><br>- Loss of certain privileges (recreation, television, telephone): Maximum 30 days<br>- Loss of tablet use: Maximum 30 days<br>- Loss of all other privileges at the DF: Maximum 15 days<br>- "Punitive detention" (solitary confinement): Minimum 1 day; Maximum 15 days<br><br>Although SAM clearly states that it is an "administrative" measure, Mr. Trevino is suffering the loss of privileges that would otherwise be available to other detainees. Not only has he been segregated into a form of solitary confinement that is punitive in nature, but he has also been there for more than 200 days and, if he is not granted a reprieve from such a condition, he will be in punitive solitary confinement for many more years.<br><br>**## 9 and 10 Hearings and appeals**: Even in situations where an inmate receives a "sentence" calling for "punitive confinement," he is afforded the right to a hearing to assess whether "punitive confinement" is warranted, and if he is unsuccessful at that hearing, he is afforded the right to appeal.<br><br>Mr. Trevino's transfer to solitary confinement and the imposition of other restrictions were imposed without granting him the right to a hearing or appeal. |

In sum, prisoners who are segregated in the DF system are placed there for two reasons: (i) "Administrative Segregation" for purposes such as preventing the spread of diseases or the inmate's protection; or (ii) "Punitive Detention" as disciplinary punishment, resulting from a sentence imposed by a Disciplinary Hearing Officer for the commission of an infraction or crime, in accordance with section 16 of the DF Manual. In this case, Mr. Trevino has not been convicted or sentenced for any crime and thus does not qualify for punitive segregation. He is also not under "Administrative

Segregation" imposed by the DF, since if that were the case, he could "participate in programs and enjoy the privileges and services offered in the Regional prison if his behavior is such that he does not pose a threat to himself, others, or the security of the facility."

DF rules and regulations establish the maximum level of severity of punitive measures for detainees who commit policy violations. This is significant considering established jurisprudence that clearly prohibits the imposition of confinement restrictions that effectively become punitive measures (*see infra* Section IV, Applicable Law). The unlawfulness of the measures imposed on Mr. Treviño is compounded by the irrefutable expectation that his detention will significantly exceed the typical length of detention. That is, while the maximum "sentence" of 15 days of solitary confinement applies to the "typical" detainee, Mr. Trevino's isolation has far exceeded that limit and will continue to multiply that amount many times over during the pendency of this case. The government notified this Court and the defendants that discovery in this case comprises millions of documents and hundreds of thousands of recordings. Undoubtedly, the time required to properly evaluate the evidence and prepare for trial will be extensive, as will the application of punitive security measures that restrict basic rights.

Mr. Treviño's solitary confinement thus greatly exceeds the SAM's two categories of severity limitations (i.e., what is required by the SAM and the "usual policies of the USMS/BOP/DF," including the DF's usual measures for the four categories of inmates: minimum security, medium security, maximum security (within which there is a special section called "premium"). In all four categories, inmates are free to move around within their pod or module. They are only locked in their cells to sleep and for roll call. They have access to public telephones and video visitation phones that they can use without restriction (except during sleep and roll call times) all of which are monitored and recorded, with no limit on the number of calls or video visits per day. Inmates in all categories have access to a tablet, which they can use as a phone, to listen to music, or even to play games. Even

in maximum security and "premium" maximum security, inmates receive the tablet three and five times a week, respectively. In medium security, inmates receive the tablet five days a week, with more programming available, and the tablet's phone can be used all day. In minimum security, the tablet can be used all week, with access to more programming, including series and movies, and even news programs in Spanish. In sum, even the DF's highest-security inmates, as well as those in punitive segregation, have significantly better conditions than Mr. Trevino-Morales.

### VII.    The Devastating "Nuclear Option" of Solitary Confinement

The harmful effects of solitary confinement have been extensively studied by clinical specialists and by our country's courts. These studies consistently show that solitary confinement has harmful physical and psychological effects on inmates. Solitary confinement has been described as akin to torture, which is prohibited by U.S. CONST. amend. VIII. Despite this, the Department of Justice is using solitary confinement as a form of punishment against Mr. Trevino, thereby affecting his defense. The restrictions imposed by the DOJ are affecting Mr. Trevino and his counsel's ability to prepare a defense, depriving Mr. Trevino of due process and his right to effective assistance of counsel. Moreover, solitary confinement is subjecting him to torture and suffering from cruel and humiliating treatment, which diminishes his abilities in the face of a case as complex as this one.

In September 2017, the Center for Constitutional Rights ("CCR") and the Allard K. Lowenstein International Human Rights Clinic at Yale Law School ("Lowenstein Clinic") published a report on SAMs entitled "THE DARKEST CORNER:  Special Administrative Measures and Extreme Isolation in the Federal Bureau of Prisons,"[10] which addressed multiple issues regarding SAMs, including the physical and mental impacts of solitary confinement. The CCR and the Lowenstein Clinic reported:

---

[10] This report is available at https://ccrjustice.org/sites/default/files/attach/2017/09/SAMs%20Report.Final_.pdf (last accessed Dec. 1, 2025).

Prisoners, psychologists, and human rights advocates have long attested to the horrors of solitary confinement: cramped concrete cells, sensory deprivation, and overwhelming social isolation. Scientific consensus that such conditions cause permanent harm led the former United Nations ("U.N.") Special Rapporteur on Torture to declare that **"any imposition of solitary confinement beyond 15 days constitutes torture or cruel, inhuman or degrading treatment."**

*Id.* at 1 (emphasis added). Moreover, "[t]here is a broad—and growing—consensus that the standard conditions of prolonged solitary confinement cause serious and often indelible harm after just weeks." *Id.* at 11. In fact, "the United Nations Standard Minimum Rules for Treatment of Prisoners, or 'Mandela Rules' . . . define 'prolonged' as 'beyond fifteen days, after which continued isolation constitutes cruel, inhuman and degrading treatment and, under some conditions, torture.'" *Id.* Notably, Mr. Trevino has been in solitary confinement for more than 200 days.

The report also summarizes multiple "[s]cientific studies [that] have concluded that prolonged isolation causes severe physical disease, including chronic headaches, digestive problems, dizziness, and even heart palpitations." *Id.* at 11 (citing Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQUENCY 124, 130 et seq. (2003) (surveying studies on the effects of isolation)). For example, a study of prisoners at ADX Florence—where numerous SAMs inmates are held in solitary confinement—revealed that "all prisoners interviewed exhibited physical symptoms 'that are well known in literature to be caused by isolative confinement.' In particular, the study revealed that 'every prisoner exhibited memory problems and extreme lethargy, and most prisoners suffered from chronic insomnia and headaches.'" *Id.* "Other studies demonstrate that the complete absence of stimuli experienced in solitary confinement causes structural changes to the brain." *Id.* (citing Maclyn Willigan, *What Solitary Confinement Does to the Human Brain*, Solitary Watch (Aug. 4, 2014), https://solitarywatch.org/2014/08/04/what-solitary-confinement-does-to-the-human-brain/ (last accessed Dec. 1, 2025)). In sum, "the effects of prolonged isolation mirror the effects of other forms

of torture: anxiety, panic, paranoia, hallucinations, self-mutilation, and suicide. When these symptoms develop, and when the purpose of isolation is to coerce, punish, or discriminate, solitary confinement *is* torture." *Id.* at 12 (citing Laura Rovner & Jeanne Theoharis, *Preferring Order Over Justice*, 61 AM. U. L. REV. 1331, 1364 (2012)).

