# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 08-CR-057 (TNM)** |
| v. | |
| **MIGUEL TREVINO MORALES,** also known as "Z-40," "Zeta40," "40," "Cuarenta," "Mike," | |
| **Defendant.** | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELIEF FROM SPECIAL ADMINISTRATIVE MEASURES

The United States respectfully submits this Opposition to Defendant Miguel Trevino Morales's ("Defendant") Motion for Relief from Special Administrative Measures ("Motion" or "Mot."). ECF No. 780. The Motion should be denied for two independent reasons. First, the Defendant has failed to exhaust his administrative remedies. And second, the Special Administrative Measures imposed by the Attorney General are reasonably related to the Government's legitimate interest in preventing death or serious bodily injury to others. Special Administrative Measures were created for individuals like the Defendant. He was a leader of an incredibly violent drug cartel, which is a designated foreign terrorist organization; has operated his organization both while in and out of custody; and has employed violence, kidnapping, and torture to retaliate against witnesses and law enforcement. There is substantial risk that the Defendant's communications or contacts with certain third parties could result in death or serious bodily injury, including potential witnesses in this case.

## FACTUAL BACKGROUND

**A. The Defendant's Conduct in Mexico**

The Defendant is a leader of a violent international drug trafficking organization based in Mexico known at various times as The Company, the Zetas, and the Cartel del Noreste ("CDN").[1] As the evidence at trial will show, the Defendant worked his way up the cartel's ranks. By 2008, the Defendant was second in command of the Zetas, and he assumed the cartel's leadership after the Zetas' prior leader was killed in 2012. Though the Defendant was arrested in 2013, he continued to direct the cartel's activities from Mexican prison until his expulsion to the United States on February 27, 2025. *See* Fifth Superseding Indictment, ECF No. 578 ¶¶ 1-6.

Under the Defendant's leadership, and at his direction, the Zetas and CDN carried out numerous acts of violence, including murders, assaults, kidnappings, assassinations, and torture. They did so for a variety of reasons, including (1) to promote the cartel's prestige with respect to rival criminal organizations; (2) to protect and expand the cartel's power, territory, and criminal ventures; (3) to keep victims, rivals, and law enforcement in fear of the cartel, their members, and their associates; (4) to discipline members and associates by punishing disloyalty and failure; (5) to enrich the members and associates of the cartel through criminal activity, including narcotics trafficking, theft, extortion, and human smuggling; and (6) to seek reprisal against elected and public officials, members of the military and law enforcement, and others for failing to provide services to the cartel. *See* ECF No. 578 ¶ 7.

---

[1] On February 20, 2025, the U.S. Department of State designated the "Cartel del Noreste (also known as CDN, Northeast Cartel, Los Zetas)" as Specially Designated Global Terrorists that have "committed or have attempted to commit, pose a significant risk of committing, or have participated in training to commit acts of terrorism." 90 Fed. Reg. 10,030 (Feb. 20, 2025).

The Defendant not only directed and oversaw this violence, but often personally inflicted it himself, frequently in spectacular fashion. At trial, the Government will present evidence that the Defendant killed—or ordered the killing of—not just fellow drug traffickers, but also politicians, law enforcement officials, prosecutors, and innocent civilians. *See, e.g.* ECF No. 578 ¶¶ 11, 12, 14 (alleging such killings). For instance, as alleged in the Fifth Superseding Indictment, the Defendant and his brother, co-defendant Omar Trevino Morales ("Omar"), "executed dozens of residents living around Allende, a small town in Coahuila, Mexico, in approximately March 2011." ECF No. 578 ¶ 7. As the evidence will show at trial, the killings occurred because the Defendant suspected that a cartel member had provided information about the Defendant to U.S. law enforcement. Upon developing this suspicion, the Defendant led a convoy of armed gunmen to the town of Piedras Negras, Coahuila, where they kidnapped several of the suspected informant's relatives and associates. The Defendant ordered his men to bring the kidnapped victims to a soccer field on the edge of town where they were executed by gunshot. The victims included children and others who were not involved in drug trafficking. In the days that followed, the Defendant sent gunmen to the nearby town of Allende, where they killed dozens more residents, many of whom also had no direct relationship to the cartel or drug trafficking. In doing so, the Defendant broadcast the message that he and his cartel would punish cooperation with law enforcement with death—not just the death of the person suspected of cooperating, but that of their relatives, associates, and others only tangentially connected to them.

