**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **vs.** | : | **Case No. 08-CR-057-4** |
| | : | |
| **MIGUEL TREVINO MORALES (4),** | : | |
| | : | |
| **Defendant.** | : | **Honorable Trevor N. McFadden** |
| | : | |

<u>**DEFENDANT MIGUEL ANGEL TREVINO-MORALES' REPLY TO GOVERNMENT'S**
**OPPOSITION TO MOTION FOR RELIEF FROM SPECIAL ADMINISTRATIVE**
**MEASURES**</u>

      Now comes the defendant, Miguel Ángel Treviño Morales, by and through counsel, and replies to the Government's Opposition (ECF No. 789) to Defendant's Motion for Relief from Special Administrative Measures (ECF No. 780). Mr. Treviño renews his request for judicial review and modification of the Special Administrative Measures (SAM) restrictions imposed by the Department of Justice. The Government is using the SAM in a punitive fashion to keep Mr. Treviño segregated, isolated, and marooned from the world while he awaits trial in this matter. With each passing day, he suffers further psychological and physical harm from the restrictive conditions in which the Government has sequestered him.[1] The SAM were imposed based on nothing more than unsupported speculative conclusions and unconstitutionally impinge on Mr. Treviño's First and Fifth Amendment rights. Further, the restrictions under which Mr. Treviño is held exceed the scope of the SAM.

---

[1] As the Third Circuit recognized in *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 566 (3d Cir. 2017), even a few days in solitary confinement can cause cognitive disturbances. Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 331 (2006). Solitary confinement… "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage." Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. Rev. L. & Soc. Change 477, 500 (1997) "[t]here is not a single study of solitary confinement wherein non-voluntary confinement that lasted for longer than 10 days failed to result in negative psychological effects." *Id.* at 531.

The Government has held Mr. Treviño in solitary confinement with limited human contact and limited communication with his family for **315 days**. He sits alone in a windowless cell where he has no social interaction, but for the Detention Facility ("DF") guards who pass him food through a slot in the cell's door and his legal team who visits to work on his case. He has no access to educational, vocational, or recreational programming, and not even to television programming in his native language. He is permitted just two calls with approved immediate family members per month.[2] He is only permitted to bathe twice or three times per week. The Government argues that these conditions are not punitive. They assert that these conditions are the only reasonable means of preventing Mr. Treviño from transmitting messages outside the jail to others – an act he has not attempted or indicated an intent to attempt. The Government offers no proof that Mr. Treviño ever sent coded messages or is at risk of doing so. Their speculative concern, they say, provides Constitutionally sound justification for his indefinite solitary confinement as a pretrial detainee. If the court does not intervene, Mr. Treviño will continue to be held in solitary confinement for years as this complex case proceeds through litigation.

## A.  The Government's Factual Allegations Cannot Support The Restrictions.

The Government does not argue that the conditions of confinement it has imposed upon Mr. Treviño are not harsh or extreme. Indeed, such an argument would be impossible to make when they have elected to impose the most restrictive conditions of confinement available to any detainee, pretrial or convicted.[3] Despite Mr. Treviño's prolonged stay, solitary confinement is generally intended as "short term housing." *Boudin v. Thomas*, 533 F. Supp. 786, 791 (S.D.N.Y. 1982). The Code of Federal Regulations makes clear that "[a]dministrative detention is to be used

---

[2] Each call may be a maximum of 30 minutes. Mr. Treviño is permitted to break the calls into two 15-minute calls.
[3] The DF in which Mr. Treviño is being held reserves its most restrictive conditions of confinement for inmates who have committed disciplinary sanctions. Those inmates may be punished with "punitive confinement" lasting up to 15 days. *The Northern Neck Regional Jail Rules and Regulations Manual*, § 16, #7.

only for short periods of time except where an inmate needs long-term protection. . . or where there are exceptional circumstances ordinarily tied to security or complex investigative concerns." 28 C.F.R. § 541.22(c). For the indefinite detention of a pretrial detainee, there must be substantial proof justifying the need for such placement. *United States v. Khan*, 540 F. Supp. 2d 344, 353-54 (E.D.N.Y. 2007) (citing *U.S. v. Basciano,* 369 F. Supp. 2d 344, 351-2 (E.D.N.Y. 2005)).

In *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549 (3d Cir. 2017), the Third Circuit Court of Appeals recognized the deprivations attendant to solitary confinement and the resulting harm to state inmates held under these conditions. The detainees were convicted of committing worse crimes than what is charged against Mr. Trevino and was sentenced to death, but even then, was granted more privileges than those granted to Mr. Treviño who is presumed innocent. The detainees in *Williams* were isolated in "death row" cells, were allowed to have three 15 minutes calls per week, and four non-legal visits per month. The Court found that the deprivations were such a significant departure from the hardships normally attendant to incarceration that the inmates had a protected liberty interest, rooted in due process, in not being held under such conditions. Those inmates had been convicted and previously sentenced to death and were awaiting resentencing. Still, the court found that they had a protected liberty interest in not being held in solitary confinement indefinitely without a meaningful opportunity for review of their conditions of confinement. In so doing, the Third Circuit acknowledged "The standards applicable to sentenced inmates provide a floor for treatment of pretrial detainees, who are generally entitled to greater comparative freedom from unconstitutional punishments and deprivations of process." *Id.* 558 n.44. Mr. Treviño certainly holds a protected liberty interest in not being held under the most restrictive conditions available to any inmate.

      i.    *The Conditions of Confinement are Beyond the Most Restrictive Conditions Available in the DF and Exceed Those Contemplated by the*

3

*SAM.*

The conditions of confinement imposed on Mr. Treviño exceed the most restrictive conditions imposed on other inmates in the DF who can only be held in administrative segregation for up to 15 days and then only as punishment for violating institutional rules. Those inmates continue to have access to telephone communications and daily hygiene. His conditions of confinement also exceed those required by the SAM, despite the Government's interpretation to the contrary.

