UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| PLAINTIFF | § | |
| | § | |
| V. | § | CASE NO. 08-CR-00057-TNM |
| | § | |
| MIGUEL ANGEL TREVINO-MORALES (4) | § | |
| DEFENDANT | § | |

## DEFENDANT'S MOTION TO COMPEL
## DISCLOSURE OF SPECIFIC INFORMATION

One year ago today, with formal extradition proceedings pending and the entry of an order by a federal judge that he was not be removed from the country until finalization of lawful extradition proceedings, Miguel Angel Trevino Morales was taken by military forces from his jail cell in Mexico without he or his attorneys having received prior notice and in contravention of the federal judge's order, and transported to armed forces in the United States where he remains incarcerated to date. The circumstances of this unannounced, extrajudicial forced removal from his home country bears directly on Mr. Trevino's constitutional and civil rights in the instant case and other cases pending in the United States. At issue is the extent to which the Executive Branch of the U.S. Government exceeded the limits of authority granted to it by constitution, statute and treaty.

NOW COMES, Defendant Miguel Angel Trevino-Morales ("Mr. Trevino") by and through his attorney of record and respectfully moves this Honorable Court to order the Government to disclose all documents that relate to the circumstances which gave rise to the transfer of Mr. Trevino Morales from Mexico to the United States. This includes

communications between representatives of the two governments and internal documents within United States government agencies and offices, to include the Departments of Justice and State and the White House. For the reasons described below, there are substantial legal and factual grounds to believe that such documents are material and necessary to Mr. Trevino's defense.

## I.
## Context of Requested Material

As with all other defendants who face indictment charges and deprivation of pretrial and/or post-conviction liberty, Mr. Trevino must be able to evaluate the law and facts applicable to his situation. At the most basic level, this includes evaluating what rights he has so he knows whether they have been and/or are being violated, as well as evaluating what remedies he has to avail himself of his constitutional rights.

Mr. Trevino is a citizen of Mexico who was removed involuntarily from his home country in February 2025 to face charges in the United States. In addition to the charges in the instant case, he faces indictment in at least four other federal districts (Eastern District of New York; Eastern District of Texas; Western District of Texas; and Southern District of Texas).

Under the ambit of law approved by Congress, the prosecution of a defendant who has not been arrested in the United States is permitted through the proper administration of extradition proceedings. Extradition treaties between the United States and other countries have been negotiated and approved by the respective governments through each country's approved constitutional processes. In the United States, this necessarily

involves mutual respect for the authority of each branch of government under the doctrine of separation of powers and, conversely, each branch's commitment to not exceed the limits of its constitutional and statutory authority.

The extradition process addresses and respects each country's agreed grant of authority as well as the limitation of such authority, including situations in which the United States requests the removal of a person from another country for prosecution in the United States and vice versa. Not surprisingly, treaties include agreed provisions which protect the rights of the individual whose life is affected by an international agreement to remove such person from his home country.

Such is the case in the extradition treaty between the United States and Mexico and the attendant United States statutory law that executes such treaty.[1] The U.S./Mexico treaty clearly sets forth certain rights designed to protect persons, including the following which specifically relate to Mr. Trevino's situation:

1. The right of judicial review prior to removal to assess the sufficiency of evidence;[2]
2. The right against double jeopardy, prohibiting the prosecution of a person who has been prosecuted and convicted or acquitted for the offense for which extradition is requested;[3]
3. The right of limitation, prohibiting prosecution for an offense that is barred for lapse of time;[4]
4. The prohibition of the death penalty;[5]
5. The right against involuntary removal from his home country, unless such removal is authorized under the home country's laws;[6]

---

[1] *See* Extradition Treaty between United States and Mexico, May 4, 1978, attached hereto as **Exhibit A**, & 18 U.S.C. § 3184, *et al.*

[2] *See* Extradition Treaty, Art. 3.

[3] *Id.* at Art. 6.

[4] *Id.* at Art. 7.

[5] *Id.* at Art. 8.

[6] *Id.* at Arts. 9 & 13.

6. The right to faithful adherence to detailed extradition laws and mechanisms;[7] and,

7. The right of specialty, mandating that prosecution must be limited solely to the offense for which extradition is requested.[8]

Our United States Congress approved the U.S./Mexico treaty negotiated by the Executive Branch, but with a specific condition: the treaty expressly states that when the Executive Branch takes international steps with or against Mexico, it must do so in accordance with U.S. Congressional approval as granted through statutory law. Clearly, the intent of our government was to create an international structure which protects the rights of citizens affected, including a mandate that prevents the Executive Branch from committing acts outside that which has been specifically authorized by Congress and judicial review. Nothing in the treaty (nor any other law) provides for the extrajudicial, surprise removal of a citizen from his home country to the United States, particularly where extradition proceedings are in place and the countries are not in war with each other.

In the normal extradition process, a defendant removed from another country to the United States is entitled to evaluate whether his rights under the U.S./Mexico treaty and attendant extradition statutes have been honored. The only vehicle available to a person the judicial process designed to protect a citizen from abuse of power. The problem inherent in Mr. Trevino's situation, however, is that he was not removed to the United States from his home country pursuant to the U.S./Mexico treaty or extradition process. The extradition process which includes judicial review is specifically mandated

---

[7] *Id.* at Art. 10.
[8] *Id.* at Art. 17.

prior to the forced removal of a citizen from his home country. As the evidence described below proves, this process was unilaterally dispensed with by the coordinated acts of both country's Executive Branches. Not coincidentally, such actions were taken subsequent to extreme economic sanctions through tariffs imposed by the President upon Mexico (an act that the U.S. Supreme Court has now held to have been unlawful and outside the bounds of the President's authority).  Mr. Trevino's removal also came subsequent to threats by the U.S. President to send U.S. military forces into Mexico to combat crime. Not only does the combined acts of unlawful extreme tariffs, threats of military invasion, and extrajudicial removal of a citizen from his home country impact our country's doctrine of separation of powers, but it directly impacts Mr. Trevino's life.