In fact, Justice Anthony Kennedy, in his concurring opinion in *Davis v. Ayala*, 576 U.S. 257 (2015), addressed the impact of prolonged isolation:

> The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. Eighteenth-century British prison reformer John Howard wrote "that criminals who had affected an air of boldness during their trial, and appeared quite unconcerned at the pronouncing sentence upon them, were struck with horror, and shed tears when brought to these darksome solitary abodes." THE STATE OF THE PRISONS IN ENGLAND AND WALES 152 (1777). In literature, Charles Dickens recounted the toil of Dr. Manette, whose 18 years of isolation in One Hundred and Five, North Tower, caused him, even years after his release, to lapse in and out of a mindless state with almost no awareness or appreciation for time or his surroundings. A TALE OF TWO CITIES (1859). And even Manette, while imprisoned, had a work bench and tools to make shoes, a type of diversion no doubt denied many of today's inmates.
>
> One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170 (1890); *see also id.* at 168 ("A considerable number of the prisoners fell, after even a short [solitary] confinement, into a semi-fatuous condition . . . and others became violently insane; others, still, committed suicide"). The past centuries' experience and consideration of this issue is discussed at length in texts such as THE OXFORD HISTORY OF THE PRISON: THE PRACTICE OF PUNISHMENT IN WESTERN SOCIETY (1995), a joint disciplinary work edited by law professor Norval Morris and professor of medicine and psychiatry David Rothman that discusses the deprivations attendant to solitary confinement. *Id.* at 184.
>
> There are indications of a new and growing awareness in the broader public of the subject of corrections and of solitary confinement in particular. See, e.g., Gonnerman, *Before the Law*, THE NEW YORKER, Oct. 6, 2014, at 26 (detailing multiyear solitary confinement of Kalief Browder, who was held—but never tried—for stealing a backpack); Schwirtz & Winerip, *Man, Held at Rikers for 3 Years Without Trial, Kills Himself*, N.Y. TIMES, June 9, 2015, at A18. And penology and psychology experts, including scholars in the legal academy, continue to offer essential information and analysis. *See, e.g.*, Simon & Sparks, *Punishment and Society: The Emergence of an Academic Field*, *in* THE SAGE HANDBOOK OF PUNISHMENT AND SOCIETY (2013); *see also* Venters, et al., *Solitary Confinement and Risk of Self–Harm Among Jail Inmates*, 104 AM. J. PUB. HEALTH 442 (March

2014); Metzner & Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACADEMY PSYCHIATRY AND LAW 104–108 (2010).

These are but a few examples of the expert scholarship that, along with continued attention from the legal community, no doubt will aid in the consideration of the many issues solitary confinement presents. And consideration of these issues is needed. Of course, prison officials must have discretion to decide that in some instances temporary, solitary confinement is a useful or necessary means to impose discipline and to protect prison employees and other inmates. But research still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price. *See, e.g.*, Grassian, *Psychiatric Effects of Solitary Confinement*, 22 WASH. U.J.L. & POL'Y 325 (2006) (common side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors). In a case that presented the issue, the judiciary may be required, within its proper jurisdiction and authority, to determine whether workable alternative systems for long-term confinement exist, and, if so, whether a correctional system should be required to adopt them.

Over 150 years ago, Dostoyevsky wrote, "The degree of civilization in a society can be judged by entering its prisons." THE YALE BOOK OF QUOTATIONS 210 (2006). There is truth to this in our own time.

*Id.* at 286–90.

Echoing Justice Kennedy, the courts uniformly recognize the "strong" conclusions of experts on the devastating effects of isolation. *See, e.g.*, *Williams v. Secretary of the Pennsylvania Department of Corrections*, 848 F.3d 549, 574 (3rd Cir. 2017) ("psychological stressors such as solitary confinement can be as clinically distressing as physical torture") (citing *Johnson v. Wetzel*, 209 F. Supp. 3d 766, 779 (M.D. Pa. 2016); *United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005) ("long periods of solitary confinement can have devastating effects on the mental well-being of a detainee") (citing Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477, 531 (1997)).

In *Williams*, the Third Circuit drew the following conclusion from studies on isolation:

A comprehensive meta-analysis of the existing literature on isolation within and outside the criminal justice system revealed that "the empirical data lead to an unequivocal conclusion: this experience is psychologically painful, can be traumatic and harmful,

and puts many of those who have undergone it at risk of long-term harm." Specifically, based on a review of a representative sample of studies on sensory deprivation, the researchers found that virtually all individuals exposed to such conditions are affected in some way. They further explained that "there is not a single study on solitary confinement in which involuntary confinement lasting more than 10 days has not had negative psychological effects." And, as another researcher explained, "all [people subjected to isolation] will experience . . . some degree of stupor, difficulty thinking and concentrating, obsessive thoughts, agitation, irritability, and difficulty tolerating external stimuli.

848 F.3d at 566. The court also noted that "the lack of opportunity to move freely is associated with more general physical deterioration. The range of symptoms includes dangerous weight loss, hypertension, and cardiac abnormalities, as well as the aggravation of preexisting medical problems." *Id.* at 568.

It should be noted that even the plaintiffs in *Williams*—death row inmates whose sentences were commuted to life in prison—had fewer restrictions than Mr. Treviño, a pretrial detainee who has not been convicted of any crime. For example, the *Williams* plaintiffs had access to more phone calls (three per week) and non-legal visits (four per month), while Mr. Treviño has been limited to one or two calls or video visits per month in the last nine months (i.e., a total of two communications per month, with a video visit replacing a call and vice versa). To date, Mr. Treviño has spent approximately nine months isolated in a small, windowless cell measuring 2.1 x 2.7 meters, cut off from any form of socialization with the outside world or other prisoners except for visits from his legal team and sporadic, brief contact with his family. Mr. Trevino's psychological and physical conditions have already been affected by stress, anxiety, despair, depression, and other effects of isolation.[11] If uncorrected, this situation will go on for several years, given the breadth and complexity of the case in question. This form of "indefinite" isolation has been described as the "nuclear option." *Basciano*, 369 F. Supp. 2d at 353.

---

[11] The Department of Justice is fully aware that Mr. Trevino suffers from high blood pressure, which he is administered daily medication to treat (Termistatan 80 mg and Amiodipine 5 mg).