Mexican authorities arrested the Defendant in 2013. Though the defense characterizes the Defendant as a "model detainee," Mot. at 6, the Fifth Superseding Indictment charges that the Defendant "continued to control the Cartel"—which he renamed the Cartel del Noreste—while in custody. ECF No. 578 ¶ 3; *see id.* 578 ¶¶ 10, 30 (alleging criminal conduct up to August 20, 2024,

3

the date of indictment); *id.* ¶ 28-29 (alleging CCE violations occurring in January and April 2024).[2] At trial, the Government will present evidence that the Defendant and his brother Omar[3] bribed officials running the facilities in which they were incarcerated, including the director of at least one high-security prison, and that the Defendant used intermediaries to pass messages and orders to cartel members on the outside. These orders included not just the arranging of so-called "pollas"—or drug loads—destined for the United States, but also included orders, among other things, to kill (1) one of the witnesses on a pending Mexican criminal case against the Defendant and (2) a formerly allied drug trafficker, who had switched allegiances to a different cartel.

### B. The Government's Charging, Arrest and Detention of the Defendant

The Defendant was first charged in this district in an indictment returned on March 13, 2008. ECF No. 3. On August 20, 2024, a grand jury returned a Fifth Superseding Indictment against the Defendant and his brother Omar charging them with, among other things, a Continuing Criminal Enterprise under 21 U.S.C. § 848. ECF No. 578. The Continuing Criminal Enterprise charge alleges five separate murder violations, *see* ECF No. 578 ¶¶ 11-15, as well as fourteen narcotics distribution violations, *id.* ¶¶ 16-28, and it carries a mandatory minimum penalty of life imprisonment.

On or about February 27, 2025, the Defendant was expelled from Mexico, transported to the United States, and arrested by U.S. authorities. The Defendant has been held at Northern Neck Regional Jail ("NNRJ") in Virginia since his arrival in the United States. *See* Min. Entry (Feb. 28,

---

[2] Throughout his Motion, Defendant also argues that he should not be subject to SAMs because he was allegedly acquitted of some charges in Mexico. But the outcome of certain judicial proceedings in Mexico has no bearing on whether the United States possesses the requisite evidence to convict the Defendant of violations of U.S. law and to justify the imposition of SAMs while that Defendant is in U.S. custody.

[3] Omar Trevino Morales was arrested in 2015.

2025) (defendant conceded detention).

On April 15, 2025, the Attorney General approved the imposition of SAMs as to the Defendant. *See* Ex. A (April 15, 2025, Origination of SAMs as to Defendant). By regulation, SAMs "ordinarily may include housing the inmate in administrative detention and/or limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." 28 C.F.R. § 501.3(a). As relevant here, the Attorney General found that "there is substantial risk that [the Defendant's] communications or contacts with persons could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons." *See* Ex. A at 3. Based on that finding, the SAMs restrict the Defendant's communications with persons who are not on his legal team and permit the Defendant to have non-legal visits and telephone calls only with his immediate family members, which must be contemporaneously monitored by the Drug Enforcement Administration ("DEA"). *See id.* at 4-12. The SAMs further provide that the Defendant is not allowed to share a cell with another inmate; shall be limited, subject to reasonable efforts and existing confinement conditions, from communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates; and shall be kept separated from other inmates as much as possible while in the cellblock area. *See id.* at 14.[4]

The SAMs provide that the Defendant may have, at minimum, one phone call a month with immediate family members. Ex. A, at 10 ¶ 3a.ii. NNRJ, in consultation with DEA, has arranged

---

[4] The Defendant seems to misread the SAMs: He argues that NNRJ has improperly exceeded the scope of its own policies and the SAMs by implementing measures that reduce his contacts with all other inmates. *See* Mot. at 13-14. But, as noted, that is what the SAMs require, based on the Attorney General's finding of substantial risk of death or serious bodily injury.