Section 1(a) of the SAM establishes the general provisions regarding adherence to "usual" policy requirements:

> **Adherence to Usual USMS, Federal Bureau of Prisons (BOP), and Detention Facility (DF) Policy Requirements-** In addition to the below-listed SAM, the inmate must comply with all usual USMS, BOP, and non-BOP DF policies regarding restrictions, activities, privileges, communications, etc. If there is a conflict between USMS/BOP/DF policies and the SAM, as set forth herein, where the SAM are more restrictive than usual USMS/BOP/DF policies, then the SAM shall control. If usual USMS/BOP/DF policies are more restrictive than the SAM, then USMS/BOP/DF policies shall control.

ECF 789, Ex. A § 1(a)) (emphasis added).

The "usual" policy of the DF in which Mr. Trevino is detained does not impose segregation; rather, the DF's "usual" policy of confinement consists of the restrictions Mr. Treviño was subjected to before the SAM was imposed: that is, being able to have phone calls and video-visits with his family daily and be able to interact with other inmates. Those are the "usual" conditions referred to in Section 1(a), above, that are imposed for more than 90% of the DF's inmates. The exceptional or non-usual restrictions is the administrative segregation which can only be imposed

as a punitive measure or other justified reason (like health concerns).[4]

As to contact with other inmates, the Government reads the SAM to require the DF to reduce Mr. Treviño's contacts with *all* other inmates. (ECF 789 p.5, n.4). However, the SAM does not order isolation or require detention in a segregated cell. It only requires the imposition of restrictions to prevent Mr. Trevino from having contact with inmates that could reasonably foreseeably result in the inmate communicating information to circumvent the SAM intent:

> **Inmate Communications Prohibitions –** The inmate is limited within the USMS/BOP/DF's reasonable efforts and existing confinement conditions, from having contact (including passing or receiving any oral, written, or recorded communications) with any other inmate, visitor, attorney, or anyone else, except as outlined and allowed by this document, that could *reasonably foreseeably result in the inmate communicating* (sending or receiving) information that could circumvent the SAM's intent of significantly limiting the inmate's ability to communicate (send or receive) threatening or other violence-related information,

(ECF 789, Ex. A § 1(c)) (emphasis added).

Unlike what the government suggests, the SAM's communication restrictions are not total and definitive. The only person the SAM indicates Mr. Treviño has a total ban on communication is his brother, Oscar Omar Treviño Morales. The SAM does not prohibit Mr. Treviño's social interaction. It only limits his interaction to persons who could reasonably and predictably communicate messages that circumvent the intent of the SAM. The SAM itself establishes the requirement to conduct a criminal background check on lawyers and legal assistants. But the same check is routinely performed on any person authorized to communicate with Mr. Treviño, just as it must also be performed on the rest of the inmates to determine with whom communication is permitted. In fact, at NNRJ, as in all prisons, there is a classification area for inmates, which has the necessary resources to carry out the

---

[4] Attached as **Exhibit A** are recordings of two video-visits of Mr. Treviño with his family, recorded from the module in which Mr. Treviño was held before the SAM was imposed. In these videos, the Court can see the DF's usual conditions of confinement.

verification indicated here.

A judge in this District reviewed identical SAM restrictions[5] on interactions with other inmates,[6] and noted that while, "The SAMs [] place limitations on the Defendant's interactions with other inmates," they do not "require administrative segregation." *United States v. Trabelsi*, No. 06-89 (RDM), 2019 U.S. Dist. LEXIS 129761, at *4 (D.D.C. Aug. 2, 2019). There, the DF had determined that administration segregation was necessary for Mr. Trabelsi based on his conduct, combined with the descriptions of his activities in the SAM Memo.[7] Specifically, the DF placed Mr. Trabelsi in administrative segregation based on:

> [I]nformation provided [about] Trabelsi's proclivity for violence, including his plans to carry out terrorist attacks; his dedication to the cause of radical Islamist jihad, which has been unwavering; his ability and repeated efforts to influence others to act in furtherance of his cause; and his continuous disregard of SAM restrictions by attempting to pass information to third parties[8].

> *Id.* at *10.

The Deputy Warden of the detention facility also filed a declaration asserting that Trabelsi threatened her just months earlier, yelling in her direction, "I am going to kill someone! I give my life for my religion! I am going to kill someone here!" The Court found, "Taken together, the justification provided in the SAMs and this more recent threat demonstrate the reasonableness of the Government's judgment concerning the continued threatening nature of the Defendant." *Id.* at

---

[5] *See* **Exhibit B**, Memorandum *"Origination of Special Administrative Measures Pursuant to 28 C.F.R. § 501.3 for Federal Pretrial Inmate Nizar Trabelsi."* November 1, 2013.

[6] Mr. Trabelsi was held in the same cell that confines Mr. Treviño at Northern Neck Regional Jail. After 10 years of solitary confinement, Mr. Trabelsi was acquitted of all charges in 2023.

[7] Despite the DF's determination that Mr. Trabelsi should be held in administrative segregation, he was given daily access to showers, unlike Mr. Treviño.

[8] For example, the 2018 SAM describes multiple instances in which the defendant has demonstrated interest in using other prisoners to communicate to third parties in contravention of the SAMs. See Dkt. 185-2 at 4-5 (describing incidents in January 2015, August 2015, September 2016, and March 2017 in which Trabelsi attempted to pass messages to third parties via other inmates). Indeed, Trabelsi has specifically sought to use telephone conversations with Berrou to communicate with other individuals in contravention of the SAMs.

*11. Mr. Trabelsi was not held in administrative segregation at the DF due to the SAM language, but rather due to the DF's individualized review of his conduct.

The SAM language in *Trabelsi* that did not require administrative segregation is identical to the language in the SAM at issue here and the court should similarly determine that it does not require administrative segregation and does not prohibit all contact with other inmates. It only prohibits contact with those in a specific situation in which could reasonably foreseeably result in communicating an improper message. The Government could evaluate other inmates' classifications to determine which inmates have the characteristics referenced in the SAM and house them separately from Mr. Treviño. His complete isolation is not required and is an exaggerated response to the Government's interest.