Frankly, there is no treaty or statutory law which appears to govern the factual scenario under which Mr. Trevino was removed to the United States. Clearly, as shown below, Executive Branch government officials of both countries have repeatedly and publicly acknowledged there was some form of "agreement" entered between the Executive Branches of the United States and Mexico. But to date, Mr. Trevino has been denied access to that agreement or its terms and has no way to assess his own rights. He now faces prosecution in multiple districts and, potentially, state jurisdiction without having had the opportunity for judicial review that is otherwise provided by the extradition process. In the instant motion, Mr. Trevino is compelled to request documents which outline and/or describe such agreement to evaluate (a) what rights he has, and (b) the extent to which his rights are being honored or violated.

II.
## Pending Extradition Request
## Prior to Mr. Trevino's Involuntary Removal

The dates of different stages of Mr. Trevino's legal situation are relevant to the issues described above:

### *2008–2009*

Mr. Trevino was originally indicted in the instant case in 2008. Docket No. ("Doc.") 3. In 2009, the government sought and obtained a superseding indictment. Doc. 6.

### *2012*

In 2012, Mr. Trevino was arrested in Mexico upon the execution of a United States provisional arrest warrant (a procedure required under the U.S./Mexico treaty and U.S. statutory law). Pursuant to extradition law, the provisional arrest warrant was based on a specifically identified indictment, in this case the indictment returned in the instant case in 2009.

### *2013*

In 2013, the United States government served upon Mexico a formal request for extradition, changing its reliance on the 2009 indictment to reliance on an indictment returned in the instant case in 2013.

### *2013–2024*

Judicial extradition proceedings in Mexico occurred from 2013 through 2024, as was provided for by the U.S./Mexico treaty and U.S. & Mexico statutory law. During this

6

time period, Mr. Trevino was charged, tried and acquitted in a Mexico court for the same offense charged in the 2013 U.S. indictment.

In June 2024, the government sought and obtained a "superseding" indictment in the instant case. Neither Mr. Trevino nor his attorneys representing him in pending extradition proceedings in Mexico were notified of such indictment, and judicial extradition proceedings remained pending in Mexico based on the 2013 indictment returned in the instant case. The 2024 indictment included charged offenses which had not been included in the 2013 indictment (Count One, charging Continuing Criminal Enterprise; Count Three, charging a firearms felony; and Count Four, charging money laundering). The lack of notice by the United States' Executive Branch directly impacted Mr. Trevino's right of specialty, as referenced in the rights listed on page 2, above.

<u>2025</u>

In February 2025, while extradition proceedings were still pending pursuant to the U.S.'s 2013 extradition request, Mr. Trevino was forcibly removed from a detention facility in Mexico by the Mexican military forces without prior warning of any kind. There was no court order authorizing his removal, which was in violation of a Mexican court order prohibiting all agencies of the Mexican government from removing Mr. Trevino from Mexico without court approval.[9] Despite the specific requirements of the U.S./Mexico treaty and attendant statutory extradition law, the United States did not give notice to Mr.

---

[9] A copy of the federal court order is attached as Exhibit B (the original and an English translation). Under Mexican law, though a federal judge does not have direct jurisdiction over a pending extradition, it does have jurisdiction to order that a citizen not be removed from the country. This court did so, and such order was subsequently filed in the extradition proceedings, giving notice not only to other structures of government within Mexico but also to the United States Executive Branch, a party to such proceedings.

Trevino, his attorneys, or the Mexico courts presiding over the U.S.'s 2013 extradition request that the 2013 indictment had been "superseded" by a 2024 indictment that contained additional charges that had not been included in the extradition request and which exposed Mr. Trevino to significantly harsher penalties. Stated differently, between June 2024 and February 2025, Mr. Trevino was held in custody pursuant to an extradition request based on a 2013 indictment that no longer held legal force, and Mexico removed Mr. Trevino from his home country to the District of Columbia without having been notified by the United States that Mr. Trevino was to face a completely different and more severe indictment.

Mr. Trevino was transported to the United States by the Mexican military and transferred to the custody of the United States government. Mr. Trevino's forced removal from Mexico and transportation to the United States was not pursuant to any order issued through the still-pending extradition requests. Mr. Trevino was subsequently detained at Northern Neck Regional Jail, Warsaw, Virginia ("NNRJ") and arraigned in the instant case.

Mr. Trevino is suffering the exposure to a much more expansive indictment than the 2013 indictment that was the basis of the U.S.'s extradition request. Were his presence in the United States judicial system the result of an extradition process, issues of specialty, double jeopardy, limitation, sufficiency of evidence and other provisions of the U.S./Mexico treaty would have required a complete opportunity for judicial scrutiny prior to removal, including Mr. Trevino's right through counsel to scrutinize and contest such removal. Given the extrajudicial manner of Mr. Trevino's involuntary removal secretly

coordinated between the Executive Branches of both countries, *plus* the absence of any treaty or statute which governs the unprecedented extrajudicial removal of Mr. Trevino from his home country, he is compelled to seek clarification of the "agreement" apparently entered between the Executive Branches of the United States and Mexico, as publicly confirmed by government officials, and to otherwise review the panoply of rights, if any, that would otherwise exist had his removal followed established statutory and treaty provisions.