# VIII.   Applicable Law

The primary issue is whether the imposed restrictions violate Mr. Trevino's constitutional right as a pretrial detainee. Many courts have been called to address the propriety of the DOJ's imposition of restrictive conditions of confinement. The standards governing the district court's review differ depending on whether the person is a convicted prisoner serving a sentence or a non-convicted detainee housed in a detention facility pending trial. As discussed in more detail below, because Mr. Trevino is a pretrial detainee and has a right to not be punished, the fundamental issue is whether the restrictions on him "amount to punishment." *Bell v. Wolfish,* 441 U.S. 520, 535 (1979).

The Eighth Amendment protects prisoners from cruel and unusual punishment. But "under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Id.* Thus the question is not whether Mr. Trevino is being subjected to *cruel and unusual* punishment, but whether he is being punished *at all*. In other words, as a pretrial detainee, Mr. Trevino's conditions are analyzed in the context of his Fifth Amendment guarantee of due process,[12] a less stringent analysis than the Eighth Amendment's prohibition against cruel and unusual punishment. *See id.* at 536 n.16 ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished."); *see also Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015) (pretrial detainee issues to be determined under due process clause, requiring lower threshold of proof); *Brogsdale v. Barry*, 926 F.2d 1184, 1187 n.4 (D.C. Cir. 1991) ("the threshold for establishing a constitutional violation is clearly lower for pretrial detainees"); *Lep v. Biden*. No. 20-3344, 2023 WL 2707493 (D. D.C. March 30, 2023) (noting that "whether Guantanamo detainees

---

[12] The Supreme Court has emphasized that "[t]he imperative necessity for safeguarding these rights to procedural due process under the gravest of emergencies has existed throughout our constitutional history, for it is then . . . that there is the greatest temptation to dispense with fundamental constitutional guarantees which, it is feared, will inhibit governmental action." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165 (1963).

should be viewed as pretrial detainees or convicted prisoners" is "an important distinction, as the classifications carry different standards.") (citing *Brogsdale*, 926 F.2d at 1187 n.4).

"For *convicted* persons, the question is not whether prison conditions amount to punishment—for convicts plainly may be punished—but rather whether the conditions 'deprive inmates of the minimal civilized measure of life's necessities'" and thus amount to cruel and unusual punishment under the Eighth Amendment. *Brogsdale*, 926 F.2d at 1887 n.4 (citing *Bell*, 441 U.S. at 535) (emphasis added). Conversely, "[p]retrial detainees stand in a different position [from convicted persons]: they have not been convicted of anything, and they are entitled to the constitutional presumption of innocence." *Miranda v. Cty. of Lake,* 900 F.3d 335, 350 (7th Cir. 2018) (citing *Kingsley*, 576 U.S. at *(*"pretrial detainees cannot be punished at all"). In cases of pretrial detainees, "not yet convicted of any crime, the question is whether prison conditions 'amount to punishment of the detainee.'" *Brogsdale*, 926 F.2d at 1887 n.4 (quoting *Bell*, 441 U.S. at 535).

There is "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Bell*, 441 U.S. at 537 (citing *Mendoza-Martinez*, 372 U.S. at 168). *Bell* guides this Court in how to determine whether Mr. Trevino's conditions amount to punishment. Looking to *Mendoza-Martinez*, the *Bell* Court cited "the tests traditionally applied to determine whether a governmental act is punitive in nature[.]" *Id.* That seven-factor test is:

(1) "Whether the sanction involves an affirmative disability or restraint,"

(2) Whether the sanction "has historically been regarded as a punishment,"

(3) Whether the sanction "comes into play only on a finding of *scienter*,"

(4) Whether the sanction "will promote the traditional aims of punishment—retribution and deterrence,"

(5) "[W]hether the behavior to which [the sanction] applies is already a crime,"

(6) "[W]hether an alternative purpose to which it may rationally be connected is assignable for it,"

(7) "[W]hether it appears excessive in relation to the alternative purpose assigned"

*Id.* at 537–38 (quoting *Mendoza-Martinez*, 372 U.S. at 168–69).

The *Bell* Court also simplified these "useful guideposts" into a two-part test. *First*, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. *Second*, there will usually not be "a showing of an expressed intent to punish[.]" *Id.* Consequently, "that determination will generally turn on the sixth and seventh *Mendoza-Martinez* factors: whether there is another rational purpose for the disability, and whether the disability "appears excessive in relation to the alternative purpose." *Id.* As the *Bell* Court concluded:

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id.* at 539.[13]

Subsequently, the United States Supreme Court applied a related test in the context of *prisoner* regulations. *Turner v. Safley*, 482 U.S. 78 (1987). *Turner* stemmed from a class action

---

[13] It is important to recognize that the *Bell* Court's standard of review addressed institutional measures imposed to safeguard internal institutional safety, such as confinement of two inmates in individual rooms for 6-8 hours/day most of which during nighttime sleep hours, the prohibition against receiving books not mailed directly from publishers, book clubs, or bookstores, and the prohibition against receiving food and other personal items from persons outside the prison. Conversely, the instant case involves more severe restrictions arbitrarily imposed by the Attorney General, such as the imposition of daily isolation of Mr. Trevino for 24 hours/day and the prohibition against physical, visual and audible contact with other inmates. Additionally, another important distinction is in *Bell,* although a restriction was imposed against the receipt of books from friends or family, the prisoners were given an alternate opportunity to receive books from a third-party business; similarly, although prisoners were prohibited from receiving clothes and other personal items from friends or family, an alternative was provided by allowing the purchase of such items from the commissary. That is, unlike the situation with Mr. Trevino, alternatives were given to the prisoners addressed in *Bell*. Mr. Trevino is not being given alternatives to address the severity of imposed restrictions.

challenging regulations on *sentenced* prisoners and thus did not concern the due process rights of pretrial detainees. *See id.* at 81.[14] But even in that context, the Court observed that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. Although prisoners have fewer rights than pretrial detainees, the *Turner* Court evaluated the following factors in weighing the reasonableness of regulations:

(1) Whether there is "a 'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it, or whether it is "arbitrary or irrational,"

(2) "[W]hether there are alternative means of exercising the right that remain open to prison inmates,"

(3) "[T]he impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally,"

(4) Whether there are "ready alternatives" to the regulation.

*Id.* at 89–90. *Turner* thus echoed *Bell*'s concern that regulations be rational, and not arbitrary or excessive, even in the context of incarcerated prisoners whom the facility has not only a right, but also a duty, to punish.[15]

---

[14] In *Turner,* the Supreme Court addressed two internal Missouri prison regulations: (i) the prohibition of marriage between inmates, and (ii) restriction against communication between prisoners of different prisons. Notably, the regulations did ***not*** prohibit communication between prisoners of the same institution, nor direct/indirect communication with family and friends, contrasted against the more severe restrictions being imposed on Mr. Trevino.