5

for the Defendant to have two fifteen-minute calls with family members every two weeks.[5] There are currently no restrictions on the amount of mail the Defendant may receive from approved family members. Further, the DEA and NNRJ have made every effort to accommodate the defense team's meetings with the Defendant. To date, sixteen individuals have been approved to visit the Defendant (including attorneys, paralegals, investigators, and his co-defendant's attorneys) and, from the implementation of the SAMs to January 30, 2026, the Defendant has received 241 in-person visits from his attorneys and their legal staff (which amounts to nearly one visit per day). On some days, the Defendant has had nearly seven hours of visits, and, in some weeks, he has had as many as 40 hours of visitation time. Defendant's claim that he has been placed in "solitary confinement" and subjected to "psychological torture" is unfounded. Mot. at 8, 18.

Finally, though the defense asserts that the Defendant has been subjected to "cruel and degrading treatment" because the "lights are on twenty-four hours a day in Mr. Trevino's cell," Mot. at 11, the Defendant is held in a cell similar to every other cell within the NNRJ. According to uniform protocol within the facility, the lights go on at 6:00 a.m. and dim at 11:30 p.m. The same is true of the lights in every other cell at NNRJ, including the one that the Defendant occupied prior to implementation of the SAMs. Further, per facility policy, the Defendant is shackled when moving from one location to another in the facility, but the restraints are removed upon his arrival to his destination. Approximately two months ago, the Defendant submitted a request to have his restraints removed during visits. The facility granted the requested. The Defendant is not restrained when in his cell, receiving visitors, in the shower, or in the recreation area.

---

[5] In addition, at the Defendant's request, NNRJ and DEA recently re-arranged the Defendant's ordinary call schedule to permit him to speak with his mother at an unscheduled time because she was reportedly in ill health. Further, the facility and DEA recently resolved a technical issue and anticipate that future calls can be video calls, rather than audio-only phone calls, should the Defendant prefer a video call.

On December 19, 2025, the Defendant submitted a grievance to NNRJ, asking to be moved to "general population" and have daily phone and video calls. According to the defense, this request was rejected by the jail administrator, but the appeal is "pending." Mot. at 2. He filed his Motion for Relief from the SAMs on January 17, 2026. ECF No. 780.

## ARGUMENT

The Motion should be denied because: (1) the Defendant has failed to exhaust administrative remedies and (2) the SAMs do not infringe upon the Defendant's constitutional rights.

### I. THE DEFENDANT HAS FAILED TO EXHAUST ADMINISTRATIVE REMEDIES

The Prison Litigation Reform Act of 1995 ("PLRA") applies to "any person incarcerated or detained in any facility who is accused of . . . violations of criminal law." 42 U.S.C. § 1997e(h) (emphasis added). "[T]his . . . includes pretrial detainees." *Ardaneh v. U.S. Gov't*, No. CV 19-1786, 2020 WL 7316123, at *3 (D.D.C. Dec. 11, 2020), *aff'd* 848 F. App'x 7 (D.C. Cir. 2021).

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under . . . any . . . Federal law . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Thus, "[a]n inmate . . . may not bring any action [regarding prison conditions] absent exhaustion of available administrative remedies." *Ross v. Blake*, 578 U.S. 632, 638 (2016). "[P]risoners must . . . exhaust all 'available' remedies, not just those that meet federal standards." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). The requirement's purpose "is to improve prison administration, filter out frivolous claims, and clarify the contours of controversies for cases that

are ultimately brought to court." *United States v. Al-Marri*, 239 F. Supp. 2d 366, 367 (S.D.N.Y. 2002).