> ii.    *Mr. Treviño is Held in Solitary Confinement Despite Visits from His Legal Team.*

The Government dismisses the characterization of Mr. Treviño's current custody status as "solitary confinement" based on its mining of his legal visitation records. It uses the information it gleaned from his legal visiting logs to suggest that Mr. Treviño has had an excessive number of meetings with his legal team. While counsel will not justify the defense work and strategy in this complex matter, the Government's efforts to parse out the activities of Mr. Treviño's defense team is concerning.[9] While the Government has placed Mr. Treviño under SAM restrictions, which require his legal visitors to be cleared by the Drug Enforcement Administration prior to visiting, the SAM does not override his Sixth Amendment rights and attorney-client privileges or provide

---

[9] Counsel does not feel a response to the Government's improper assessment of his legal visitation records is necessary. However, counsel points out that the Government's calculations, which equate 241 in-person visits to "nearly one visit per day" (ECF 789 p. 6) are a gross overrepresentation of the facts. Their calculations seem to double, triple, and quadruple count, when many legal visits included more than one member of the defense team. The Government's attempt to sensationalize the amount of activity being performed by Mr. Trevino's legal team either represents a lack of information about the effort required to defend a complex case or a misrepresentation of the facts, because he had not had 241 days of in-person visits.

the Government with unfettered access to documentation of his legal contacts. Such access is an intrusion upon the defense camp and could reveal privileged information, attorney work product, or other strategy.

In any case, visits with the defense team are not social visits and offer no replacement to Mr. Treviño's constitutional right not to be held in punishing conditions as a pretrial detainee. Neither do meetings with his legal team replace communications and ongoing relationships with his family. His right to communicate with the outside world is a protected right under the First Amendment, s*ee Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[T]he right of free speech includes a right to communicate a person's views to any willing listener…"), separate from his Sixth Amendment right to counsel, and could be exercised through regular phone calls. In short, the Government is not excused from honoring Mr. Treviño's Constitutional rights because he works with his counsel to mount a defense to the charges pending against him. Neither should they be rewarded for permitting him to meet with his defense team, as is required by the Sixth Amendment.

### iii.    *The Seriousness of the Allegations Cannot Justify the Restrictions.*

The Government attempts to justify the draconian conditions of confinement by restating the (unproven) allegations contained in the Fifth Superseding Indictment (ECF No. 578) to portray Mr. Treviño as the former "leader of a violent international drug trafficking organization based in Mexico," who engaged in acts of violence. (ECF 789 p. 2). The Government then describes a violent incident that it alleges Mr. Treviño participated in in approximately March 2011 (ECF 789 p.3) and quotes the Fifth Superseding Indictment, which alleges that he "continued to control the Cartel" while in custody in Mexico. (ECF 789 p.3).

Despite the lack of evidence presented to support its claim, the government continues to maintain the need for SAMs, stating that "*the Government will present evidence that the Defendant*

*killed—or ordered the killing of—not just fellow drug traffickers, but also politicians, law enforcement officers, prosecutors, and innocent civilians*"

The Government claims that the defendant and his brother Omar, while detained in Mexico, ordered "*to kill (1) one of the witnesses on a pending Mexican criminal case against the Defendant and (2) a formerly allied drug trafficker, who had switched allegiances to a different cartel.*" (ECF 789 p.4)

These statements are also unsubstantiated and are made with the intention of attempting to "demonize" Mr. Treviño so that, based on an elaborate image of evil, it can be demonstrated that Mr. Treviño is a prisoner who must be subject to SAMs to contain his "*high dangerousness*," as if there were any evidence that Mr. Treviño had committed any of the crimes he is accused of during the time he was held in various prisons in Mexico.

However, the Government overlooks the reality of its own assertions, contained in the Fifth Superseding Indictment and in its response to various motions to dismiss (see ECF Nos. 578 and 788). Throughout the Fifth Superseding Indictment, Mr. Treviño is charged with committing various homicides, the most recent of which relates to an alleged homicide that occurred in 2011; while in its response to the motion to dismiss (ECF No. 788), the Government clarifies and emphasizes that the homicides it alleges all occurred no later than 2011. The Government has provided no evidence or indication, beyond its mere allegation, that Mr. Treviño participated in any homicide during the time he has been in prison since his arrest in 2013. Therefore, the Government's accusations regarding Mr. Treviño's lethal dangerousness, despite his incarceration, contradict its indictment. This is because the Government's indictment only presents homicides allegedly committed up to 2011, without charging any homicides committed between 2013 and 2025, as it claims in its opposition, that he committed and ordered homicides during his imprisonment in Mexico (2013-2025).

It also contradicts his opposition to the motion to dismiss (ECF No. 788), since there he emphasizes the homicide cases referred to in the indictment, the oldest of which are from 2011, meaning that the government is making contradictory statements. Although it is true that the Government states it will file a Sixth Superseding Indictment, we do not rule out the possibility that it will tailor it to try to support the punitive measures SAM, which at this time are being imposed without factual or evidentiary support.

It is also contradictory because the discovery evidence includes a report by the Attorney General's Office of Mexico,[10] which provides the government with details of the legal proceedings pending in Mexico against Mr. Treviño. Among the list of proceedings against Mr. Treviño, there is not even one initiated or related to the murder of any witness, alleged rival, or any other person during the time he was imprisoned in Mexico (2013-2015).

Furthermore, another fact that has not been refuted by the Government with any concrete evidence is that Mr. Treviño never received any administrative sanctions during his time in prison in Mexico, and that he received various training, reading, and participated in multiple activities. This is demonstrated by the official letters that were attached to Mr. Trevino's motion for relief and on which the Government made no comment or objection regarding this proven fact. The Government just limits itself to claim that they "*will present evidence that the Defendant and his brother Omar bribed officials running the facilities in which they were incarcerated, including the director of at least one high-security prison.*"

Where administrative detention is imposed based on the nature of the charges against an inmate, such detention is punitive. *United States v. Gotti*, 755 F. Supp. 1159, 1164-65 (E.D.N.Y. 1991). Under the Due Process Clause, a detainee may not be punished prior to an adjudication of

---

[10] Attached as **Exhibit C** is **a** document provided by the Government in discovery at Bates 1244-1252, and its translation.

guilt in accordance with due process of law. *Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979) (citing *Ingraham* v. *Wright*, 430 U.S. 651, 671-2 n. 40, 674 (1977); *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 165-7, 186 (1963); and *Wong Wing* v. *United States*, 163 U.S. 228, 237 (1896)). In addition to a Fifth Amendment due process right not to be subjected to punishment based on the pending charges, Mr. Treviño retains a First Amendment right to communicate with people outside prison walls, *United States v. Simmons*, No. 13-CR-6025CJS, 2016 U.S. Dist. LEXIS 8086, at *70 (W.D.N.Y. Jan. 22, 2016), and "a telephone provides a means of exercising this right." *Almahdi v. Ashcroft*, 310 Fed. Appx. 519, 521-22 (3d Cir. 2009).