Though undersigned counsel requested the U.S. government to disclose all documents relative to the unprecedented and extrajudicial forced removal of Mr. Trevino, including all documents describing the terms and parameters of such removal, the government refused. Mr. Trevino has not been provided any document which describes the legal authority nor factual history of how this occurred, nor whether there is an agreement relative to the rights one is entitled to expect in an authorized extradition. As explained below, representatives of the Executive Branch of the Mexican government, including the President of Mexico, publicly announced that the forced removal was the result of negotiations and agreements with the Executive Branch of United States. Additionally, such officials have assured the public that Mr. Trevino's rights will be honored. Yet, without a copy of such agreement and/or documents exchanged during the planning and negotiation of the forced removal, Mr. Trevino has no way to analyze the extent there was an agreement or at least acknowledgment relative to each right normally provided in extradition.

For example, the U.S. government announced months after Mr. Trevino's removal that it would not seek the death penalty in the instant case. Mexican government officials have publicly indicated that forbearance of the death penalty was a condition of the agreement between the two Executive Branches prior to the forced removal, yet the U.S. government never acknowledged such an agreement, and instead initially communicated to this Court and Mr. Trevino that the death penalty as on the table. Both governments have been silent as to the extent to which, if at all, the U.S. government intends to honor other rights specifically outlined in the U.S./Mexico treaty that are listed on page 2 of the instant motion. Moreover, it is impossible for Mr. Trevino and his attorneys to evaluate whether, or to what extent, other federal districts or state governments will abide by the decisions of prosecutors or the Court in the instant case, a right that Mr. Trevino would have if his removal to the United States had occurred pursuant to the U.S./Mexico treaty and attendant extradition statutes.

As another example, soon after arrival at the NNRJ, Mr. Trevino was placed in "general population," a housing area within NNRJ where persons are detained together in a common area. In general population, Mr. Trevino was allowed to contact family members on a regular basis, contact his attorneys in Mexico regarding the still-pending extradition proceedings and other pending litigation in Mexico, watch daily news reports and other shows on television, and otherwise socialize with other humans. All detainees in general population are heavily monitored by supervising jail employees, and all calls to persons outside the NNRJ (telephone and videocalls) are recorded and must be pre-

approved by the NNRJ. Mr. Trevino spent six weeks in general population, where he was able to speak with his family and attorneys regularly through monitored and recorded communications, and did not commit a single infraction of rules.

In April 2025, the U.S. Department of Justice unilaterally imposed "Special Administrative Measures" ("SAM") which significantly altered aspects of Mr. Trevino's confinement. Mr. Trevino was moved to solitary confinement and was prohibited from any contact with other prisoners. Contact with his family was reduced to two short calls per month, and communication with his attorneys in Mexico was prohibited. Did the agreement between the Executive Branches of both governments include the prohibition of such severe detention restrictions? Without access to the agreement or representations made by the U.S. Executive Branch to their counterparts in Mexico, Mr. Trevino cannot analyze any terms related to the conditions of his confinement, nor raise a challenge to his conditions based on such agreement.

As a third example, the right of specialty is a critical aspect of extradition law. Under this doctrine, an extradited person cannot be prosecuted for crimes other than the specific ones for which they were extradited. In this case, it was not until Mr. Trevino arrived in the United States in February 2025 that he and his attorneys discovered that the United States had altered the charges in the 2013 indictment, which was the basis of the U.S. extradition request. Specifically, the 2024 indictment charges Continuing Criminal Enterprise ("CCE"), which carries a mandatory life sentence, as well as new firearms and money laundering charges. Also, the CCE charge alleges five homicide violations that were neither previously

charged nor included in the U.S.'s extradition request. Though United States extradition laws previously protected Mr. Trevino from exposure to charges that were not included in the extradition request, the United States apparently is sidestepping this law through forcibly removal Mr. Trevino from his home country. Without knowing whether the expulsion agreement provides for a right of specialty, Mr. Trevino is unable to challenge this government action.

As a final example, does the agreement protect a person from double jeopardy or time-barred prosecutions? Is such protection solely within U.S. statutory and/or constitutional protection? Why or under what circumstances does it allow removal of a citizen from his home country without the protection of his home country's judicial review and authorization?

We all are accustomed to abiding by the rules of extradition in terms of limiting the scope of process that an extradited person is subject to in a prosecution. The absence of shared knowledge about the law or rules or agreements applicable to this case, if any, creates an obvious due process problem. Simply put, both the parties and the Court have a right to know what the rules are. If we are proceeding under an international protocol different from that prescribed by the U.S./Mexico treaty and attendant extradition statutes, what is it? Is it an approved protocol approved by our government? Is it a private "agreement" entered between two Executive Branches? Mr. Trevino is entitled to know the scope of the agreement entered between the two Executive Branches and the representations made from one to the other relative to Mr. Trevino's rights (just as would

be required under established extradition law), whether such agreement or representations encompass some or all the proscriptions of extradition law, and whether there is a reference to or provision for another protocol. What are Mr. Trevino's rights? The government refuses to tell us.