[15] *Turner* held that one of the Prison's restrictions—a bar on inmate marriages—did "not satisfy the reasonable relationship standard, but rather constitute[d] an exaggerated response to petitioners' rehabilitation and security concerns." *Turner*, 482 U.S. at 91. Even though officials identified "legitimate security concerns," the restrictions were "an exaggerated response to such security objectives." *Id.* at 97–98. This conclusion was supported by the fact that there were "obvious, easy alternatives" that would have "impos[ed] a *de minimis* burden on the pursuit of security objectives." *Id.* at 98.

Although courts may be hesitant to weigh in on issues of confinement, *Bell* and its progeny make clear that the judiciary has both the authority and obligation to prevent unreasonable correctional restrictions, especially upon pretrial detainees. This includes preventing pretrial detainees—even those with serious charges—from being held in solitary confinement indefinitely. For example, the District Court for the Eastern District of New York granted a pretrial habeas corpus petition in which the alleged leader of the Bonnano crime family sought to be moved from a Special Housing Unit ("SHU"). *United States v. Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y. 2005). Like Mr. Trevino, Basciano was held under onerous conditions that included constant lighting, limited access to radios and reading materials, "and perhaps most significantly . . . contacts with other human beings [that] ha[d] been sharply curtailed." *Id.* at 347. Also, like Mr. Trevino, the government averred that "severe restrictions on Basciano's ability to interact with other people, both inside and outside the prison, are warranted because Basciano will continue to direct the affairs of the Bonnano family, including ordering acts of extreme violence, if he is not prevented from passing messages to other Bonnano family members and associates." *Id.* Applying the above standards, the district court disagreed.

Like most cases, there was no evidence of an express purpose to punish, and thus the court considered "the second part of the *Wolfish*[16] test, i.e., whether Basciano's indefinite placement in solitary confinement is reasonably related to a legitimate government objective." *Id.* at 350–51. The court concluded that the government had a legitimate objective in preventing violence.

---

[16] It is important to note that the District Court applied the *Bell* standard, even after *Turner* was decided, because *Basciano* dealt with the rights of a pretrial detainee. As made explicit in *Bell* and reaffirmed by the D.C. Circuit in *Brogsdale*, pretrial detainees have the right not to be punished and therefore their claims are assessed under a due process standard, not a stricter Eighth Amendment standard. *See also Demery v. Arpaio*, 378 F.3d 1020, 1028–29 (9th Cir. 2004*)* (noting that "Turner dealt with convicted prisoners, not pretrial detainees," and that Turner involved an Eighth Amendment cruel and unusual punishment challenge, not a claim brought under the Substantive Due Process Clause of the Fourteenth Amendment.") As the Ninth Circuit observed, "[b]oth distinctions are critical because the Fourteenth Amendment prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment on convicted prisoners." *Id.* (citing *Bell*, 441 U.S. at 535 n.16).

However, "the ultimate question is whether the government's chosen means—the indefinite and solitary confinement of Basciano pending a trial that is unlikely to go forward for at least eighteen months—is reasonably related to its goal of preventing Basciano from continuing to plan or approve violent criminal conduct while in prison . . .." *Id.* at 351. The court concluded that this was not the case, as "indefinite detention in the SHU is an exceptionally harsh method of preventing a detainee from communicating with his alleged criminal associates," and therefore must be "reserved for the most extreme cases." *Id.*

In reaching this conclusion, the court noted that the allegations were serious, but that serious allegations are not sufficient to support such restrictive conditions. The court thus "conclude[d] that the government ha[d] not made a sufficient showing that Basciano was engaged in planning acts of violence while in pre-trial detention" and that there was "little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." *Id.* Pre-arrest violence "might well be sufficient to justify pre-trial detention," but "it is insufficient to justify detention under the harsh conditions present in the SHU." *Id.* at 352. The Court concluded that the government "may not place Basciano in indefinite administrative detention for committing the crimes for which he is charged under this indictment without more substantial proof that he committed these crimes *while in pre-trial detention.*" *Id.* (emphasis added).

In addition to the lack of proof that Basciano had committed violent crimes *in detention*, the Basciano court considered the overwhelming scientific consensus on the "devastating effects" of solitary confinement. *Id.* at 352 (quoting Haney & Lynch, *supra*, 23 N.Y.U. REV. L. & SOC. CHANGE at 531). The court also emphasized that the security restrictions imposed on Basciano were hampering his defense, as the restrictions made it "much more difficult" (both practically and psychologically) to have productive meetings with his attorneys. Given these effects, the Court ruled

that "the government reserve 'the nuclear option' of indefinite solitary confinement until it is clear that less restrictive options have failed to constrain Basciano." *Id.* at 353. In conclusion, the Court held that "Basciano's detention in the SHU [was] not reasonably related to the government's legitimate objective of curtailing Basciano's alleged criminal activities, and that less restrictive means of doing so [were] available to the government." The court thus ordered Basciano's release to general population, subject to "such restrictions as the government deems necessary to prevent him from communicating with other Bonnano family members and associates." *Id.*

A similar situation arose in the prosecution of John Gotti, accused of being a leader of a Mafia crime organization and committing murder, obstruction of justice and witness tampering. *See United States v. Gotti*, 755 F. Supp. 1159 (E.D.N.Y. 1991). For fear that Gotti would continue to utilize communication with others to commit crime while detained, the government segregated Gotti from other pretrial detainees, placed him in a small solitary cell, denied him access to news, and severely curtailed his communication with others. *Id.* at 1160. Gotti asserted the restrictions were effectively punitive, despite the government's facially legitimate reasons. The district court, applying *Bell*, noted the speculative nature of the government's concern:

> The essence of the issue before me is *whether it is enough* to justify placing a pretrial detainee in administrative detention for a stated reason *without providing any basis for the reason.* The cases are legion which caution that courts must give due deference to the expertise of corrections officials in operating their institutions in a manageable fashion. But surely *due deference does not mean blind deference*. If it were otherwise, then any statement of reason offered by a correction official, whether well-founded or not, would justify the imposition of any condition or restriction of confinement and leave the detainee completely vulnerable to arbitrary governmental action. "Prison authorities are not afforded unbridled discretion" because the detainee is either notorious or newsworthy or both.

*Id.* at 1164 (emphasis added). The Court ordered that the restrictions be removed, noting that Gotti had not committed any act while in detention to support the government's speculation of continued danger. Alarmingly, the court highlighted how the fallacy of a government's unfounded justification

based solely on the indictment charges can lead to an "exaggerated" response: "The inevitable and erroneous conclusion to be reached from [the government's] stated reason is that every defendant indicted for murder or witness tampering should be placed in administrative detention." *Id.* at 1165.