While there is currently a split in authority as to whether a motion in a criminal case is an "action" subject to the PLRA's exhaustion requirements, *see, e.g.*, *United States v. Ghailani*, 751 F. Supp. 2d 508, 512 & n.20 (S.D.N.Y. 2010) (citing authorities), the better view is that "Congress wished to apply the PLRA's deterrent effect to prisoners' complaints, regardless of the type of pleading filed by the prisoner to obtain relief." *In re Nagy*, 89 F.3d 115, 117 (2d Cir. 1996). Thus, a "defendant must exhaust his administrative remedies before challenging . . . SAMs in federal court," whether that is by motion in a criminal case or a separately filed civil case. *United States v. Ali*, 528 F.3d 210, 244 (4th Cir. 2008); *see also, e.g.*, *United States v. Ali*, 396 F. Supp. 2d 703, 707 (E.D. Va. 2005) (denying pre-trial motion challenging SAMs for failure to exhaust); *Al-Marri*, 239 F. Supp. 2d at 367 (same).[6]

Here, the defense concedes that the Defendant has not exhausted the available administrative remedies. *See* Mot. at 2 (stating that the administrative appeal of his grievance remains "pending"). Indeed, "[f]ederal regulations prescribe a mechanism by which inmates may appeal SAMs." *Ali*, 528 F.3d at 244. Specifically, they provide that "the affected inmate may seek review of any special restrictions imposed . . . through the Administrative Remedy Program,"

---

[6] Even if some motions were exempt from the PLRA's exhaustion requirement, a motion that challenges "aspects of prison life that have no bearing on the ability of the court to manage the criminal prosecution" are not. *United States v. Savage*, No. CRIM.A. 07-550-03, 2010 WL 4236867, at *6 (E.D. Pa. Oct. 21, 2010). Such a motion is effectively "an attempt to commence a new civil action that must comply with the PLRA, even if it is stylized as a motion in a criminal case." *Id.* Defendant's Motion is such a motion: As described below (see note 7, *infra*), it contains no meaningful argument that the SAMs impede the Defendant's ability to mount a defense, and, instead, challenges the Defendant's conditions of confinement as unduly punitive and for other reasons unrelated to the ongoing prosecution.

8

28 C.F.R. § 501.3(e), which provides for a grievance and appeal process, *see* 28 C.F.R. §§ 542.10 *et seq*. Because the Defendant has not exhausted these administrative remedies, the Court should dismiss the Defendant's Motion without prejudice.

## II.     THE SAMS DO NOT VIOLATE THE DEFENDANT'S CONSTITUTIONAL RIGHTS

If the Court does address the Defendant's challenge despite his failure to exhaust his administrative remedies, it should hold that the SAMs do not violate the Defendant's constitutional rights. To determine whether a prison regulation unconstitutionally "burdens fundamental rights," the reviewing court asks whether the regulation is "reasonably related to legitimate penological objectives." *Turner v. Safley*, 482 U.S. 78, 87 (1987); *United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000). "Where the regulation at issue imposes pretrial . . . restrictions . . . , the 'legitimate penological interests' served must go beyond the traditional objectives of rehabilitation or punishment." *Id.* at 81.

In *Turner*, the Supreme Court identified four factors to evaluate whether a regulation is reasonably related to legitimate penological objectives: (1) whether a valid, rational connection exists between the regulation and a purported government interest; (2) whether alternative means of exercising a constitutional right remain available to a prisoner; (3) whether accommodation of the right asserted by the prisoner will have a significant impact on the prisoner's fellow inmates, prison staff, or prison resources; and (4) whether there is an absence of ready alternatives to the regulation. *Turner*, 482 U.S. at 89-91; *see also El-Hage*, 213 F.3d at 81 (recognizing four-factor test in *Turner* as the standard by which SAMs restrictions should be reviewed). "This is not a 'least restrictive alternative' test." *Turner*, 482 U.S. at 90. Prison officials do not "have to set up and then shoot down every conceivable alternative method of accommodating [a] claimant's constitutional complaint." *Turner*, 482 U.S. at 90-91. Instead, "if an inmate claimant can point to