In *Bono v. Saxbe,* 450 F. Supp. 934 (1978), the District Court for the Eastern District of Illinois found that "*Punishment for no offense is disproportionate and cruel and unusual.*" The Court reviewed the seven factors set forth in 28 C.F.R. § 541.41, holding that the warden must consider when recommending placement in a control unit or administrative segregation unit: (1) incidents causing injury to other persons during confinement, (2) threats to the life or well-being of others, (3) possession of deadly weapons or dangerous drugs, (4) involvement in disruption of orderly prison operations, (5) escape from a correctional institution, (6) escape attempts, and (7) the nature of the offense for which committed 28 CFR §541.41. **The regulation emphasizes that "an inmate may not be considered solely on the nature of the crime which resulted in that inmate's incarceration," though the offense nature may be considered in combination with other factors in 28 CFR §541.41**.

The seventh factor in 28 C.F.R. § 541.41 is the most general of all, based simply on the nature of the offense committed by the inmate; however, the generality of the rule's language does not authorize the Government to place an inmate in administrative segregation arbitrarily or without support. If this category, based on the nature of the offense, is to be used, *the reasons must be*

*sufficiently detailed to support the conclusion that the safety of the institution is threatened in some way other than those listed in the other acceptable factors*. (*Id. at \*943*)

These factors were analyzed by the District Court for the Eastern District of Illinois in *Bono*, where the Court held that " *any attempts to determine that an inmate will not function in the prison setting, based on the crime for which he was convicted, are violative of due process* (See *Bono* at \*943).

In *Gotti*, 755 F. Supp. 1159, the court found that placement in administrative detention was not warranted based on the nature of the charges including multiple murders, conspiracy and solicitation to murder, and obstruction of justice, which included allegations of witness tampering. There, the court expressed concern that placing a pretrial detainee in administrative segregation based on underlying criminal charges would lead to, "The inevitable and erroneous conclusion…that every defendant indicted for murder or witness tampering should be placed in administrative detention." Instead, the court looked to the defendants' conduct since they had been in the institution to determine whether the restrictions imposed on them were excessive in relation to the government interest. It found, "since the defendants have been in custody, they have committed no act or omission which suggests that they pose a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution." (internal quotations omitted). It then held that the restriction imposed was exaggerated and excessive [to the government interest]. *Id.* at 1165.

The Government's restating of the charges in the indictment here does not provide a sufficient basis to punish Mr. Treviño with indefinite solitary confinement, minimal communication with his family, or lack of social interaction. To make the restrictions anything less than punitive, the Government would have to show that Mr. Treviño committed acts since he has

been in the DF that suggest he must be placed in solitary confinement because his contact or communication with others has posed a risk of death or serious bodily injury to potential witnesses and their families. Mr. Treviño has now been in housed in the DF for approximately one year. He has been a model detainee, even under the strict, punitive, and inhumane conditions in which he is forced to live. Having monitored and recorded all his communications and evidently reviewed his jail records, the Government does not even allege otherwise. They present no basis upon which to conclude that removing him from solitary confinement at the DF would cause a risk to others. Therefore, his confinement under these restrictions is punitive.

### B.  The Matter is Properly Before the Court.

The Government argues that this matter is not properly before the Court because Mr. Treviño has not fully exhausted his administrative remedies. This matter is properly before the Court because Mr. Treviño has exhausted administrative remedies before bringing this motion, even though he is not required to do so.

### i.     The Prison Litigation Reform Act does not Apply to this Motion.

The Government argues that Mr. Treviño must first exhaust these remedies because of the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), which provides that "no action shall be brought with respect to prison conditions under ... Federal law, by a prisoner ... until such administrative remedies as are available are exhausted." However, the PLRA does not govern motions by the pretrial detainees to challenge SAM restrictions. *U.S. v. Hashmi*, 621 F.Supp.2d 76, 86 (S.D.N.Y 2008); *see also United States v. Ayala-Lopez*, 327 F. Supp. 2d 138, 141-42 (D.P.R. 2004) (finding a motion challenging pretrial administrative segregation fell outside of the intended coverage of the PRLA as well as its plain language).  Thus, Mr. Treviño is not statutorily required to exhaust administrative remedies before bringing this matter before the Court.

ii.   *Administrative Remedies Need not be Exhausted Under These Circumstances.*

Even if the PLRA applied to motions filed by pretrial detainees challenging SAM restrictions, Mr. Treviño would not be required to exhaust administrative remedies under these circumstances. Administrative remedies need not be exhausted, [], if the administrative remedies would be futile, if the actions of the agency violate constitutional rights or are otherwise not reasonably available. *Khan*, 540 F. Supp. 2d at 350 (A court may, however, excuse the exhaustion requirement if a petitioner demonstrates that pursuing appeals through the administrative process would be futile or that the appeals process is inadequate to prevent irreparable harm to the petitioner). In addition, the exhaustion requirement may be deemed inappropriate for a pretrial detainee. *See Lyons v. U.S. Marshals*, 840 F.2d 202 (3rd Cir. 1988). "Where the harm that is constitutionally actionable is the violation of intangible rights - regardless of actual physical or emotional injury [the exhaustion requirement of the Prison Litigation Reform Act] does not govern." *Shaheed-Muhammad v. Dipaolo*, 138 F. Supp. 2d 99, 107 (D. Mass. 2001). In making this distinction, courts have expressed that "there is a point beyond which Congress may not restrict the availability of judicial remedies for the violations of constitutional rights without in essence taking away the rights themselves by rending them utterly hollow promises." *Zehner v. Trigg*, 952 F. Supp. 1318, 1331 (S.D. Ind. 1997).