## III.
### Affirmation of Agreement between Executive Branches & Reference to International Treaty & Conventions

Based upon public statements by officials of the Executive Branches, it is apparent that removal of Mr. Trevino from Mexico was based solely on the actions of both Executive Branches. No court from either country authorized the removal, nor was a court asked to approve. Remarkably, this extrajudicial joint action by the Executive Branches was despite the entry of orders issued by Mexican courts prior to the removal specifically stating that Mr. Trevino was *not* to be removed from Mexico without prior judicial authorizations. For Mr. Trevino to be able to analyze the breadth and specificity of his rights, two questions must be answered:

(1) If some law or international treaty authorized such removal, what is it?

(2) If the terms of such removal and subsequent prosecution were secured at least in part by an agreement and/or representations made by one government to the other, what is the agreement and/or what are the representations?

### *A. Agreement Between Executive Branches.*

Based upon public statements by government officials, not only was there an agreement, but also it involved U.S. officials in the White House, the Department of

Justice, the Office of the Attorney General, the Office of International Affairs of the Department of Justice, the DEA, and the FBI. These officials apparently worked in concert with officials of the government of the United Mexican States, including officials in the Attorney General's Office and the Secretary of Security and Citizen Protection ("Secretaría de Seguridad y Protección Ciudadana"). Officials publicly confirmed that the removal came upon the formal written request of the Executive Branch of the United States government, including the U.S. Department of Justice and the Office of the U.S. Attorney General.

One day after After Miguel Angel Trevino Morales and Oscar Omar Trevino Morales were involuntarily removed from Mexico on February 27, 2025, Mexican government authorities held a press conference to explain such acts. On February 28, 2025, the Attorney General of Mexico (Alejandro Gertz Manero), the Secretary of Citizen Security (Omar García Harfuch), the Secretary of National Defense (Ricardo Trevilla Trejo), and the Secretary of the Navy (Raymundo Pedro Morales Angeles) held a press conference broadcast on national television to report the details of this removal of citizens.[10] The Secretary of Security and Citizen Protection and the Attorney General of the Republic reported that the removal of Mexico citizens the day prior was the result of an agreement between the government of the United States and the government of Mexico in response to the United States' **specific, written** formal request, including "names and surnames."

---

[10] *See* Gabinete de Seguridad, Conferencia de Prensa (Feb. 28, 2025), *available at* https://www.youtube.com/watch?v=r27QMvPu5Q4&list=PPSV (last accessed Feb. 16, 2026). A translated transcript is attached as **Exhibit C**.

The following are excerpts from the initial press conference:

- ▪ Secretary of Security and Citizen Protection Garcia Harfuch:
  "*Yesterday, in coordination, cooperation, respect for sovereignty, and international reciprocity with the United States Government, it was agreed to transfer 29 perpetrators of violence, sought by the U.S. Department of Justice, some of whom had been wanted for 40 years and others for 11 years.*"

- ▪ Attorney General Gertz Manero:
  (min. 13:47 – 14:04) "*There was only one reason why we complied with the Palermo Convention: there was a well-founded request from the United States Government, and that was the reason why the whole procedure was triggered.*"

  (min. 14:22 – 14:38) "*From the moment we received the notification and written request from the United States Government, all actions were taken immediately. They were carried out by the Ministry of Security and supported by both the Army and the Navy.*"

  (min 15:03 – 15:07) "*No, no, it wasn't untimely; there was a specific written request.*"

  (min. 15:49 – 15:52) "*Everything stems from a request, and the request includes names and last names.*"

  (min. 17:26 – 17:46) "*No extradition law is being applied; this is a national security request, which the United States justified on the basis of the criminal conduct of these individuals in that country, which coincides with the procedures and knowledge we have of the evidence regarding their conduct.*"

A second press conference was held on August 13, 2025,[11] subsequent to the transfer of a second group of 26 Mexican citizens to the United States on August 12, 2025, presided by Attorney General Gertz Manero, Secretary of National Defense Trevilla Trejo,

---

[11] Secretaría de Seguridad y Protección Ciudadana, Conferencia de Prensa (Aug. 13, 2025), *available at* https://www.youtube.com/watch?v=A9As22TLKlo&list=PPSV (last accessed Feb. 16, 2026). A translated transcript is attached as **Exhibit D**.

Secretary of the Navy Morales Angeles, Commander of the National Guard Hernan Cortez Hernández, and Secretary of Security and Citizen Protection Garcia Harfuch. Secretary of Security and Citizen Protection Garcia Harfuch and Attorney General Gertz Manero confirmed that this removal of citizens was similar to the removal on February 27, 2025, in that it was a coordinated action that occurred at the request of the United States Government. Notably, the officials confirmed that there was an agreement with respect to at least one right typically addressed in an extradition proceeding, the right of protection from the death penalty:

> (min. 27:50 – 28:15)  *"It was agreed with the U.S. Department of Justice not to seek the death penalty for the initial 29 who were transferred in February, nor for these 26 who were recently transferred."*

> (min 42:44 – 43:03) "*Regarding your other question about the death penalty, the Department of Justice, as I mentioned at the beginning of my message, has committed not to seek the death penalty for the 29 who were transferred in February, nor for these 26, for any of them. That was agreed upon with the Department of Justice.*"

Perhaps most significantly, Attorney General Gertz Manero confirmed that the United States officials made certain representations regarding the "processes and trials" the removed citizens now "face" in the United States:

> (min 40:14 – 40:47) "*In this case, the request from the US Attorney clearly states and specifically points out the processes and trials that each of these individuals is facing.*"

On February 10, 2026, Secretary of Security and Citizen Protection Garcia Harfuch again publicly commented of the existence of written representations by the U.S. Executive Branch:

> *In the petition from the Department of Justice, signed by its Head, there states that none of the persons are going to be subject to the death penalty, they will have different trials, some have begun and others have not, but the death penalty is discarded for all persons sent to the United States."[12]*

The officials did not offer, however, details about what "processes" or "trials" the Mexican citizens were to be exposed to or, conversely, protected from.