Yet another example is the case of *Boudin v. Thomas*, 533 F. Supp. 786 (S.D.N.Y. Jan. 7, 1982). Arrested for armed robbery, Boudin was placed in solitary confinement and cut off to a significant extent from communications with others. The government reasoned that this was necessary due to Boudin's alleged connection with the Black Liberation Army and other terrorist organizations. The Court noted that Boudin's solitary "indeterminate" segregation was unwarranted, as it was based on the government's speculative concern of future criminal acts. As with Mr. Trevino, Gotti, and Basciano, the court noted that Boudin had "not committed any act or engaged in any conduct to suggest a serious threat to life, property, self, staff, other inmates or to the security of the institution. . . [He] has broken no rules, threatened no escapes nor presented any substantiated risk to either the staff or other inmates." *Id.* at 791. The court emphasized that notoriety does not give the government "unbridled discretion" to impose severe and harmful conditions of confinement. *Id.*

In sum, this Court must determine whether the numerous restrictions and disabilities placed upon Mr. Trevino amount to punishment. If so, he has a right to be free of such punishment, because he is presumed innocent and has not been convicted of any crime. Because there is almost never an expressed intent to punish, the Court's determination turns mostly on (1) whether the restrictions are punitive, and (2) whether the restrictions are excessive in relation to their purpose. As in *Basciano* and *Gotti*, the fact that the government can proffer purposes that seem facially legitimate does not end the inquiry. Rather, this Court must also look at whether the restrictions are speculative, or an exaggerated response to the charges in the indictment. Just as in the above cited cases, this Court should conclude that Mr. Trevino's conditions are an unreasonable and excessive response to a speculative concern.

## IX.    Application of Law to Instant Case

This Court's concern should be "the one overriding question presented to it: does the practice or condition violate the Constitution?" *Bell*, 441 U.S. at 544. In this case, the DOJ based extreme restrictions on the notoriety of Mr. Trevino. But "'[p]rison authorities are not afforded unbridled discretion' because the detainee is either notorious or newsworthy or both." *Gotti*, 755 F. Supp. at 1164. Mr. Trevino is presumed innocent and has the same rights as other pretrial detainees. Moreover, the government's actions are based on the charges and language in the indictment, despite the fact that discovery demonstrates that alleged acts occurred fifteen and more years ago, outside prison, and before his indictment. Based on speculation of future criminality, the DOJ unilaterally imposed an "indeterminate" set of restrictions that are not only harmful to Mr. Trevino's mental, emotional, and physical wellbeing, but also significantly impede his right to prepare an adequate defense. The imposition of these restrictions is wholly based on a speculative concern that Mr. Trevino, as an alleged leader of a cartel, will use communication devices and other detainees to perpetuate acts of violence and drug trafficking. After thousands of recorded communications, there is zero evidence that he has done this or intends to do so.

### 1.    The Restrictions on Mr. Trevino Are Punitive in Nature.

The Supreme Court has recognized that there is usually no "showing of an expressed intent to punish." *Bell*, 441 U.S. at 538. There is, however, "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Id.* at 537. As discussed above, "[t]he factors identified in *Mendoza-Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word." *Id.* at 538. Viewing Mr. Trevino's conditions in light of those factors, it is evident that they constitute punishment.

*First*, Mr. Trevino's conditions "involve[] an affirmative disability of restraint[.]" *Mendoza-Martinez*, 372 U.S. at 168 (citing *United States v. Lovett*, 328 U.S. 303 (1946); *Flemming v. Nestor*, 363 U.S. 603 (1960)). As outlined in the Factual Background of this petition, numerous disabilities and restraints have been affirmatively placed on Mr. Trevino as an individual. These include solitary confinement, severe restrictions on communication with his family and lawyers, and the prohibition of most contact with other humans during what is likely to be a prolonged period of pretrial preparation.

*Second*, Mr. Trevino's conditions have "historically been regarded as punishment." *Mendoza-Martinez*, 372 U.S. at 168. Mr. Trevino's conditions are a severe, extreme form of what is typically known as "punitive segregation." In fact, the measures *exceed* what is described in the DF Manual as "punitive detention." For example, "punitive detention" for violations of DF rules results in a **maximum period** of segregation of 15 days. This 15-day limitation, as well as other limitations on the length of punishment, are undoubtedly applied because of the numerous studies that have demonstrated the serious psychological and physical consequences of prolonged isolation. Mr. Trevino's prolonged solitary confinement is thus not only a recognized form of punishment, but also a particularly excessive version of that historical punishment. As discussed above, prolonged solitary confinement has been considered torture, or at least cruel and degrading treatment. Nevertheless, Mr. Trevino has spent *more than 274 days* in this condition, **more than eighteen times** the maximum allowable period of segregation imposed as a punishment in the DF.

*Third*, the restrictions on Mr. Trevino have "come[] into play only on a finding of scienter." *Id.* (citing *Helwig v. United States*, 188 U.S. 605, 610–12 (1903); *Child Labor Tax Case*, 259 U.S. 20, 37–38 (1922)). As the United States Supreme Court has made clear, "[s]cienters are associated with penalties[.]" 259 U.S. at 37. In support of the SAM, the government levies various accusations against Mr. Trevino, asserting that he has both the power and intent to retaliate against witnesses and

cooperators. **Exhibit C** at 2–3. It is that purported *intent*—which is supported only by speculation—on which the restrictions hinge. The restrictions on Mr. Trevino are thus based on a finding of his scienter that has been made without any trial, i.e., a pretrial penalty.

*Fourth*, the restrictions "promote the traditional aims of punishment—retribution and deterrence[.]" *Mendoza-Martinez*, 372 U.S. at 168. Indeed, the government does not hide that its purpose in the SAM is to promote a traditional goal of punishment: specific deterrence. Additionally, as noted above, it is inarguable that the segregation conditions are an extreme form of those that are expressly imposed as punishment in the DF.

*Fifth*, the allegations for which these restrictions have been imposed are "already a crime." *Id.* The SAM document sets forth a variety of criminal allegations against Mr. Trevino, concludes that they are true, and then punishes him for them. However, Mr. Trevino has a presumption of innocence, and whether he is guilty of these allegations and should be punished for them is a decision for the jury, not the DOJ.

*Sixth*, while there is an alternative purpose set forth by those government, that does not end the inquiry. In *Basciano*, for example, the court concluded that "[t]he government's *stated* objective"—preventing the alleged head of the Bonnano family from communicating with the organization— was "clearly legitimate." 369 F. Supp. 2d at 351 (emphasis added). The problem in that case was, as it is here, that there was no proof that Basciano "was engaged in planning acts of violence while in pre-trial detention." *Id.* Consequently, "there [wa]s little or nothing that distinguishes Mr. Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." *Id.* Thus, the government's purposes had facial legitimacy but were speculative at their core.

In Mr. Trevino's case, the government's basis for imposing restrictions is also purely speculative. The SAM imposed on Mr. Trevino clarifies the government's reasoning: (1) Trevino is

charged with committing violent crimes as a leader of a cartel; (2) it is probable that Trevino will use communication devices in the DF and/or other detainees to continue operating the violent cartel; and (3) solitary confinement and severe curtailment of communications is necessary to protect society. In response, two important facts stand out to demonstrate that the government's concern is wholly speculative. First, although the indictment charges that criminal behavior continues to the present, tape recordings and documents provided by the government in discovery point to acts allegedly committed fifteen-plus years ago in 2007–10. Second, there is no evidence to show that Mr. Trevino has used communication devices or other detainees to commit illegal acts while detained in the DF this year, despite thousands of recorded and pre-approved communications.