9

an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

Here, the Defendant claims that the SAMs are unconstitutional because they are "punitive in nature." Mot. 31.[7] They are not. Instead, they are reasonably related to the Government's interest in preventing the defendant from contacting persons associated with the cartel and other intermediaries who could cause death or serious bodily injury to potential witnesses and their families. No reasonable, alternative means of serving this interest exists.

### A. The SAMs Are Reasonably Related to a Non-Punitive, Penological Interest

Here, the Attorney General directed the U.S. Marshals Service to implement SAMs because she found that there was sufficient evidence that the Defendant's communications or contacts with others could result in death or serious bodily injury to persons, or substantial damage to property that would entail the risk of serious bodily injury to persons. *See* Ex. A at 1-4. This is a legitimate, non-punitive interest. *See, e.g.*, *Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446 (E.D.N.Y. 2008) (noting that "preventing harm" and "inhibiting [a defendant's] ability to oversee the operations of [a criminal organization], widely known for its propensity to order and commit violent acts, are legitimate purposes"). That is particularly so where, as here, the defendant has a history of retaliating against witnesses and running a criminal organization from prison. Under the *Turner* test, the SAMs are reasonably related to this non-punitive, penological interest.

---

[7] In addition to asserting that the SAMs are punitive in nature, the Defendant also alleges that the SAMs inappropriately "reduce his ability to adequately prepare his defense." Mot. at 36. He does not, however, meaningfully support that claim. Nor could he. The SAMs pose no restrictions on whom the Defendant may hire as his attorneys of record and require only that legal support staff pass a criminal background check, which in all instances thus far they have done. Moreover, as described above, the Defendant has had hundreds of visits from his lawyers and his legal team.

There is a valid, rational connection between the SAMs and the government's interest in inhibiting the Defendant's ability to harm others. Specifically, the challenged communication and contact restrictions are reasonably necessary to ensure that others do not transmit, whether intentionally or inadvertently, forbidden messages from the Defendant to third parties. Courts have long recognized this concern as a legitimate justification for the imposition of SAMs. *See, e.g. Basciano*, 530 F. Supp. 2d at 440, 446-47 (upholding SAMs where defendant demonstrated ability to pass messages in coded language to order violence); *Ali*, 396 F. Supp. 2d at 709 (upholding restriction where criminal organization had "train[ed] its followers to use a variety of means to communicate with their confederates from prison"); Memorandum Decision & Order, ECF No. 71 at 5-6, *United States v. Joaquin Archivaldo Guzman Loera*, No. 09-CR-466 (E.D.N.Y. May 4, 2017) ("Regarding the visitor and communication restrictions, the Government has expressed a reasonable concern that without such restrictions, there is a possibility that defendant may pass encoded messages to his co-conspirators, which is a concern several courts have recognized.").

There is no reasonable, alternative means of serving this legitimate interest, and any alternative means would have a significant, negative impact on fellow inmates and facility staff and resources. Allowing the Defendant to remain in the prison's general population, with his notorious history of leading a violent drug trafficking organization with access to vast financial resources, would put other inmates and prison guards at risk and would markedly strain prison resources to stop illicit communications from the Defendant. Each pod, or section of NNRJ, contains over twenty other inmates. The facility has no ability to intercept or overhear every conversation between the Defendant and other inmates, let alone monitor all the communications of every one of those inmates to the outside world. The resources needed to monitor the

Defendant's communications with other inmates, who may try to curry favor with the Defendant by passing messages from him or feel intimidated to ferry out secret communications from the jail on his behalf, would be impossible for the facility or the U.S. Marshals Service to provide.