Here, pursuing appeals through the DF's process would be futile when the DF is interpreting the SAM to impose these conditions. Further, the Government's actions violate Mr. Treviño's intangible Constitutional rights and cause irreparable harm to Mr. Treviño. If an exhaustion requirement applies, he would be excused from it. Nonetheless, he has exhausted available administrative remedies.

iii.   *Mr. Treviño Exhausted All Available Administrative Remedies.*

The Government acknowledges that Mr. Treviño filed a grievance with the DF on December 19, 2025, challenging his placement in segregation and requesting additional access to calls. (ECF 789 p.7). Mr. Treviño actually filed three requests on December 19, 2025, each related to modifications of his conditions of confinement: (1) a request to be granted daily phone calls and video calls; (2) a request to use a tablet to watch Spanish-language news and programming; and (3) a request to be moved to general population. All three requests were denied by the DF on the grounds that they could not be resolved because Mr. Treviño is under SAM and the Government, not the DF, must authorize any requests. Mr. Treviño then filed a grievance requesting a review of the denials, to which the DF reiterated its denial, stating that the decision was not within its control and depended on the US Marshals Service, pursuant to Special Administrative Measures.[11]

The DF's response is consistent with its Inmate Handbook which expressly establishes the issues that are not subject to a grievance procedure:

> **You cannot complain about the following things**:
>
> • *Disciplinary actions taken against an individual or group.*
> • *Matters under the jurisdiction of the ICC.*
> • ***Any matter over which the prison has no control***.

Similarly, Section 14 of the Inmate Handbook also establishes that the appeal procedure is optional. The DF made it clear that it has no authority to modify Mr. Treviño's conditions of confinement, as they derive directly from the imposition of SAM, not from any internal decision by the DF. The same applies for Mr. Treviño's requests for calls with his family, where the DF forwards Mr. Treviño's request to the Government for its approval[12]. Therefore, waiting for the completion of Mr. Trevino's appeal would be futile. Mr. Treviño elected not to burden the DF with an appeal that

---

[11] The three requests and their respective grievances are attached as **Exhibit D**.
[12] Attached as **Exhibit E** are three request forms filed by Mr. Treviño asking for a call with his family, where the DF reply that the petition was forwarded to the Government for approval.

DF had no ability to grant and had advised Mr. Trevino that DF officials could not grant his requests or appeal. Mr. Treviño has, therefore, exhausted all administrative remedies available to him.

This motion is properly before the Court because any further administrative challenges filed with the DF would be futile when the DF is obliged to follow the SAM issued by the DOJ. Further, the current conditions of confinement are punitive and violate Mr. Treviño's First and Fifth Amendment rights and expose him to continuing irreparable harm.[13] To restrict the judicial remedies available to Mr. Treviño when he is wrongfully being held in indefinite solitary confinement and require him to wait an undetermined longer period of time before seeking the court's intervention would render his constitutional rights hollow promises. The motion is properly before the Court and the Court should intervene.

### C. The Government Applies the Wrong Standard to Determine Whether the Restrictions Violate Mr. Treviño's Constitutional Rights.

The Government argues that the restrictions do not violate Mr. Treviño's Constitutional rights because they are "reasonably related to legitimate penological objectives." (ECF 789 p.9). The Government analyzes the restrictions under the standard in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner*, the Supreme Court established a four-factor test to determine whether a prison regulation that impinges on *sentenced* inmates' constitutional rights, is valid, relying on whether the challenged regulation is reasonably related to legitimate penological interests. Mr. Treviño is not a sentenced inmate. He is a pretrial detainee, and as such, enjoys a higher level of constitutional protection than the sentenced inmates in *Turner.  See Women Prisoners of D.C. Dep't of Corrs. v.*

---

[13] *See Ayala-Lopez*, 327 F. Supp. 2d at 143-44 (recognizing the harmful effects of pretrial administrative segregation) (citing *Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995) ("Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate  mentally and in some cases develop psychiatric disturbances") and *Davenport v. DeRobertis*, 844 F.2d 1310, 1316 (7th Cir. 1988)(noting that "there is plenty of medical and psychological literature concerning the 'ill effects' of solitary confinement").

*District of Columbia*, 877 F. Supp. 634, 664 n.38 (D.D.C. 1994) ("Whereas convicted [prisoners] bring cause of action under the Eight Amendment, pretrial detainee[s] [] rely upon the Fifth Amendment guarantee of due process. Though the unconstitutional conditions may be the same, the threshold for establishing a constitutional violation is clearly lower for pretrial detainees.") (internal citations omitted). Mr. Treviño's conditions should be analyzed in the context of his Fifth Amendment guarantee of due process, a less stringent analysis than the Eighth Amendment's prohibition against cruel and unusual punishment. *See Bell*, 411 U.S. at 536 n.16 ("The Court of Appeals properly relied on the Due Process Clause rather than the Eighth Amendment in considering the claims of pretrial detainees. Due process requires that a pretrial detainee not be punished.").

The Government does not argue that the restrictive conditions do not violate Mr. Treviño's Fifth Amendment right to due process under the seven-factor standard developed in *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 165-167, 186 (1963), *Bell,* and its progeny.[14] The *Bell* court simplified the seven factors into a two-part test. First, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id*. at 538. Second, there will usually not be "a showing of an expressed intent to punish[.]" *Id*. Consequently, "that determination will generally turn on the sixth and seventh *Mendoza-Martinez* factors: whether there is another rational purpose for the disability, and whether the disability "appears excessive in relation to the alternative purpose." *Id*. As the *Bell* Court concluded:

---

[14] The seven factors to determine whether a government action is punitive in nature are: (1) "Whether the sanction involves an affirmative disability or restraint," (2) Whether the sanction "has historically been regarded as a punishment," (3) Whether the sanction "comes into play only on a finding of scienter," (4) Whether the sanction "will promote the traditional aims of punishment—retribution and deterrence," (5) "[W]hether the behavior to which [the sanction] applies is already a crime," (6) "[W]hether an alternative purpose to which it may rationally be connected is assignable for it," (7) "[W]hether it appears excessive in relation to the alternative purpose assigned" *Bell*, 441 U.S. at 537–38 (quoting *Mendoza-Martinez*, 372 U.S. at 168–69).

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

*Id*.at 539.