In sum, it is evident by these statements that Mexico's agreement to participate in the forced removal of Mr. Trevino and others to the United States was preceded by specific representations by the United States government as to the "processes and trials" they would face. Furthermore, the forced removal was made pursuant to at least one **specific, written** request. To date, Mr. Trevino only knows of one of the promises made by the United States in its agreement with Mexico: it would not seek the death penalty, which is clearly an important consideration by Mexico given its inclusion in the U.S./Mexico treaty. But what other promises or representations were made? If no other promises other than the death penalty, does this abrogate the terms of the U.S./Mexico treaty or otherwise violate Mr. Trevino's due process rights? Mr. Trevino has a right to know.

### B. A Reference to "International Conventions"

The Attorney General of Mexico made one statement that offers some clarity as to the scope of the agreement and/or representations made.

> (min 39:13 – 39:40) "*We are applying the same constitutional basis, the same legal basis, we are applying the same international conventions, we are applying the same system whereby a requesting sovereign country asks a requested sovereign country for support of this nature, which is within the legal framework.*"

---

[12] The reference to U.S. Attorney General Bondi is in the transcript and translation of the relevant part of the February 10, 2026, conference, attached as Exhibit E.

This statement begs the question of what "international conventions" are being and/or should be "applied" to the multiple prosecutions Mr. Trevino is facing, including the instant case? Attorney General Gertz Manero was clear that both the United States and Mexico Executive Branches are "applying the same international conventions," yet neither Mr. Trevino nor this Court has been notified which "conventions" are to be applied. More importantly, what rights under such unnamed conventions are given or forsaken under this extrajudicial, non-statutory, non-procedural removal and subsequent prosecution? Because Attorney General Gertz Manero was confident that the Executive Branch with whom he and others negotiated were on the same gameplan, Mr. Trevino should be given copies of all of the intergovernmental communications where such "conventions" were discussed and agreed upon.

Other statements given by Mexican officials provide hints of the legal bases upon which Mexico forcibly removed its own citizens outside the extradition process. In one statement, Attorney General Gertz Manero referenced the "Palermo Convention":

> (min. 13:47 – 14:04) "*There was only one reason why we complied with the Palermo Convention: there was a well-founded request from the United States Government, and that was the reason why the whole procedure was triggered.*"[13]

Undersigned counsel suspects that Attorney General Gertz Manero's reference to "The Palermo Convention" is a reference to The United Nations Convention against Transnational Organized Crime, a convention initiated and approved by the United

---

[13] *See* Exhibit C.

Nations in the year 2000. [14] The United States, Mexico and other member states participated in the Convention. Though Attorney General Gretz Manero suggested that the removal of Mexican citizens to the United States was in "compliance" with the Palermo Convention, however, nowhere in the Convention does it provide for the extrajudicial removal of a country's citizens.

Conversely, the only mention of the transfer of a person from one country to another for prosecution is Article 16 of the Convention, "Extradition." Section 7 of Article 16, explicitly provides that extradition shall be governed by the extradition treaty that exists between the two countries. And while Article 18 of the Convention allows for "mutual legal assistance," nowhere in such article does it allow for the transfer of humans outside the extradition process. Even if the "mutual legal assistance" article could be interpreted as allowing for the involuntary removal of a citizen to another country, Section 12 of Article 18 specifically provides that such person may *not* be prosecuted in the requesting country. Finally, the Palermo Convention offers no information as to the specific rights that Mr. Trevino has in the context of his current detention and prosecution.

Moreover, the Palermo Convention specifically admonishes an Executive Branch's extrajudicial act. Because it was the U.S. Executive Branch that sought Mr. Trevino's extradition in 2013, the U.S. government can hardly claim ignorance of the Mexico court orders issued in connection with such extradition proceedings that expressly prohibited the extrajudicial removal of Mr. Trevino from Mexico. As clearly stated in Article 4 of the

---

[14] *See* United Nations, Office on Drugs and Crime, UNTOC, *available at* https://www.unodc.org/unodc/en/organized-crime/intro/UNTOC.html (last accessed Feb. 16, 2026).

Palermo Convention, "the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States" prohibit acts taken in contravention to the Palermo Convention and bilateral treaties between countries. Respectfully, Attorney General Gertz Manero's reference to the "Palermo Convention" thus provides no outline of the panoply of rights Mr. Trevino has in this extraordinary process, if any, nor provides a legal basis for the involuntary, extrajudicial and non-statutory removal of Mr. Trevino from his home country. In fact, it admonishes it in the context of Mexico court orders which specifically prohibited such removal.

A second hint of an attempted justification for the extrajudicial removal is contained in a press release issued by the U.S. Attorney General on February 27, 2025, the day Mr. Trevino was removed to the United States.[15] Attorney General Bondi stated that Mexico's removal of its citizens to the United States was "in response to the Justice Department's efforts pursuant to President Trump's directive in Executive Order 14157, entitled *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, to pursue total elimination of these Cartels." The Attorney General also thanked the Justice Department Criminal Division's Narcotic and Dangerous Drug Section and its Office of International Affairs, indicating their involvement in the extrajudicial removal. In addition to the fact that the legality of Executive Order 14157 has been and is being questioned in the United States, such

---

[15] *See* Dep't of Justice, Press Release No. 25-200, "Attorney General Bondi Announces 29 Wanted Defendants from Mexico Taken into Custody, https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-announces-29-wanted-defendants-mexico-taken-us-custody (Feb. 27, 2025).

executive order does not provide a legal basis for the extrajudicial, non-statutory removal of another country's citizens. Nor does such order offer any information as to the rights and/or proscriptions against abuse that are necessary for Mr. Trevino to evaluate his legal status.