The Department of Justice has no evidence that Mr. Trevino has sought to violate pre-trial restrictions. For example, there is no evidence that he seeks to communicate any message that would jeopardize the security of the prison, persons, or protected legal interests; and there is no evidence that he attempted to engage in any criminal or unlawful act while in custody. The government's alleged reason for imposing SAMs is pure speculation that Mr. Trevino intends to and will promote violent crimes through his communications. This is contradicted by Mr. Trevino's first six weeks of pretrial detention in the DF, in which he was safely housed in a maximum-security module where he made thousands of monitored communications without any violations. Significantly, Mr. Trevino has been detained for twelve years without any incidents of the type of activity that allegedly forms the basis for the SAM.

In sum, the restrictions placed upon Mr. Trevino are clearly punitive in nature. As the *Bell* Court noted, however, there will usually not be "a showing of an expressed intent to punish," as the correctional authority will usually offer a different reason for the conditions at issue. *Bell*, 441 U.S. at 538. Consequently, this Court must look to whether the restrictions on Mr. Trevino are "reasonably related" to the government's purported purpose or whether they are "excessive in relation to the

alternative purpose." *Id.* at 538–39. If they are excessive and unreasonable, they are unconstitutional.

**2. The Restrictions on Mr. Trevino Are Unreasonable and Excessive in Relation to their Supposed Purpose.**

The stated purpose of the SAM is to prevent Mr. Trevino from engaging in communications that could result in death or serious injury. "Thus, the ultimate question is whether the government's chosen means—the indefinite and solitary confinement of [Mr. Trevino] pending a trial that is unlikely to go forward for at least eighteen months—is reasonably related to its goal of preventing [him] from continuing to plan or approve violent criminal conduct . . .." *Basciano*, 369 F. Supp. 2d at 351. This Court should "hold that it is not. Indefinite definition in the SHU is an exceptionally harsh method of preventing a detainee from communicating with his alleged criminal associates." *Id.*

As a starting point, the excessiveness of these conditions is demonstrated by the fact that Mr. Trevino has spent more than eighteen times the days in segregation than the DR's regulations allow for express punishment. Troublingly, because Mr. Trevino's SAM were imposed by the Department of Justice—not the DF—Mr. Trevino has none of the recourse that is available to other detainees. For example, the DF's Manual authorizes the DF to regularly review the status of prisoners who are in administrative segregation to decide whether they should be assigned to general population, or whether certain of their privileges can be restored. An outlier, Mr. Trevino remains in onerous conditions without any right to a review by DF administrators of his conditions.

Mr. Trevino's conditions are among the harshest imaginable. Like the defendant in *Basciano*, Mr. Trevino is in solitary confinement for an indefinite period. Exacerbating Mr. Trevino's isolation, however, is his lack of access to communication and materials in his native tongue. These isolating conditions are negatively affecting his psychological and physical state, a harm that is compounded by the fact that Mr. Trevino court case is extremely complex and, therefore, is expected to take a considerable amount of time to resolve. Most critically, Mr. Trevino's conditions almost completely

restrict his relationship with his family. Furthermore, they reduce his ability to adequately prepare his defense, as they limit his ability to consult with lawyers and experts of his choice, while also creating a distracting amount of psychological stress. These restrictions on Mr. Trevino fall into two categories, each of which are excessive in relation to the government's stated purpose.

*First*, Mr. Trevino is under numerous negative conditions that are completely unrelated to his communications. Although Mr. Trevino is supposedly not in punitive segregation, his strict conditions suggest otherwise. Mr. Trevino is limited to his cell, where he must eat all his meals. The lights are on twenty-four hours a day in Mr. Trevino's cell, interfering with his sleep. Mr. Trevino has no access to programs available to other pretrial detainees, and thus is unable to occupy his mind with education or recreation. Due to his isolation, Mr. Trevino can only bathe twice a week, limiting his access to appropriate sanitation. These conditions, which have no relationship *whatsoever* with the purported risk of his communications, *a fortiori* bear no *rational* relationship to the stated purpose of the SAM. *Second*, Mr. Trevino is under onerous conditions related to his communications, including extreme restrictions on both his contact with loved ones and with his Mexican lawyers, despite ongoing legal proceedings in Mexico. Although theoretically related to the government's purpose, these restrictions are not reasonable.

When considering whether Mr. Trevino's conditions are reasonable or excessive, it is useful to consider the Supreme Court's analysis in *Turner*. In that case, prison officials had identified actual "legitimate security concerns," but the restrictions placed on prisoners were "an exaggerated response to such security objectives." *Id.* at 97–98. Before reaching this conclusion, the United States Supreme Court in *Turner* applied four factors. Applying those same factors to Mr. Trevino's conditions, it is evident that his restrictions are unreasonable and excessive.

"First, there must be a 'valid rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v.*

*Rutherford*, 468 U.S. 576, 586 (1984)). "[A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational" *Id.* Additionally, "the governmental objective must be a legitimate and neutral one." *Id.* As discussed above, safeguarding the life and property of individuals is a legitimate government interest. In this case, however, the legitimate government interest has no valid rational connection to the restrictions on Mr. Trevino for several reasons.

One, as detailed above, the restrictions are based on unfounded speculation and unsubstantiated assumptions. Before being deported to the United States, Mr. Trevino Morales was held in various Mexican federal detention centers for a period of more than eleven years, a period during which he did not violate prison rules by attempting to escape or endangering the security of the prisons or the personnel working in those institutions. Although Mr. Trevino was charged with various crimes, he was acquitted in its all cases arising from his alleged participation in the Gulf Cartel, the Zetas, or "La Compañía." Simply put, the SAM is based on acquitted conduct, rendering it arbitrary and irrational, as opposed to logical and reasonable.

Two, most of Mr. Trevino's restrictions are unrelated to the purported goal of preventing him from communicating about threats and violence. Specifically, Mr. Trevino's severe solitary confinement conditions—including twenty-four-hour lighting, shackling, and deprivation of programs and education—have nothing to do with the supposed goal. Additionally, the strict limitations on Mr. Trevino's ability to communicate with his lawyers and family members who have never been accused of participating in organized crime are so remote from the government's stated purpose as to render them arbitrary and irrational.