It is likewise not feasible to place the Defendant in "a unit that house detainees who are cooperating other cases," Mot. at 44, because there is no such unit. Moreover, creating one—and identifying cooperating defendants—or, alternatively, placing the Defendant in an existing maximum-security unit where inmates are instructed to report the Defendant if he attempts to circumvent his SAMs restrictions, Mot. at 43-44, would create obvious safety risks and unduly burden other inmates to enforce the Defendant's compliance with the SAMs. Likewise, there is no "module for English-speaking detainees" only, Mot. at 44, nor is it realistic to expect that a language barrier alone would be sufficient to prevent potentially dangerous communications. Finally, the Court should not order the Defendant to be placed in a unit with inmates that "have more privileges than other maximum-security inmates, including access to a personalized tablet five days a week," Mot. at 43, or otherwise give him access to a tablet with unrestricted communication abilities, because that would *increase* the risk that the Defendant could communicate with cartel members on the outside.

Thus, courts in similar cases have held that the Government may reasonably conclude that "confinement as part of the general prison population" creates an unacceptable risk that violent messages may be communicated to others. *El-Hage*, 213 F.3d at 82. In *Guzman Loera*, for example, the appellate court upheld the district court's decision to not modify the pre-trial solitary confinement conditions of Joaquin Archivaldo Guzman Loera, also known as "El Chapo," one of the leaders of the Sinaloa Cartel. *United States v. Guzman Loera*, 24 F.4th 144, 152-154 (2d Cir. 2022). As the Court of Appeals explained, the defendant's "history of bribing prison officials,

harming cooperating witnesses, . . . and continuing to manage his illegal enterprise from jail were valid bases for the Government to seek his segregation." *Id.* at 154. Indeed, solitary confinement was appropriate because "[t]he Government's security concerns stemmed primarily from Guzman's behavior if he were to communicate with others." *Id.* at 154. The same applies here.

There likewise exists no reasonable alternative to the SAMs' restrictions on the Defendant's communications with those outside NNRJ. As the defense notes, the Defendant had over 2,500 external communications in the approximately six weeks before the imposition of the SAMs. Mot. at 6. It would require enormous resources to monitor such communications in real time, or even to review them after the fact. Moreover, any meaningful monitoring or review would need to be conducted by individuals who both speak Spanish and have knowledge of the Defendant and his organization due to the substantial likelihood that the Defendant would communicate in a code decipherable only to those with subject matter expertise. As courts have recognized, "anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code," *United States v. Johnson*, 223 F.3d 665, 673 (7th Cir. 2000), and "[a] conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code," *United States v. Hammoud*, 381 F.3d 316, 334 (4th Cir. 2004). *See also Turner*, 482 U.S. at 93 ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); *United States v. Salameh*, 152 F.3d 88, 108 (2d Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."). This is why the SAMs mandate that calls be contemporaneously monitored and recorded by DEA and authorize the immediate termination of calls if that contemporaneous monitoring detects any indication of a discussion of illegal activity, the soliciting of or encouraging of acts of violence or terrorism, or actual or attempted

13

circumvention of the SAMs. Ex. A at 11. Thus, if this Cout were to require NNRJ to allow two calls a day, every day, for an unspecified period of time, as the Defendant requests (see Mot. at 44), that, too, would require an unreasonable expenditure of resources.

For these reasons, the current SAMs are reasonably related to a legitimate, non-punitive interest and there is no ready alternative to them, and certainly no ready alternative that would not have a significant impact on prison staff and resources. *See Turner*, 482 U.S. at 89-91.

### B. The Defendant's Contrary Arguments Are Unavailing

The Defendant attempts to distinguish his case from the numerous cases upholding SAMs for similarly situated defendants by arguing the Defendant has not done anything specific since his arrival in the United States to warrant SAMs restrictions. Mot. at 5-6, 29. That argument does not hold water. Nothing in the law suggests that SAMs are only appropriate if the Defendant continues to commit the very harm the SAMs are designed to prevent. The reasons that SAMs restrictions were imposed in this case included the Defendant's charged criminal conduct, which includes running the cartel from a Mexican prison for more than a decade, his ability to cause death or injury to others, and his history of retaliating against potential witnesses and others he perceives to have wronged him.