The restrictions on Mr. Treviño are punitive in nature. He is subjected to the harshest available conditions of confinement, far beyond what is available to punish other inmates for disciplinary sanctions at the DF *and* is only permitted to communicate with a small group of immediately family members on a very limited basis. The Government argues that these restrictions are "reasonably related to the Government's interest in preventing the defendant from contacting persons associated with the cartel and other intermediaries who could cause death or serious bodily injury to potential witnesses and their families." (ECF 789 p.10). They further argue that "no reasonable, alternative means of serving this interest exists." (ECF 789 p.10).

### i.    *The Restrictions are Arbitrary.*

The Government appears to be primarily concerned with the possibility that Mr. Treviño would attempt to pass messages to third parties. (ECF 789 p.11). It relies on cases where restrictions were imposed on defendants' communications because they had demonstrated a propensity to covertly communicate from inside a prison. *See Basciano v. Lindsay*, 530 F. Supp. 2d 435, 446-7 (E.D.N.Y. 2008) ("Basciano is on record saying that he has used several sources to pass messages from federal prison to his associates regarding the affairs of the Bonanno organized crime family…") and *United States v. Abu Ali*, 396 F. Supp. 2d 703, 709 (E.D. Va. 2005) ("The government notes that al-Qaeda trains its followers to use a variety of means to communicate with their confederates from prison.).

The Government attempts to equate their allegations about Mr. Trevino's conduct in Mexican detention facilities with the conduct that justified restrictive SAM conditions in *Basciano*, 530 F. Supp. 2d. Mr. Basciano was returned to general population from solitary confinement after a court determination that his indefinite placement in solitary confinement was not supported by a sufficient Government showing that he had engaged in planning acts of violence while in pre-trial detention. *Basciano*, 369 F. Supp. 2d 344. However, the Government then imposed SAM and moved Mr. Basciano back to administrative segregation after it discovered a "hit list" he had authored, which included the names of the federal judge and prosecutor presiding over his case. The court found that the move was based on "ample evidence to support the conclusion that Basciano had sought to conduct criminal activity, including acts of violence, from [a federal detention center]." In addition to an *in-camera* review of the "hit list," a witness testified that he sought permission from Basciano to carry out a murder while Basciano was in the federal detention center. There was also evidence of Basciano using sources to pass messages from the detention facility to associates to continue to run the criminal enterprise. The court found "ample evidence" of "Basciano's extensive Mafia connections, of his consistent contact and efforts to communicate with those connections from prison, and his stated intent to commit acts of violence against certain individuals. The court also found, "The evidence in the record is clear that Basciano consistently seeks to communicate with criminal associates when he is housed in the general prison population." *Basciano*, 530 F. Supp. 2d at 446-48. As such, the SAM restrictions, which curtailed his communications with other inmates and visitors[15] had a valid, rational connection to the

---

[15] Even after demonstrating a propensity to commit criminal conduct and communicate with criminal associates from within the federal detention facility, Mr. Basciano was permitted to have three calls to his family per month – more than Mr. Trevino is permitted. Both the Government and BOP personnel indicated to the court their ongoing efforts to provide reasonable increases in the number of phone calls Basciano was allowed to family members, to allow reasonable increased visitation with family members, to allow correspondence between Basciano and his five-year-old son, and to continue to improve the efficiency of Basciano's meetings with his lawyers and his receipt of legal mail. The Government also permitted non-contact visits with his five-year-old son. *Basciano,* 530 F. Supp. 2d

legitimate purpose of protecting those Basciano may seek to harm and was not an exaggerated response to the risk he posed. *Id.* at 448.

Unlike the "ample evidence" in Mr. Basciano's case, the Government has offered **no** evidence to support its unsubstantiated allegations that Mr. Treviño engaged in misconduct while housed in Mexican detention facilities for 12 years. The Basciano court heard testimony, reviewed recordings, and reviewed the documentary evidence (the "hit list") presented by the Government before finding the evidence sufficient to justify the restrictions. The Government's bald allegations here are not enough to justify indefinite solitary confinement, limited communication with family members, and lack social interaction.

In *Trabelsi,* the SAM prohibited Mr. Trabelsi, who was charged with assisting al Qaeda, from communicating via mail and telephone with anyone other than certain pre-authorized individuals. 2019 U.S. Dist. LEXIS 129761, at *4. Trabelsi challenged a prohibition on communicating with his wife via telephone, alleging it violated his First Amendment rights. The Court found that the Government had a legitimate interest in preventing acts of violence or terrorism and the communication restrictions were reasonably related to that interest by preventing Trabelsi from communicating forbidden messages with third parties. The Court further found that there were no readily available alternatives to the communication restrictions when Mr. Trabelsi had made multiple attempts to violate the SAM, including:

1. At least four incidents in the preceding year when he demonstrated his interest in using other prisoners to communicate to third parties in contravention of the SAMs.

2. He also sought to use telephone conversations with his wife to communicate with other individuals in contravention of the SAMs.

3. Multiple media outlets in Belgium reported on his wife's discussion of the content of her calls with Trabelsi, including allegations of improprieties in his confinement

---

at 449. This "flexible" implementation of the SAM helped to demonstrate to the court that the measures were not punitive in nature. Mr. Trevino's restrictions have not been implemented in a "flexible" way.

conditions.

4.   Trabelsi requested that his wife forward his regards to the Muslim community and tell the community about his situation.

5.   Trabelsi instructed his wife to record their conversations

6.   Trabelsi instructed his wife to create a Facebook page dedicated to him and to share all the documents she gathered.

*Id.* at *15 (internal citations and quotations omitted).

By contrast, Mr. Treviño has complied with the SAM and other restrictions of the DF in every way. He has never been accused of attempting to contravene the SAM. During his first six weeks in general population, he made no attempts to use other prisoners to pass messages. All his telephone communications over the past year have been monitored and recorded and the Government has found no evidence that he intends to use communications to pass improper messages. Here, the restrictions cannot be said to be reasonably related to the Government's interest in preventing Mr. Treviño from engaging in prohibited communications when he has shown no indication that he intends engage in such behavior. Moreover, reasonable alternatives exist – he could be granted more meaningful access to telephone communications and be allowed to interact with other inmates who do not present a threat that they would reasonably foreseeably pass threats or improper messages.