In sum, the official statements of U.S. and Mexican government officials relative to "International Conventions" fail to provide any information relative to Mr. Trevino's rights and the parameters of prohibited governmental acts relative to the prosecutions against him. For this reason, production of the requested material is material to Mr. Trevino's defense. Otherwise, matters that are routinely addressed in the context of a judicial extradition process pursuant to statute and treaty are glaringly absent and unavailable to Mr. Trevino. He has been thrown into an unprecedented no-man's land of open questions and vulnerabilities, including (a) the harsh aspects of his confinement which the DOJ unilaterally imposed, (b) the harsh augmentation of charges and potential penalties in the 2024 indictment relative to the 2013 indictment, a violation of the rule of specialty otherwise protected by the extradition process; (c) the exposure to potential penalties that are incompatible with the Mexican justice system, and (d) the exposure to prosecution for offenses that Mr. Trevino was acquitted of, thus violating the extradition treaty's protection against double jeopardy.

To protect the rights of Mr. Trevino in the instant cause, it is incumbent upon the U.S. government to provide Mr. Trevino the communications and agreements entered into with the Mexican government. Just as the United States government is prevented

from exceeding its promised course of prosecution in an extradition context, Mr. Trevino's right to due process should prevent the government from exceeding whatever promise it made in entering an agreement with Mexico regarding the forced, unorthodox removal of Mr. Trevino from his home country. The request for all documents associated with this forced removal, described on page 2 of Defendant's written request of June 6, 2025, is material to aspects of Mr. Trevino's detention and prosecution in the instant case.

## IV.
## The Government's Refusal

As discussed above, the historical precedent of extradition in the United States calls for protection of extradited persons through judicial review to ensure compliance with all treaty provisions. The involuntary removal procedure inflicted upon Mr. Trevino was outside the protective realm of extradition law. Relevant to the analysis of Mr. Trevino's rights in light of the severity of such breach of Congressionally authorized extradition law, a total of 92 Mexican citizens have been involuntarily removed to the United States, many of whom had pending extradition requests. Some citizens were forcibly transferred despite the absence of an extradition request and its attendant protective measures. This unilateral extrajudicial movement of people is unprecedented in the absence of war.

A critically important question is "What rights does Mr. Trevino have relative to the aspects of his confinement and/or the charges he is now facing?" To that end, on June 9, 2025, counsel for Mr. Trevino delivered a written request to the prosecution to produce material required by Federal Rule of Criminal Procedure 16 and *Brady v. Maryland*. Notice

of this request was filed of record in the instant case that same day. *See* Doc. 705-1. The

second item in this letter requested the following:

> Please produce all documents that relate to the circumstances which gave
> rise to the expulsion of Mr. Trevino Morales from Mexico to the United
> States, to include communications between representatives of the two
> governments and internal documents within United States government
> agencies and offices, to include the Departments of Justice and State and
> the White House.

*See* Doc. 705-1 at 2.

The government's response narrowly interpreted its obligation of production to

the office of the particular prosecutors; the prosecutors responded to the request stating,

*"The **prosecution team** did not request Mr. Trevino Morales's expulsion and does not have*

*any communications with the Mexican government regarding that expulsion. . . . The*

***prosecution team** is likewise not aware of any 'internal documents within United States*

*government agencies."* Govt. Response, 7/23/2025 (emphasis added). The "prosecution

team" (i.e., the prosecutors assigned to the instant case) cannot insulate itself from the

government's *Brady* obligation by limiting the scope of its search obligation to the walls

of its office. *See United States v. Naegele*, 468 F. Supp. 2d 150, 153 (D.D.C. 2007) (citing

*United States v. Safavian,* 233 F.R.D. 12, 16–20 (D.D.C. 2005); *United States v. Hsia*, 24 F.

Supp. 2d 14, 29–30 (D.D.C. 1998)). Rather, "prosecutors have an affirmative duty to search

possible sources of exculpatory information, including a duty to learn of favorable

evidence known to others acting on the prosecutor's behalf." *Id.* While the government

included in its response that it *"is aware of its discovery obligations"* under applicable

rules of procedure, *Brady v. Maryland*, and *Giglio v. United States*, it has long been admonished in this Circuit that such blanket affirmations are insufficient. *Id.* at 152 n.2.

In this case, the prosecutors indicated that they were not in possession of any such material and even if they were, the government nevertheless objected to production on the basis of lack of relevance of such material. Furthermore, the prosecutors claimed that if such material were in its possession, the documents would be considered "*reports, memoranda, or other internal government documents*" protected from discovery by Rule 16(a)(2).

## V.
## Applicable Law

### A. Disclosure Obligation of "Material" Evidence under Rule 16

Rule 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure provides that "*upon a defendant's request, the government must permit the defendant to inspect and copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control*" and if "*the item is material to preparing the defense.*" The "*materiality standard of Rule 16 normally is not a heavy burden.*" *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993). Evidence is *material* "*if it could be used to counter the government's case or to bolster a defense.*" *United States v. Stevens*, 985 F.2d 1175, 1180–81 (2d Cir. 1993).