"A second factor relevant in determining the reasonableness of a prison restriction . . . is whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. The current SAM restrictions are unreasonable because they leave no alternative means open to

37

Mr. Trevino. With respect to communication, Mr. Trevino's contact with his immediate family has been restricted to twice a month, and sometimes only once a month, for a very short period (approximately 20 minutes). In addition, the SAMs prevent Mr. Trevino's family members from communicating with any third party (even other family members) about their conversations, further isolating Mr. Trevino from family matters unrelated to the objectives of the SAM (to prevent threatening or violent acts).[17]

Furthermore, Mr. Trevino is completely prohibited from speaking to any other member of his family not considered "immediate family."[18] The prohibition includes his grandchildren, nephews, cousins, uncles, brothers-in-law, sisters-in-law, daughters-in-law, and sons-in-law. There is no provision for Mr. Trevino to communicate with friends or the press. That is, he is left with no alternative to communicate with such persons. Given that Mr. Trevino's approved immediate family members cannot discuss their communications with him, he cannot send greetings to anyone. Regarding Mr. Trevino's conditions of confinement, solitary confinement leaves him with no alternative means to live a healthy and productive life in pretrial detention. The stated purpose of the SAM's is to prevent Mr. Trevino from "having contact . . . that could reasonably foreseeably result in [him] communicating . . . threatening or other violence-related information." [19] Again, it is important to recognize that the SAM does not prevent contact with all the persons; under the SAM's own verbiage, Mr. Trevino could be allowed human contact with persons that are previously classified as those that would not include reasonably foreseeable communications threatening or otherwise including violence-related information, which is the same classification that the Department of Justice has in the clearance process for attorneys and paralegals.

---

[17] Exhibit C at 10 ("Inmate's Non-legal Contacts").
[18] Exhibit C at 10. "The inmate's 'immediate family members' are defined as the inmate's (USMS/BOP/DF -or DEA- verifiable) spouse, children, parents, and siblings. Request for additional non-legal contacts may be submitted and will be considered on a case-by-case basis." *Id.* at 10 n.7.
[19] Exhibit C at 4.

Rather than navigate what restrictions would be reasonable in this context, the DOJ has decided that Mr. Trevino must be indefinitely segregated in solitary confinement. This implementation leaves Mr. Trevino no other options for communication, social connections, education, or programming, constituting a severe infringement of his constitutional rights to freedom of speech, association, and personal relationships.

On this factor, The United States Supreme Court's decision in *Overton v. Bazzetta*, 539 U.S. 126 (2003) is instructive. In that case, high-security sentenced prison inmates challenged restrictions on visitation. *Id.* at 130–31. The Court acknowledged "that the Constitution protects 'certain kinds of highly personal relationships,' but applied the *Turner* factors to determine whether the restriction was reasonable. *Id.* at 131–33. When assessing whether the inmates had alternatives means to exercise their rights, the Court looked to the many other ways in which the inmates were allowed to communicate: "sending messages through those who are allowed to visit," "by letter," and "telephone." *Id.* at 135. But, the Court noted, "*[w]ere it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable.*" *Id.* at 135 (emphasis added).

In sum, because Mr. Trevino has no alternative means of communication, he has substantial evidence that the restrictions on him are unreasonable. Mr. Trevino has *no* means to communicate with all but the most select few people, who in turn cannot communicate about their conversations with him. Mr. Trevino also has no means of social contact, no accessing to programming or education, and no alternative means of achieving the social and mental stimulation of which solitary confinement famously deprives people. This indefinite denial of alternatives weighs heavily in favor of a finding that the restrictions are unreasonable.

"A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482

U.S. at 90. This factor has three component parts: (i) the impact on guards; (ii) the impact on other inmates; and (iii) the impact on the allocation of prison resources.

Regarding (i) the impact **on guards**, removing Mr. Trevino from indefinite solitary confinement would have no impact. Each area of the DF has surveillance points from which inmates are consistently observed, as well as video surveillance and real-time monitoring. Thus, no additional guards would be needed to watch Mr. Trevino. Similarly, allowing Mr. Trevino more access to communications would not impact the guards, as DF staff could monitor one or more calls a day without additional expense or staffing. Similarly, videocalls with authorized visitors are paid for by visitors and scheduled at least twenty-four hours in advance, existing measures that ensure that the calls are appropriate and that any necessary staff are available. Thus, allowing more calls and video visits to Mr. Trevino would not have an impact on the guards, as these communications would be conducted in accordance with the rules and procedures already established in the DF.

Regarding (ii) the impact on **other inmates**, removing Mr. Trevino from solitary confinement and granting him more access to communication would have no impact. Most importantly, Mr. Trevino has had *no* incidents involving other inmates and has no record of negatively affecting the rights or privileges of other detainees. Additionally, increasing his access to communications would have no effect on other inmates. For example, in the maximum-security unit where Mr. Trevino was held prior to the imposition of SAM, there were two public telephones and two booths for video visits. The maximum-security units are units with twelve cells or rooms, each of which is for two people. Most of the time these units are not at maximum capacity. In these modules, a process for call scheduling is already in place. The calls are scheduled by cell number, making it both routine and easy to integrate any inmates moved into the module. Additionally, although each security level has different rules regarding tablet access, inmates throughout the jail have access to personal tablets from which they can make a certain number of calls. Because other inmates have extensive access to the

phone and tablets, giving Mr. Trevino increased access to communications will not impede their ability to communicate.

Similarly, increasing Mr. Trevino's access to video visits would have no impact on other inmates. Because the DF has no contact visitation, all visits are through video. However, video visits require advance authorization and scheduling, making it easy to integrate another detainee into the schedule. Additionally, video visits cost approximately $8 for 20 minutes, payable by the visitor, a prohibitive cost that means few video visits are scheduled, because that cost is charged to the visitor and not to the inmate; the same applies in scheduling video-visits, it is the visitor who can schedule them, the inmate cannot schedule the visit. Because inmates have no control over the visits they receive—all they do is check to see if their name is on the list—allowing Mr. Trevino communications would not impact them.

Finally, with regard to (iii) the impact on *the allocation of prison resources*, Mr. Trevino's requests would not have a negative impact on the resources of the DF, as the detention center has not had to expend special resources for Mr. Trevino's custody either before or after the imposition of the SAM. Similarly, allowing Mr. Trevino regular phone calls and video visits would not have a negative impact on the DF's resources because, as explained above, the DF has sufficient capacity to meet the communication needs of all its inmates, and there is a perfectly defined and functional system that allows all inmates to communicate in an orderly manner under established security guidelines. Moreover, all communications are paid for by Mr. Trevino and his family. Thus, allowing Mr. Trevino to maintain regular communication with his family and authorized persons would not require the DF to allocate special resources.[20]

---

[20] The SAM currently require contemporaneous monitoring of calls by both an approved interpreter and the DEA. Exhibit C at 10–11. The SAM also notes that "[a]rranging for an interpreter/translator may require at least fourteen (14) days' advance notice." *Id.* at 10. The DF has approved staff who are fluent in Spanish and English and who currently supervise Mr. Trevino's calls and video visits, so the DF would not have to expend any additional resources. Moreover, Mr. Trevino has had calls both scheduled and rescheduled promptly by the DF, indicating that the DF does not need

The final *Turner* factor is whether there are alternatives to the restrictions that are currently in place. "[T]he existence of obvious, easy alternatives may be evidence that the regulation is not reasonable but is an 'exaggerated response' to prison concerns." *Taylor*, 482 U.S. at 90; *see also Bazzetta*, 539 U.S. at 136 (noting that the petitioner need not prove a less restrictive alternative, but rather "point [] to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."). The issue of whether there are reasonable alternatives dovetails with the question of "excessiveness," one of the Court's concerns in *Martinez-Mendoza*. In this case, there are obvious, easy alternatives to Mr. Trevino's current conditions, meaning that solitary confinement is an excessive and exaggerated response.