The Defendant also suggests that restrictions on communications are inappropriate because his family "are honest people dedicated to work and study." Mot. at 6. But, first, the Defendant has been cleared to speak with several members of his immediate family. And second, several members of his family are deeply entwined with drug trafficking and the Zetas and CDN. To name just a few, the Defendant's younger brother, Omar, is his co-defendant in this case. The Defendant's older brother, Juan Francisco Trevino Morales, served 22 years for conspiracy to distribute marijuana. *See United States v. Trevino Morales*, 3:95-CR-00189-N-1 (N.D. Tex.), ECF

14

No. 104. The Defendant's nephews, Juan Francisco Trevino Chavez and Juan Gerardo Trevino Chavez, were both indicted in multiple federal districts in Texas on drug trafficking and related charges. *United States v. Trevino Chavez*, No. 6:11-cr-00189-AM-3 (W.D. Tex.); *United States v. Trevino Chavez*, No. 19-cr-0787-FB (W.D. Tex.). And another older brother of the Defendant, Jose Trevino Morales, was sentenced to 20 years in prison on September 5, 2013, after conviction at trial for his role in a conspiracy to launder millions of dollars of the Defendant's and the cartel's drug proceeds through the American Quarter-Horse industry. *United States v. Jose Trevino Morales, et al.,* No. 12-cr-210-3 (W.D. Tex). The money laundering activity took place throughout the Southwest United States and demonstrates the cartel's strong influence within the United States.

The defense also argues that the Defendant's situation is similar to that of *Basciano*, where the court ordered that Basciano, the head of a mob family, be returned to general population from the special housing unit. *United States v. Basciano*, 369 F. Supp. 2d 344 (E.D.N.Y. 2005). But *Basciano* is inapposite. At the time of the court's decision in 2005, the Attorney General had not directed the implementation of SAMs against Basciano, and the court concluded that the government did not possess evidence that Basciano engaged in attempts to have others commit violence after he was incarcerated—only that the defendant engaged in violence prior to facing charges—and that "there was nothing to distinguish Basciano from the hundreds of individuals in pre-trial detention who are accused of having committed violent acts *before* they were detained." *United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005) (citation modified) (emphasis in original). However, two years later, Basciano was moved back to solitary confinement after he ordered hits on parties involved in the case, and the Government soon thereafter received authorization from the Attorney General to impose SAMs on Basciano. The

15

court upheld the defendant's subsequent challenge to his confinement conditions, declining to remove the SAMs because of the defendant's demonstrated ability to pass messages in coded language to order violence.  *See Basciano*, 530 F. Supp. 2d at 439.   Here, the Defendant has a decades-long history of making efforts to retaliate against witnesses and potential witnesses, both before and *after* his arrest in Mexico.  That history—which is charged in the Fifth Superseding Indictment—justifies the SAMs in this case.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendant's Motion for Relief from the Special Administrative Measures.

Respectfully submitted this 13th day of February, 2026,

                                          Respectfully submitted,

                                          MARGARET A. MOESER
                                          Chief
                                          Money Laundering, Narcotics
                                          and Forfeiture Section Criminal Division
                                          U.S. Department of Justice


By:    */s/ Kirk Handrich*
                KIRK HANDRICH
                D. HUNTER SMITH
                JAYCE BORN
                Trial Attorneys
                Money Laundering, Narcotics
                and Forfeiture Section
                Criminal Division
                U.S. Department of Justice

**CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing was sent via ECF, to counsel of record for Defendant Miguel Trevino Morales, this 13th day of February, 2026.


                        By:    */s/ Kirk Handrich*
                                Kirk Handrich
                                Trial Attorney
                                Money Laundering, Narcotics
                                and Forfeiture Section
                                Criminal Division
                                U.S. Department of Justice