The Government also cites *United States v. El-Hage*, 213 F.3d 74 (2d Cir. 2000) for its conclusion that the defendant's confinement in the general prison population would create an unacceptable risk that violent messages may be passed. Mr. El-Hage was Osama Bin-Laden's secretary and played a significant role in al-Qaeda's operations. There, like here, Mr. El-Hage was not alleged to have made any prohibited communications from prison. However, the court found that permitting Mr. El-Hage to communicate with inmates or others would create a national

21

security risk. The risk was not that he would engage in further criminal activity, but rather that he would pass information gleaned from the pretrial discovery to active al Qaeda members that they would use in planning future terrorism operations or covering up prior operations. Still, Mr. El-Hage enjoyed less institutional restrictions that Mr. Treviño does. He was permitted to have three phone calls with family per month and after being held in solitary confinement for 15 months, he was given a cellmate. The circumstances of Mr. Treviño's case and the risk of communication at issue does not bear similarity to the national security issues in *El-Hage*.

The next case on which the government bases its response in support of SAMs is *United States v. Joaquín Archivaldo Guzmán Loera,* No. 09-CR-466 (E.D.N.Y. May 4, 2017). This case is also not analogous to that of Mr. Treviño; first, Joaquín Archivaldo Guzmán Loera ("El Chapo") had already been convicted in Mexico for federal crimes and had made two spectacular and world-renowned escapes from maximum-security federal prisons in Mexico, the first of which was made possible by his absolute control over the directors of the Mexican federal prison CEFERSO No. 2 Occidente in Puente Grande Jalisco, and the second from CEFERESO No. 1 Altiplano in Almoloya de Juárez, State of Mexico, which was world-renowned for having built a tunnel to escape from federal prison. These events bear no comparison to the case of Mr. Treviño, given the facts and background of Mr. Treviño, who has never received an administrative sanction or infraction during his time in prison, either in Mexico or in the United States. Therefore, there is no point of comparison between the cases.

The Government also cites *United States v. Hammoud*, 381 F. 3d 316, 334 (4th Cir. 2004) and *United States v. Salameh*, 152 F. 2d 88, 108 (2nd Cir. 1998). These cases are also not comparable to the facts of Mr. Treviño's case. In the first of those cases, it was proven that the defendant *Hammoud* provided material support to a foreign terrorist organization with the intent to influence or coerce the conduct of the government. *Hammoud* was convicted of 14 crimes, including material support for the

military activities of Hezbollah, a terrorist group of religious fanatics that openly wages war against the United States of America and its citizens.

The *Salameh* case refers to a defendant convicted of various charges related to the attack on the World Trade Center in New York. *Salameh* was part of a group of people who attended a terrorist training camp, known as "Camp Khaldan," on the border between Afghanistan and Pakistan, who conspired to carry out a bomb attack on the World Trade Center complex (occurred on February 26, 1993), which killed six people, injured more than a thousand, and caused hundreds of millions of dollars in damage. In addition, the conspirators sent an anonymous letter to the New York Times explaining that the attack had been carried out in retaliation for U.S. support for Israel.

The cases that the government uses to justify SAM restrictions are not *remotely* similar to that of Mr. Treviño. To summarize, the case of Chapo Guzmán involves a prisoner who had already been convicted and sentenced in Mexico, in addition to having escaped from two maximum-security federal prisons. In the Basciano case, the court upheld the administrative measures imposed by the government after Basciano was convicted in two separate trials. Evidence was found that Basciano was planning to attack the judge and the lead prosecutor in his case, and three witnesses testified that Basciano was attempting to continue running the Bonanno family from prison. The rest of the cases mostly involve individuals belonging to Al-Qaeda and Hezbollah, fanatical groups with religious and political ideas that have openly declared armed war on the United States and its citizens, with the aim of destroying U.S. property and attacking the lives of its citizens.

In Mr. Treviño's case, the Government does not allege that he passed coded messages or did so covertly. Instead, it alleges that he *bribed* officials in Mexico to allow him to use intermediaries to continue to lead the cartel. The implication is that they believed he conducted the affairs of the cartel openly rather than through covert messages. The Government provides no

evidence of the bribery allegation. Mr. Treviño has not been charged with bribery either in Mexico or in the United States. No grand jury has even accused him of it. He incurred no infractions while detained in five different Mexican facilities from 2013 to 2025. He participated in educational and vocational programming and lived under the conditions in which other inmates lived. Far from having the prison officials in his pocket as the Government alleges, he was subject to the same rules and restrictions as other inmates. He followed the prisons' grievance procedures when he needed access to books, vocational materials, and toiletries. Mr. Treviño filed 60 requests for the revision of his confinement conditions between 2020 and 2025, out of which 53 were granted in hearings before Federal Courts and the rest before the facility's administrators. *See* **Exhibit F**, *Chart of Grievances from Miguel Ángel Trevino's confinement in Mexico.* On some occasions, he was awarded the relief he requested and on others he was not. His adherence to the prisons' administrative regulations and ordinary treatment suggests he did not have improper authority over prison officials during his incarceration and reports of his good conduct can be trusted. Without more, the Government's mere allegations of misconduct in Mexican detention facilities does not provide enough evidence to support the SAM restrictions, especially when paired with Mr. Treviño's records of positive adjustment in the Mexican detention facilities and his positive adjustment to the current DF.

Further, the Government has not substantiated its concern that there is a risk of improper control of prison officials through bribery while Mr. Treviño is detained in the DF. It has presented no evidence of Mr. Treviño attempting or expressing an attempt to engage in such conduct either in the United States. Mr. Treviño has also followed proper grievance procedures at the DF, and they were processed in ordinary course. He made three requests related to his conditions of confinement in December 2025, each of which was denied. *See* Exhibit D. He also made a request

that he be permitted to meet with his legal team without shackles, a request that was granted based on the DF's judgement (presumably a determination that he did not present a danger, not for the attorneys or for the DF employees). There is no reason to believe he has or would attempt to gain any control over authorities at the DF. Further, the DF is a contractor for the U.S. Marshals Service, and it is absurd to assume that its employees cannot be trusted to refrain from criminal conduct in their interactions with detainees.