The government's discovery obligation under Rule 16(a)(1)(E)(i) extends to those items that are "*within the government's possession, custody, or control.*" In determining

the scope of that control, "*courts have in the main been more concerned with fairness to the defendant, on the one hand, and the government's ease of access to the documents sought, on the other, than with the issue whether the documents are actually within the physical possession of the prosecutor.*" *See United States v. Trump*, 753 F. Supp. 3d 17, 27 (D.D.C. 2024) (citing *United States v. Libby*, 429 F. Supp. 2d 1, 5–6 (D.D.C. 2006)).

As noted above, courts of this District are consistent in ruling that the prosecutor's duty to search for material pursuant to Rule 16 requires the prosecutor to search for and produce requested information "*maintained by other components of the government which are closely aligned with the prosecution.*" *See United States v. Brooks*, 966 F.2d 1500, 1503, (D.C. Cir. 1992). Accordingly, the prosecution cannot escape its obligation by responding that such documents are not in the direct possession of the prosecution team. It must also search for and provide material evidence that is in the possession, custody, or control of other government agencies that are closely aligned with the prosecution. "*The scope of that duty depends on the 'working relationship' between the prosecution and other agencies, along with 'the nature of the files' at issue, the difficulty of searching for them, and the prospect of finding favorable evidence therein.*" *See United States v. Trump,* 753 F. Supp. 3d at 25–26 (citing *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C. Cir. 1992)); *see also United States v. Connolly*, No. 16 Cr. 00370, 2017 U.S. Dist. LEXIS 36759, 2017 WL 945934, at *4 (S.D.N.Y. Mar. 2, 2017). All of the Executive Branch offices and agencies referenced above are closely aligned with the "prosecution team" in this case.

B. Disclosure Obligation under *Brady* and *Giglio*

The law in this area is well established. Mr. Trevino is entitled to any favorable information in the government's possession. *Brady v. Maryland*, 373 U.S. 83 (1963). In fact, failure to disclose favorable evidence constitutes suppression even if the defendant's individual prosecutors do not have possession of the favorable information. *See Kyles v. Whitley*, 514 U.S. 419 (1994); *Brady*, 373 U.S. at 87. Consequently, "*the individual prosecutor has a duty to learn of any favorable evidence known to the others* acting on the government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437 (emphasis added); *see also In re Sealed Case No. 99-3096*, 185 F.3d 887 (D.C. Cir. 1999).

*Brady* and its progeny urge us to err on the side of caution when assessing whether evidence is favorable:

> [A] prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence. . . . This is as it should be. Such disclosure will serve to justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'

*Kyles*, 514 U.S. at 439–40 (1995) (citations omitted). Disclosure "will tend to preserve the criminal trial, as distinct from the prosecutor's private deliberations, as the chosen forum for ascertaining the truth about criminal accusations." *Id.* at 440; *see also Dennis v. United States*, 384 U.S. 855, 870 (1966) ("D*isclosure, rather than suppression, of relevant materials ordinarily promotes the proper administration of criminal justice*."); *Cone v. Bell*, 556 U.S. 449, 470 n.15 (2009) ("*A prudent prosecutor will err on the side of transparency, resolving doubtful questions in favor of disclosure.*").

The requested evidence regarding Mr. Trevino's expulsion goes beyond a mere allegation of its materiality. Confirmed by several high-level Mexican government officials in its Executive Branch, Mr. Trevino's forced removal came as a result of a specific, written "*request* [from the Executive Branch of the United States]*, and the request comes with names and last names"* and was carried out "*in coordination, cooperation, respect for sovereignty and international reciprocity, with the Government of the United States . . .requested by the United States Department of Justice.*"[16] Even Mexico's President Claudia Sheinbaum confirmed the extensive "collaboration and coordination" between the two country's Executive Branches, publicly stating that the removal of citizens was the result of the work of "bilateral understanding groups" and the written request of the U.S. Department of Justice. The words of these high-ranking officials of the Mexican government are clear in establishing that there was extensive verbal and written coordination and a cooperation agreement between the Executive Branch of the United States— including the Department of Justice—and the Executive Branch of the Mexican government.

United States Government officials have corroborated not only this coordination, but also the involvement of the Department of Justice—the very entity to which this prosecution team belongs. Indeed, the Department of Justice has repeatedly taken responsibility through its own press releases. In one,  Acting Deputy Attorney General Emil Bove confirmed that "*Today's actions* [i.e., the removal of Mr. Trevino and others from

---

[16] Statements by Mexico Attorney General Gertz Manero & Secretary of Security and Citizen Protection Garcia Harfuch, respectively.

Mexico to the United States] *are a consequence of a White House that negotiates from a position of strength, and an* **Attorney General who is willing to lead the Department** *with courage and ferocity.*[47] Confirming this collaboration with the Government of Mexico, the U.S. Attorney General's own August 12, 2025, press release thanked "*Mexico's National Security team for their collaboration in this matter.*" Similarly, the Attorney General referenced the involvement of the DOJ's Office of International Affairs in the negotiations and their "*critical assistance securing the transfer of these fugitives to the United States to face justice.*"

In sum, the Department of Justice and the White House were directly involved in coordinating the unprecedented transfer of Mr. Trevino from Mexico. Thus, the prosecution team's position that they don't have access to information and documents relating to that expulsion, including the Department of Justice's own specific written requests, representations and exchange of documents to and from Mexico is insufficient to meet its statutory and constitutional duty of production. This information is material to the defense, as it contains the promises and commitments made regarding the scope of the criminal prosecution of his case, the processes, and respect for the procedural guarantees granted to Mr. Trevino by international conventions. As noted above, Congress was explicit in agreeing to approve the negotiated treaty with Mexico that the Executive Branch was prohibited from taking acts outside the parameters of the treaty

---

[17] Dep't of Justice, "Attorney General Pamela Bondi Announces 29 Wanted Defendants from Mexico Taken into U.S. Custody (Feb. 27, 2025), https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-announces-29-wanted-defendants-mexico-taken-us-custody (last accessed Feb. 16, 2026).

provisions.