When evaluating the alternatives to solitary confinement, it is important to consider what restrictions are truly necessary to prevent the type of communications at which the SAM is directed. The SAM provide the following "Inmate Communication Prohibitions:"

> The inmate is limited, within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from **having contact** (including passing or receiving any oral, written, or recorded communication) **with any other inmate, visitor, attorney, or anyone else**, except as outlined and allowed by this document, **that could reasonably foreseeably** result in the inmate communicating (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other violence-related information.[21]

By its own terms, the purpose of the SAM is not to prevent Mr. Trevino from having contact with *anyone*, but rather to prevent Mr. Trevino from having contact with any other inmate that could *reasonably result* in threats or violent communications. This can easily be achieved without the need to chain him up and throw him in a dungeon. There are alternatives that are easy to implement and

---

fourteen days advance notice to monitor his communications. Therefore, the only impediment to Mr. Trevino receiving a minimum of one call and one video visit per day is the arbitrary and punitive implementation of the SAM.
[21] Exhibit C at 4 (emphasis added)

perfectly achieve these ends, since SAMs do not establish a total prohibition on all inmate communications, but rather only those that *could reasonably* convey a violent or threatening message.

Therefore, reasonable alternatives to solitary confinement are those that release Mr. Trevino from solitary but allow him to live with inmates with whom he is not reasonably foreseeably likely to have such communications. Just as the Department of Justice screens and clears Mr. Trevino's lawyers, paralegals, and various translators, measures can be taken to ensure that Mr. Trevino lives with selected inmates. In fact, according to §5 of the DF Inmates Manual, inmates are already classified by the Classification Department with a review of their history, current charges, and personal needs.

For example, in the DF, there are at least twelve modules, each of which houses between 24 and 70 detainees. Among these modules are special modules, minimum-security modules, medium-security modules, and maximum-security modules. Mr. Trevino could be returned to maximum security, where he was housed for the beginning of his detention without incident. The DF also could easily vet inmates for housing within the same module as Mr. Trevino, ensuring that he is classified with inmates who are not reasonable risks to communicate violence or threats.

In fact, within the maximum-security module, there is already a section called "premier," where the best-behaved and most trustworthy inmates among the people in maximum security are placed. To be placed in this unit, the DF conducts a scrupulous screening of inmates who have no history of misconduct, non-compliance, or jeopardizing the security of the facility or other inmates. The inmates are thus verified to have excellent behavior, be respectful of the DF, and not have committed any violations of the DF rules. Because of their good behavior, inmates in this module have more privileges than other maximum-security inmates, including access to a personalized tablet five days a week. These inmates are highly incentivized to maintain their status and privileges and would not reasonably be willing to lose their benefits by attempting to circumvent the SAM's

intentions. In addition, if Mr. Trevino were housed in this module, this Court could order the DF to instruct all inmates in the module to report any attempted violations.

In other words, the DF already maintains a special maximum-security unit that is designed for inmates who are unlikely to engage in prohibited behavior. The inmates assigned to this unit are not people who could *reasonably* be persuaded to incite violence or communicate any threatening or violence-related messages. Rather, both their histories and incentives strongly predict that they would not reasonably engage in such behavior. Mr. Trevino has a lengthy pretrial detention history without incident, and thus this maximum-security unit is an easy and obvious alternative for him. Finally, placing Mr. Trevino in that special maximum-security unit would not entail any significant or disproportionate cost, as this unit is already maintained within the DF's normal operations.

Another alternative is for Mr. Trevino to be housed in a module for English-speaking detainees only, where it would be impossible for Mr. Trevino to persuade others to commit improper acts. Another option is for Mr. Trevino to be housed in a unit that houses detainees who are cooperating in other cases, as such individuals would be unwilling to assist him in any wrongful act and would, in fact, report any such attempt to the government.

With regard to the restrictions on Mr. Treviño's communications, whereby he is currently only allowed one or two calls per month, and he has only been granted sixteen communications in more than 274 days of segregation, an easy and obvious alternative is to allow at least one call and one video visit per day. Since the DF has Spanish-speaking staff and communications are paid for my inmates and their families, daily communications would not involve any extraordinary effort and would have no impact on the prison's resources. Furthermore, the SAMs establish a minimum of one call per month but do not establish a limit of *maximum* calls, indicating that there is not even an *alleged* governmental purpose for limiting the number of calls to two per month.

In sum, the SAMs and their application are unreasonable and excessive because (i) there is no valid and rational connection between the legitimate governmental interests they seek to protect and the restriction of Mr. Trevino's rights; (ii) they leave no alternative for the exercise of constitutionally protected rights; (iii) there are alternatives to these restrictions that would not have any impact guards, other inmates, or on prison resources; and (iv) these alternatives are obvious and easy to implement, demonstrating the Department of Justice's exaggerated response to safeguard the legitimate interests it pursues. Additionally, extensive scientific research establishes that solitary confinement is inhumane and dangerous, a factor that has weighed heavily in prior decisions holding that it is an excessive restriction for a high-profile pretrial detainee. As the district court noted in *Gotti*, neither newsworthiness nor notoriety confer unbridled discretion to deprive a person who is presumed innocent of their basic rights.

## CONCLUSION

For these reasons expressed above, Mr. Trevino respectfully requests that this Court grant Mr. Trevino's motion for relief from unconstitutional special administrative measures, revoke the SAM as punitive and unconstitutional measures, order that he be removed from solitary confinement and given the opportunity for daily communication with his family, and order that he placed in general population or any module the Court deems necessary.

Respectfully submitted,

*/s/ Michael McCrum*

Michael McCrum                          William B. Purpura, Esquire
McCrum Law Office                       Purpura & Purpura
1659 Tx-46 W, Ste. 115                  606 Baltimore Ave.
PMB 487                                 Suite 301
New Braunfels, Tx. 78132                Towson, Maryland 21204
Office 210.225.2285                     Office 410-727-8550
Tx Bar No. 13493200                     DC Fed Bar # MD00074
michael@mccrumlegal.com                 wpurpura@purpuralaw.com

*Counsel for Miguel Angel Treviño Morales*

## CERTIFICATE OF SERVICE

I, Michael McCrum, hereby certify that on this January 17, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Michael McCrum*