Finally, the restrictions are unreasonable and therefore arbitrary because they leave no alternative means for Mr. Treviño to communicate with those who are not his immediate family members and, on the list, pre-authorized by the DEA. In *Overton v. Bazzetta*, 539 U.S. 126 (2003), the Supreme Court, 16 years later, reanalyzed the *Turner* factors, confirming the unconstitutionality of administrative measures that impose restrictions without leaving prisoners any options. The Court analyzed rules promulgated by the Michigan Department of Corrections (MDOC) that limited prison visits. The Supreme Court addressed prison regulations that (1) excluded family members with whom inmates were entitled to noncontact visits, including any minor nieces and nephews and children as to whom parental rights had been terminated, prohibited inmates from visiting with former inmates, that required children to be accompanied by family member or legal guardian, and that subjected inmates with two substance abuse violations to a ban of at least two years on future visitation, were rationally related to legitimate penological objectives and did not violate substantive due process or free association guarantee of the First Amendment; and (2) imposed a two-year ban on visitation for inmates with two substance-abuse violations.

The Supreme Court analyzed whether the challenged restrictions violated the inmates due process rights or their rights under the First and Eighth Amendments. In finding the restrictions to be permissible, the Supreme Court noted that the defendants **had alternative means of exercising their**

**right of association with the persons they were prohibited from visiting. They could send messages through persons who were allowed to visit and could communicate by letter and telephone**. The Court also noted that "if it were demonstrated that there were no alternative means of communication, although it would not be conclusive, it would be evidence that the rules were unreasonable." *Id.* at 135.

Here, Mr. Treviño does not have alternative options. He cannot communicate with anyone except his legal team and immediate family. He cannot communicate with extended family or any other persons by any existing means of communication. The SAM prohibits the family from disclosing communications with Mr. Treviño to third parties, and the SAM also affects the rights of non-inmates by prohibiting family members who are not incarcerated from speaking or transmitting a single word of what they discuss with Mr. Treviño. The current restrictions offer no alternative means of communication with individuals other than Mr. Treviño's immediate family.

According to the Supreme Court analysis of the *Turner* factors in *Overton v. Bazzetta*, the lack of alternative means of communication is evidence that the restrictions are unreasonable, and therefore punitive. *See Bell v. Wolfish*, 441 U.S. 520 (1979) at *521 ("if a condition or restriction is arbitrary or purposeless, a court may permissibly infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees").

        *ii.*     *The Restrictions Are Excessive.*

The Government argues that there are no reasonable alternative means of serving its interest in preventing Mr. Treviño from communicating acts of violence to the outside world other than holding him in solitary confinement and limiting him to two phone calls with family per month. In addition to his Fifth Amendment right not to be held in punishing conditions, Mr. Treviño retain those First Amendment rights that are not inconsistent with his status as a prisoner or with

the legitimate penological objectives of the corrections system. *Pell*, 417 U.S. at 822. A court will regard the available alternative means of communication as a relevant factor in a case such as this where [they] are called upon to balance First Amendment rights against legitimate governmental interests. *Id.* at 824 (cleaned up) (citing *Kleindienst* v. *Mandel*, 408 U.S. 753, 765 (1972)). Here, Mr. Treviño has no alternate means to exercise his First Amendment right to communicate with other inmates and those outside the prison. He is prohibited from communicating with anyone except the few members of his immediate family that the Government has pre-authorized, and only during his two telephone calls per month. Such a restriction is excessive.

In response to the request to permit more communication with family, the Government takes issue with Mr. Treviño's characterization that his family "are honest people dedicated to work and study." (ECF 789 p. 14). The Government ignores the professionally accomplished members of Mr. Treviño's family and his young grandchildren, with whom he is prohibited from speaking. Instead, it lists members of his family who have been accused or convicted of criminal activity, including distant relatives and estranged relatives with whom Mr. Treviño's has little contact. Importantly, the Government includes Mr. Treviño's 70-year-old brother, Juan Francisco Treviño Morales, on this list of criminal associates. However, the Government has approved Juan Francisco as a contact for communicating with Mr. Treviño and the pair have spoken by telephone from the DF. The Government itself must have verified Juan Francisco's background and confirmed that he has no ties to Los Zetas or the CDN. Their calls have been monitored and the Government has not raised any concerns of improper information being passed. Mr. Treviño has aptly demonstrated that he can communicate with family members, even those who have been convicted of crimes, without passing improper messages. To restrict him from communicating with other family members is then excessive.

In part, the Government argues that Mr. Treviño's request to allow two calls per day would "require an unreasonable expenditure of resources." (ECF 789 p. 14). The Government does not elaborate on why available resources could not accommodate the translation, monitoring, and recording of two calls per day. This is particularly true when other inmates at the DF are permitted an unlimited number of calls. The DF was apparently able to monitor all of Mr. Treviño's calls during his first six weeks in custody there without taxing its existing resources. Moreover, none of those calls contained any evidence of misconduct on Mr. Treviño's part, demonstrating that the level of monitoring, under already-available resources, was sufficient to protect the Government's interests. Limiting his calls to two per month is an excessive response to the need to monitor his calls.

## **CONCLUSION**

For these reasons expressed above, Mr. Treviño respectfully requests that this Court grant Mr. Treviño's motion for relief from unconstitutional special administrative measures, revoke the SAM as punitive and unconstitutional measures, order that he be removed from solitary confinement and given the opportunity for daily communication with his family, and order that he placed in general population or any module the Court deems necessary.

Respectfully submitted,

_____               /s/_____
Michael McCrum                        William B. Purpura, Esquire
McCrum Law Office                     Purpura & Purpura
1659 Tx-46 W, Ste. 115 PMB 487        606 Baltimore Ave.
New Braunfels, Tx. 78132              Suite 301
Office 210.225.2285                   Towson, Maryland 21204
Tx Bar No. 13493200                   Office 410-727-8550
michael@mccrumlegal.com               wpurpura@purpuralaw.com


*Counsel for Miguel Angel Treviño Morales*

**CERTIFICATE OF SERVICE**

     I, William Purpura, hereby certify that on February 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.


_____/s/_____
William Purpura