If the government is successful in its attempt to withhold the requested information from Mr. Trevino, that will constitute a *Brady* violation. *First*, the evidence in question is favorable to Mr. Trevino in multiple ways. As noted above, Mr. Trevino was acquitted in Mexican court of the same criminal conduct alleged in the indictment in this case. Extradition law—including the bilateral treaty between the United States and Mexico— prohibits the extradition of a citizen from his home country after acquittal of the same charges. Also, the rule of specialty prohibits the augmentation of charges and penalties from those upon which the United States sought extradition. Additionally, extradition law prohibits prosecution for time-barred offenses, as well as extreme conditions of confinement. Mr. Trevino now faces an indictment that violates basic extradition protections, including significantly higher charges and penalties.

The agreement between the two countries for Mr. Trevino's expulsion is favorable to Mr. Trevino because it provides the specific processes to which expelled persons are exposed, as well as any agreements relating to the international conventions to which the Attorney General and other high-ranking officials of the Government of Mexico have repeatedly referred, which were applied for the expulsion/surrender of Mr. Treviño and others. As discussed above, high-ranking Mexican government officials have acknowledged that the expulsion/surrender was carried out under a commitment to respect the procedural guarantees of the international conventions between the two countries. Documentation of Mr. Trevino's rights, benefits, and protections—including

protections against new and different charges—is obviously favorable to him. If specific rights exist, Mr. Trevino is entitled to rely upon them. If no specific rights are protected, that fact is also favorable, as it will determine whether the prosecution of Mr. Trevino can be sustained under the Constitution and the United States' obligations under its bilateral treaty with Mexico and the Palermo Convention. , For example, in examining the charges contained in the 2013 indictment which were the subject of the extradition request that presented legal limitations on the U.S. government's actions, and comparing them with the new, explansive charges that were added in the new 2024 indictment reveals the materiality of the information requested and its significance for the defense. If such a commitment to respect international conventions exists, the government would have an obligation to respect the procedural guarantees against double jeopardy, the principle of specialty, and those applicable under the relevant international conventions.

*Second*, this favorable evidence is currently being suppressed. As noted above, the prosecution team has asserted that they are not "*aware*" of the existence of such documents and that "they did not participate in the request for the expulsion and surrender" of Mr. Treviño and his co-defendant brother, Mr. Oscar Omar Treviño. This constitutes suppression, as the prosecution team is overlooking its *Brady* obligation to obtain such favorable material from other offices and agencies actively involved in the case, particularly in the expulsion, transfer, and delivery of the defendants. Most obviously, the prosecution team is a part of the Department of Justice, and the Department of Justice has released multiple press releases congratulating itself for its own participation in this

expulsión. Moreover, other offices and agents—including the White House, the Office of the Attorney General, the Office of International Affairs of the Department of Justice, and other federal agencies closely aligned with the case—admittedly worked closely on this operation. Having publicly celebrated its participation in this collaborative operation and agreement, the Department of Justice should not be heard to deny that it has any relevant information about it.

In sum, the Government must produce all communications between the aforementioned offices and agencies of the Executive Branch that are closely aligned with the "prosecuting team" in the prosecution of this case, and the authorities of the Government of Mexico that are related to the expulsion/transfer of Mr. Treviño and others, as well as the international commitments made by those authorities to secure the presence of the defendant in the United States. Such communications must cover the entire period from the beginning of the international "cooperation" referred to by high-level officials of both countries until after the defendant's presence in the jurisdiction of the United States was secured. The material must include all communications between officials of both countries on this topic, including emails, telephone records, international letters, formal requests, letters responding to requests, records, and minutes of meetings between agencies (in the United States and Mexico. Should any such documents contain material that affects the security of the United States, defense counsel should be permitted to inspect such material under protection measures typically imposed in other similar situations involving classified material.

<u>Conclusion</u>

WHEREFORE, PREMISES CONSIDERED, the defendant Miguel Angel Trevino Morales requests that this Honorable Court approve his Motion for Disclosure of Specific Evidence and compel the Government to disclose all the material described in Mr. Trevino's written request of June 6, 2025, as indicated above.

Respectfully submitted,

*/s/ William B. Purpura*

Michael McCrum
McCrum Law Office
1659 Tx-46 W, Ste. 115
PMB 487
New Braunfels, Tx. 78132
Office 210.225.2285
Tx Bar No. 13493200
michael@mccrumlegal.com

William B. Purpura, Esquire
Purpura & Purpura
606 Baltimore Ave.
Suite 301
Towson, Maryland 21204
Office 410-727-8550
DC Fed Bar # MD00074
wpurpura@purpuralaw.com

*Counsel for Miguel Angel Treviño Morales*


<u>Certificate of Service</u>

I hereby certify that on the 1st day of March 2026 a copy of the above and foregoing Motion for Specific Information has been delivered by electronic mail, to the counsel for the United States.

*/s/  William B. Purpura*
William B. Purpura