**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **vs.** | **:** | **Case No. 08-CR-057-4** |
| | **:** | |
| **MIGUEL TREVINO MORALES (4),** | **:** | |
| | **:** | |
| **Defendant.** | **:** | **Honorable Trevor N. McFadden** |
| | **:** | |

## DEFENDANT MIGUEL ANGEL TREVINO-MORALES' REPLY TO GOVERNMENT'S OPPOSITION TO MOTION TO COMPEL DISCLOSURE OF SPECIFIC INFORMATION

Now comes the defendant, Miguel Treviño Morales, by and through counsel, and replies to the Government's Opposition (ECF No. 804) to Defendant's Motion to Compel Disclosure of Specific Information (ECF No. 797). Mr. Treviño renews his request for a motion compelling the disclosure of documents that relate to the circumstances which gave rise to his transfer from Mexico to the United States. The documents are subject to disclosure under both Fed. R. Crim. P. 16(a)(1)(E)(i) and *Brady v. Maryland*, 373 U.S. 83 (1963) because they are material, exculpatory, and within the Government's custody, possession, and control.

This prosecution presents a paradigm case that overrides the presumption that the Government acted within the bounds of the law in prosecuting Mr. Treviño and his brother Omar Treviño. The Government's actions in bringing the men before the Court for prosecution shocks the conscience in a manner that would make their continued prosecution violative of due process. Indeed, the Government itself has acknowledged that it procured the presence of Messrs. Treviño outside the statutory extradition process by providing "assurances" to Mexico about the criminal prosecution the men would face in the United States in order to encourage Mexico to expel them. *See* ECF No. 804 at 10. In so doing, the Government traded Messrs. Treviños' statutory rights

1

under the U.S. Mexico Extradition Treaty for unidentified "assurances" that the Government wishes to keep secret. The timing of the men's expulsion suggests that the United States' Executive Branch may have exerted influence over the Executive Branch of Mexico during negotiations over export tariffs, resulting in the extra-judicial transfer. The men were not parties in this negotiation of their rights and do not know which rights were traded away and in which they remain clothed. Notably, the Government has not identified which arm of the United States Government provided the "assurances" and to whom in Mexico they communicated such information.[1] More importantly, the Government refuses to provide the defense with any documentation of such negotiations and "assurances," even while arguing that the "assurances" are the only rights the defendants could assert to challenge their expulsion to the United States. This Court should intervene to assure the defense has access to information that is favorable and material to the defense.

The Executive Branch should not be permitted to hide its head in the sand when it performs an act from which there is no legal precedent or authorization. Nor can it write off the severity of what happened by pointing to the Executive Branch of Mexico's decision to expel Mr. Trevino to justify the U.S. Executive Branch's own actions outside the bounds of statutory law.

What must be kept as the primary guiding principle in this legal analysis is that we are dealing with an unprecedented legal and factual situation. A man was forcibly removed from his home country in a way that no United States law permits. It was not an extradition that was approved by any court or authorized by statute or treaty. Indeed, the forced extra-judicial

---

[1] In a February 27, 2025, press release, then-Attorney General Pamela Bondi stated that Mexico's removal of its citizens to the United States was "in response to the Justice Department's efforts pursuant to President Trump's directive in Executive Order 14157. *See* Dept of Justice, Press Release No. 25-200, "Attorney General Bondi Announces 29 Wanted Defendants from Mexico Taken into Custody," https://www.justice.gov/opa/pr/attorney-general-pamela-bondi-announces-29-wanted-defendants-mexico-taken-us-custody (last accessed Apr. 23, 2026).

extraction was carried out ***despite*** the pendency of extradition proceedings requested by the United States and despite the United States knowing that the judicial authority in Mexico overseeing the extradition proceeding had entered an order specifically prohibiting the transfer or extraction of Mr. Trevino without court order.  The United States' Executive Branch committed this unprecedented act knowing it was outside each country's laws and court procedures. This alone gives a sound basis to require the Executive Branch to produce all related documentation. The fact that Mexico's Executive Branch permitted the extraction of its own citizen in contravention of its own judicial mandate that no expulsion should occur is of no legal merit in the context of justifying our own Executive Branch's actions. In the jurisprudence of the United States, there simply is no law that allows the Executive Branch to do what it did.

The Government does not assert in its Response there is law which authorized its complicity. Thus, there is an underlying question of whether the United States should be allowed to participate in a forced removal of a man from his country of origin and residence when the method of doing so is patently outside the legally recognized authorization and methodology mandated by United States law. Where the Executive Branch of the United States commits acts that are without legal foundation, and particularly one in which the United States Executive Branch is complicit in the forcible removal of a man from his home country without a statutory or procedural basis, it is entirely appropriate to describe this as an act that shocks the conscience and offends our sense of justice, each of which are grounds for finding a lack of personal jurisdiction.

To analyze the depth of this unprecedented act, this Court and the defendant must be able to review documentation to assess the extent of the Executive Branch's complicity. No less than the Due Process clause of the Constitution requires the Executive Branch to disclose

3

documentation that will show the degree of complicity by the U.S. Executive Branch. The Constitutional mandate of due process gives a person the right to contest the Executive Branch's acts that fall outside any statute or treaty. It goes to the very heart of whether this Court has legal jurisdiction over this man. Only after a careful review of the requested documentation can this Court, and perhaps appellate courts hereafter, adequately perform a court's constitutional and fully informed duty of checks and balances.

**A.  The Requested Documents Are Discoverable Under Fed. R. Crim. P. 16 and *Brady v. Maryland*.**

District courts have broad discretion with regard to discovery motions in criminal cases. *United States v. Washington,* 318 F.3d 845, 857 (8th Cir. 2003). Rule 16 of the Federal Rules of Criminal Procedure governs pre-trial discovery in criminal cases and provides, in pertinent part, that a defendant is entitled to obtain from the government documents and objects that are "within the government's possession, custody, or control" if "(i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P. 16(a)(1)(E). Fed. R. Crim. P. 16 permits a criminal defendant to obtain from the government certain documents or items of evidence that are "material to preparing the defense[.]" Fed. R. Crim. P. 16(a)(1)(E)(i).

Evidence that the Government does not intend to use in its case-in-chief is still material "if it could be used to counter the government's case or to bolster a defense [, but] information not meeting either of those criteria is not to be deemed material within the meaning of the Rule." *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993)." Under Rule 16, evidence is material if there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." *United States v. Graham*, 83 F.3d 1466, 1474 (D.C. Cir. 1996) (internal quotations omitted). "Although

4

this hurdle is not a high one, the evidence must not simply bear some abstract logical relationship to the issues in the case . . . There must be some indication that pretrial disclosure of the disputed evidence would enable the defendant significantly to alter the quantum of proof in his favor." *United States v. George*, 786 F. Supp. 11, 13 (D.D.C. 1991) (internal quotations and citations omitted). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Blackley*, 986 F. Supp. 600, 601 (1997) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

"[Rule 16] is intended to prescribe the minimum amount of discovery to which the parties are entitled. It is not intended to limit the judge's discretion to order broader discovery in appropriate cases." 18 U.S.C. Appx. § 761. Disputes should be resolved in the defendants' favor, for "the language and the spirit of the Rule are designed to provide to a criminal defendant, in the interests of fairness, the widest possible opportunity to inspect and receive such materials in the possession of the government as may aid him in presenting his side of the case." *United States v. Karake*, 281 F. Supp. 2d 302, 306 (D.D.C. 2003) (quoting *United States v. Poindexter*, 727 F. Supp. 1470, 1473 (D.D.C. 1989)).

In addition to the rights under Fed. R. Crim. P. 16, a criminal defendant is entitled to certain information under *Brady* v. *Maryland*, 373 U.S. 83 (1963). *Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The meaning of the term "favorable" under *Brady* is not difficult to discern. *United States v. Safavian*, 233 F.R.D. 12, 16-17 (D.D.C.

5

2005). It is any information in the possession of the government -- broadly defined to include all Executive Branch agencies -- that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses. It covers both exculpatory and impeachment evidence. *Id.* Where doubt exists as to the usefulness of the evidence to the defendant, the government must resolve all such doubts in favor of full disclosure. *See United States v. Paxson,* 274 U.S. App. D.C. 71 (D.C. Cir. 1988).

A defendant need not show that disclosure of the suppressed evidence would necessarily change the results of a criminal proceeding -- rather, a defendant must simply establish that there is a "reasonable probability" of a different outcome. Suppression by the government of favorable material evidence is violative of a defendant's constitutional right to due process. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

Evidence can be material and favorable to the accused even when it is germane to issues other than guilt or innocence. *See, e.g. United States v. Balogun*, 971 F. Supp. 1215, 1243 (N.D. Ill. 1997) (compelling the government to attempt to acquire documents related to the affidavits supporting extradition for disclosure to defendant); and *Berlin Democratic Club v. Rumsfeld*, 410 F. Supp. 144 (1976) (holding, in case where United States citizens in Germany challenged the alleged involvement of the United States Army in inducing German authorities to wiretap them in violation of their constitutional rights, that plaintiffs were "entitled to discovery of facts which would demonstrate that the Federal Republic of Germany simply carries out the suggestions of the United States Army without meaningful review").

In *United States v. Trabelsi*, No. 06-89 (RWR), 2015 U.S. Dist. LEXIS 189343, at *5-6 (D.D.C. May 8, 2015), the district court ordered the government to produce correspondence and documents sent between the United States and Belgium addressing Mr. Trabelsi's extradition. Mr.

Trabelsi had argued that the correspondence would support his arguments in his motion to dismiss the indictment and was therefore essential to the preparation of his defense. Specifically, he argued that the United States had induced his extradition by tricking Belgium into believing that extradition would not violate the double jeopardy provision of the extradition treaty. The materials at issue were not sought to prove Mr. Trabelsi's guilt or innocence, but rather to support the argument that the superseding indictment and prosecution violated the United States' extradition treaty with Belgium. *Id.* at *25. The Court found that "correspondence proving the trickery would surely qualify as 'evidence favorable to [the] accused." *Id.* at *23.

In *United States v. Karake*, 281 F. Supp. 2d 302, 309 (D.D.C. 2003), the district court ordered the production of extradition documents for use in a suppression hearing and as mitigation at any eventual sentencing hearing. The defendants, who had been extradited to the District of Columbia from Rwanda, sought information regarding extradition or rendition efforts pertaining to them, and other documents concerning the "advice, assistance, requests, or any other communication between the government of the United States and the government of Rwanda" concerning their investigation and apprehension. The defendants believed that United States officials acted jointly with Rwandan law enforcement officials before the defendants were brought to the United States. They hoped to demonstrate cooperation between the United States and Rwandan governments that would prove an agency relationship in order to support a motion to suppress statements made abroad.

The government argued that the discovery request was unnecessary because, "there was no joint venture and Rwanda was not acting as an agent of the United States." Even with the government's proffer, the court found that the defendants were entitled to seek information to support their claim, as it was crucial to their ability to file motions to suppress their statements,

and may reveal mitigating evidence arising from the circumstances of their extradition. *Id.* at 308. The government had not yet determined whether to seek the death penalty in that case. Still, the court ordered the government to disclose any evidence that the United States government represented to any foreign government that defendants would not be subject to the death penalty upon extradition in case such information could be used as mitigation at sentencing.

By contrast, the Eastern District of New York denied a motion to compel production of extradition-related documents in *United States v. Loera*, 2017 U.S. Dist. LEXIS 101291 (E.D.N.Y. June 29, 2017). Mr. Loera sought extradition-related documents in order to file a motion to dismiss the indictment. He intended to argue that his prosecution in that district violated the Rule of Specialty under the Extradition Treaty between the United States and Mexico. However, the government had already produced a document demonstrating that the government of Mexico had waived the Rule of Specialty in his case, essentially making that argument moot before it could be raised. The court found that he had failed to articulate any basis for the requested documents and therefore found them to be immaterial.

As to Mr. Loera's argument that the extradition requests may have contained other assurances by the United States, in addition to the assurance that the United States will not seek the death penalty, the court found that "there were no other assurances." It based this finding on a statement from the government, "The Government conferred with the U.S. Department of Justice's Office of International Affairs ("OIA") and has confirmed that abstention from seeking the death penalty was the only assurance the United States gave."

The court in *Loera* took particular issue with the defendant's failure to articulate a basis for his proposed motion to dismiss that provided a nexus to the requested documents, stating,

> [D]efendant has not identified any provision in the extradition
> treaty between the United States and Mexico that he alleges the

> United States violated; rather, his motion to compel production is more akin to a snipe hunt because there may be nothing there at all — he intends to review all of the materials and then determine what, if anything, supports a permissible argument.

In finding a lack of materiality, the court held that Rule 16 did not permit a strategy of reviewing materials to determine what, if anything, supports a possible argument. *Id.* at *19.

In its Response, the Government points to *United States v. Loera* to passively suggest that this Court presume, or worse, ignore, the underlying act of extra-judicial extraction of Mr. Trevino (one which was without legal precedent or judicial or statutory authority). The Government argues that this brazen act is substantively equivalent to Guzman-Loera's judicial extradition and his request for extradition-related documents. It most definitely is not - - the legal analysis required in each case would be equivalent to comparing apples to oranges.

Before addressing the distinguishing factors that make the *Loera* case inapplicable to the case at bar, it should be noted that the Government is relying on a non-published district court case from a different district, a case not binding on this Court, to address a material legal and factual issue that has no legal or factual precedent. On that shaky foundation, we must recognize the factual and legal distinctions.

First, Mr. Guzman-Loera was extradited pursuant to established extradition U.S. statutes and approved procedures under a Congressionally authorized treaty with Mexico. There is a presumption of regularity and compliance in the judicial oversight of his extradition proceeding. This presumption necessarily underlies Mr. Loera's request for extradition-related documents. There can be no such presumption in Mr. Trevino's situation, as there was no judicial oversight, much less authorization, and no underlying statutory authority for the extraction. The Government's possession of documents relative to this unprecedented act, therefore, must be open to scrutiny and examination.

Second, the district court rejected Mr. Loera's requests on several bases that are factually distinguishable from Mr. Trevino's requests:

1. Mr. Loera's request focused on production of documents related to the "Rule of Specialty." He already had been given, however, a waiver of the Rule of Specialty that was part of the extradition documents and failed to articulate any basis for the remaining documents.  Conversely, Mr. Trevino is not seeking production of any extradition-related document and is especially not seeking any document he already has. What is impossible to ascertain with any particularity are documents that go to the heart of the extent of the Executive Branch's choice to leap outside congressionally authorized statutes of extradition and treaty. Again, there is no presumption of regularity in the Executive Branch's act in Mr. Trevino's situation, which is different from Loera's situation.

2. Mr. Loera sought to challenge the Mexican government's acts, to which the district court correctly pointed out is not a function of a United States court. Conversely, Mr. Trevino is not contesting the improper act of the Mexican Executive Branch. Rather, he relies on his right of Due Process to fully analyze the unprecedented and extra-statutory act of the United States' Executive Branch.

3. The court in *Loera* correctly observed that the extradition documents are irrelevant to Mr. Loera's complaint that the Mexican government did not comply with Mexican law. Conversely, the requested documents relative to the United States' Executive Branch's acts (in particular, the extent to which the United States Executive Branch made the initial request for extra-judicial extraction subsequent to the President's imposition of extreme tariffs on Mexico and his threat of military intervention on Mexican soil, and/or the extent to which the United States' Executive Branch made agreements with Mexico relative to the rights of Mr. Trevino) are directly relevant to this court's jurisdiction and/or Mr. Trevino's rights in the instant case.

4. As to Mr. Loera's argument that the requested documents could shed light on any other assurances the United States made to Mexico in the context of his extradition proceeding, the district court correctly noted that there were no other assurances. That is, Mr. Loera already had been given all that he requested. This is not the case in Mr. Trevino's situation. He is requesting documentation and information that is not available to him, making it impossible for him to fully analyze his legal standing.

5. In *Loera*, the district court noted that Mr. Loera had not identified any provision in the extradition treaty that the United States violated. Again, this is not the situation in Mr. Trevino's case. As discussed in Mr. Trevino's motion, the Mexico/U.S. treaty was approved by Congress with one condition: that if the Executive Branch took any act relative to the transfer of a citizen from his home country to another and that is outside the parameter of the procedures set forth in the treaty, then Congressional approval must first be obtained. That condition was violated by the Executive Branch in Mr. Trevino's extraction. That is, the treaty was intended to address the

requirements that must be met prior to the authorized transfer of a citizen from his home country to/from the United States. The United States Executive Branch clearly acted outside this treaty, a violation of Congress' clearly noted condition. The Executive Branch did not seek Congressional approval before acting outside the governance of the treaty. Contra to Loera's situation, Mr. Trevino has a good-faith basis to assert a violation of the treaty.

The *Loera* court correctly notes that there exist other district court cases which have acknowledged a defendant's right to examine documents relative to their extradition. In those cases, as discussed in Mr. Trevino's motion and this Reply, there are legal issues that require full disclosure and transparency by the Government. Thus is the situation at bar.  Due process requires that Mr. Trevino be allowed to research, analyze and otherwise address the unprecedented extra-judicial manner of extraction in which the Executive Branches of both countries collaborated to execute.

In this case, the evidence Mr. Treviño has requested from the Government is clearly material and favorable to the defense. The Government has admitted that the Executive Branch procured the presence of the defendants extra-judicially, outside the established bounds of the Congressionally approved extradition treaty. In so doing, the Government forfeited any presumption of legality and regularity in their actions. Neither the defendants nor the Court know what rules they played by or what agreements they made with a foreign nation affecting the defendants' rights. They seek the Court's permission to keep this playbook secret. In support of their request, they offer a bare statement from OIA, discussed *infra*, that does not address the disposition of most of the rights that would be available to an extradited defendant. In *Loera*, a case where the defendant was extradited under the norms of the extradition treaty, the statement from OIA accompanied the full panoply of rights already attendant to the extradition treaty. Here, the brief unspecific statement from OIA is intended to address any and all rights the defendants

11

may have. Several questions about the defendants' rights remain and the bare statement is not enough, here.

There can be little doubt that the Executive Branch knowingly directed, encouraged, or coerced Mexico to render the defendants to the United States outside the statutory extradition treaty. In its opposition, the Government acknowledged that "the United States requested that the Government of Mexico arrest Miguel and Omar pursuant to provisional arrest warrants," *see* ECF No. 804 at 2. This shows the Government's previous involvement in the statutory extradition process of transferring the men to the United States through the proper legal channels. The Government also acknowledged that they presented a formal request for Miguel's extradition on December 30, 2013, and on September 14, 2015, for Omar; both requests were based on the Fourth Superseding Indictment. *Id.* at 3. The Government was aware of the legal means to secure the presence of the defendants before this Court, a process that provides specific warranties and protections to defendants. The Government also apparently sought a Fifth Superseding Indictment despite knowing that the extradition request on the Fourth Superseding Indictment was pending. Following the proper extradition process, they would need to file a new extradition request for the Fifth Superseding Indictment. Absent a new request, the Rule of Specialty would prevent them from trying the defendants on charges that were not part of the extradition process. Instead, and with knowledge that the extradition process was ongoing, the Government circumvented the process by apparently pressuring Mexico's government to expel the defendants without any of the warranties and protections provided by the Extradition Treaty.

The Government then abandoned the proper extradition route for reasons it has not yet disclosed. The reasons appear to be a tactical advantage gained by the Government. The Government apparently found it more convenient to circumvent the formal and ongoing

extradition process in favor of expediency. In so doing, it obviously tossed aside the defendants' rights. However, the defense still does not know exactly which rights were negotiated away.

Mr. Treviño now comes before the Court after having been abducted and expelled from Mexico, outside the judicial process. The Government states that it "understands that the Mexican government expelled the defendants from Mexico pursuant to Mexican domestic legal authorities permitting such action to protect national security." ECF No. 804 at 4. It seems to want to distance itself from the Mexican government's actions. However, the DOJ Office of Public Affairs issued a press release thanking the OIA for "coordinating the defendant's transfer," a transfer that occurred extra-judicially and outside the statutory protections of the treaty. As to the circumstances of his extraordinary rendition, the Government has admitted that it facilitated the government of Mexico's decision to expel him by offering certain undisclosed "assurances."

The government of Mexico has publicly disclosed that those assurances came in the form of a specific written request from the United States. Mexican authorities also disclosed that the expulsion was carried out in "cooperation" and "collaboration" with the United States. Officials from both countries have touted the existence of negotiations and documentation related to Mr. Treviño's rendition to the press. Far from a snipe hunt, the Government has held up the snipe for press photographs and now wishes to deny its existence.

The Government wishes to avoid producing documentation of these secret negotiations and agreements by proffering that the Department of Justice's Office of International Affairs "OIA" reported to the assigned prosecutors that the only assurances made to Mexico were that:

(1) the defendants would have the same legal rights and protections as a criminal defendant charged with a crime under U.S. law and arrested in the United States, including the right to counsel, the right to confront witnesses at trial, and the right to review evidence and to respond to that evidence at trial; and

(2) that the defendants would not be subject to the death penalty.

13

ECF No. 804 at 10.

The Government's statement only goes to prove that the requested documents are material to the defense. The United States seems to have pressured the government of Mexico to deliver the defendants and abandon all protections available to Mexican citizens under the extradition process. The defendants do not yet know with what protections they remain cloaked.

In *Loera,* the OIA statement accompanied the full explanation of rights contained within the extradition treaty. Conversely, the Government's statement in Mr. Trevino's situation is the only explanation of what, if any, additional rights the defendants have. Further, unlike the statement OIA made in *Loera* (that the abstention from seeking the death penalty was the only assurance made outside the Extradition Treaty), the OIA statement in Mr. Trevino's situation contains unspecific, yet very material promises that bear on the defendants' rights. The questions this statement raises can only be answered with further discovery.

For example, does the "same legal rights and protections as a criminal defendant charged with a crime under U.S. law and arrested in the United States," convey a right to be free from prosecution under the bar of double jeopardy? In this case, Mr. Treviño has already been tried and acquitted of these charges in a Mexican court. If he has the same right to double jeopardy protections as any other defendant, this prosecution may be barred. The requested discovery may also answer the question of whether the Mexican government was aware that Mr. Treviño was being extradited to face a different set of charges with increased penalties beyond that presented to the Mexican government in the formal extradition proceedings. If the Mexican government was not aware or was misled about the pending charges, "correspondence proving the trickery would surely qualify as 'evidence favorable to [the] accused." *Trabelsi*, at *5-6.

The requested discovery will also confirm whether the "assurances" apply only to the

prosecution in the U.S. District Court for the District of Columbia, or to the other pending federal prosecutions. Mr. Treviño does not yet know if he enjoys the same "legal rights and protections," such a bar to double jeopardy, in the other federal jurisdictions in which he has pending charges. In addition, he does not know if the Government is permitted to seek the death penalty in those jurisdictions under the reported "assurances."

Public statements by Mexican officials have suggested that certain international conventions apply to Mr. Treviño's transfer. He does not know which conventions and what rights those conventions convey. The requested discovery would also answer the question of what Mexico received in exchange for the defendants' extradition rights. If the exchange involved the White House's promise to reduce threatened tariffs on Mexican exports – tariffs that were later found to be illegally imposed – such information is material and mitigating to the defense. Discovery of the requested information is the only method for ensuring that whatever remaining rights the defendants have are properly preserved and enforced.

The Government notes that the doctrine of specialty should not apply to this case because the defendants were not extradited. ECF No. 804 at 9. The doctrine of specialty is one right available to Mexican citizens under the Extradition Treaty. The Government has not elaborated on whether the right was one of the "assurances" negotiated (or abandoned during negotiations) in the discussions regarding the defendants' expulsion. The Government acknowledges that they procured the men's presence outside of that treaty and now attempts to take advantage of their own actions in circumventing the defendants' rights. The Government's conduct to avoid the checks and balances of the Extradition Treaty approved by Congress and the Mexican government and applied in the vast majority of international transfers should not be rewarded or condoned. The Government attempted to set new extra-judicial rules for the transfer of

15

defendants. They compound their error by denying their involvement in the process and acting as if Mexico acted alone with no encouragement, coercion, or direction from Washington.

The United States acted at its own peril in pursuing Mr. Treviño's arrest in this extra-judicial manner and in so doing, may have jeopardized the prosecution. *See United States v. Alvarez-Machain*, 504 U.S. 655, 664 (1992) ("Extradition treaties exist so as to impose mutual obligations to surrender individuals in certain defined sets of circumstances, following established procedures."). Presumably, the Government took these actions with the intent to minimize the defendants' rights, beyond those provided in the U.S.-Mexico extradition treaty and approved by Congress. *See, e.g., Trabelsi* at \*5 ("The Supreme Court has recognized that a defendant who has been brought to the United States through a formal extradition treaty can, in some circumstances, challenge either the indictment or prosecution as violative of the relevant extradition treaty."). The defendants have a right to know about the actions the Government took and how it impacts their remaining rights. The Court ought not to reward the Government's actions by permitting it to keep material information hidden from the defense and judicial review.

### B. The Requested Documents Are Within The Government's Possession, Custody, and Control.

The Government argues that even if the requested information and documents were discoverable, "they are not within the possession, custody, or control of the prosecution team." ECF No. 804 at 13. The Government excludes OIA and the State Department from its definition of the "prosecution team" by arguing that "extradition proceedings and criminal prosecutions are legally distinct events." ECF No. 804 at 14. The Government's attempt to limit the scope of its discovery obligations is not consistent with its obligations under Fed. R. Crim. 16(a)(1)(E) or its constitutional obligations under *Brady. See Kyles v. Whitley*, 514 U.S. 419, 421 (1995) ("The

individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.").

Fed. R. Crim. P. 16 permits a criminal defendant to obtain from the government certain documents or items of evidence that are "material to preparing the defense[.]" Fed. R. Crim. P. 16(a)(1)(E)(i). "The term 'government' in Rule 16(a)(1)(B) and (E) encompasses more than just the Justice Department, the FBI… and other investigative agencies; it includes all agencies and departments of the Executive Branch of the government and all subdivisions thereof." *United States v. Safavian*, 233 F.R.D. 12, 18-19 (D.D.C. 2005). The fact that the documents requested may not presently be in the "possession" of the Justice Department prosecutors or the FBI is irrelevant. *Id.* The documents must be produced if they are in the "possession, custody or control" of <u>any agency</u> of the Executive Branch of the government and are either material to the preparation of a defense or are exculpatory under *Brady*. *Id.*

The Government relies on the ruling in *Loera* to assert that communications in possession of the Department of State and the OIA are not within the possession of the prosecution team. ECF No. 804 at 14 and *Loera* at *5. There, the Eastern District of New York held, "Certainly, in one way or another, there must be contact between the diplomatic arms of the U.S. Government seeking extradition of a defendant and the U.S. Attorney's Office that intends to prosecute the extradited defendant, but that contact does not intimately involve the agencies nor align the agencies for all intents and purposes." *Loera* at *20. However, *Loera*, involved a formal extradition proceeding under statutory law. There, the court may have been correct to conclude that, "State and OIA are operating with different goals and considerations in mind than the prosecution team, and nothing supports imputing common possession across these agencies based on bare assertions of contact." *Id.* There, the criminal prosecution and extradition

17

proceedings may have been legally distinct events.

Here, the Attorney General issued a press release discussing the circumstances of Mr. Treviño's capture and transfer to the United States. She invoked an Executive Order as the basis for the negotiations between the two countries and thanked OIA for its critical assistance. The DOJ publicly celebrated its involvement in this case and now wishes to say certain arms of the DOJ are not aligned with the prosecution team. Moreover, it is clear that other officers and agents were involved in the international negotiations including the White House, the Office of the Attorney General, OIA, and other federal agencies. Perhaps the usual extradition procedure does not involve the White House, the Department of State, the OIA, and the Office of the Attorney General, but it is clear that each of those government arms was involved in rendering Messrs. Treviño for prosecution. The Government should not now be allowed to disavow any association with them for the purpose of shielding their involvement from discovery.

### C.  The Requested Documents Are Subject To Disclosure.

As a final arrow in its quiver, the Government argues that "any documents that the prosecution team has regarding the defendants' transfers are 'reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting this case,'" and therefore are shielded from disclosure by Fed. R. Crim. P. 16(a)(2). ECF No. 804 at 13. Again, the Government's assertion ignores its obligations under *Brady v. Maryland.*

Federal Rule of Criminal Procedure 16(a)(2) protects government work product made in connection with the defendant's case. *United States v. Armstrong*, 517 U.S. 456, 462-63 (1996). Though the work product privilege is most frequently invoked in the civil context, the attorney work-product doctrine applies to criminal as well as civil litigation. *Trabelsi* at *14 (citing

18

*United States v. Clemens*, 793 F. Supp. 2d 236, 244 (D.D.C. 2011)). However, "not 'all written materials obtained or prepared by an adversary's counsel with an eye toward litigation are necessarily free from discovery in all cases.'" *Clemens*, 793 F. Supp. 2d at 244 (quoting *Hickman v. Taylor*, 329 U.S. 495, 511 (1947)). Instead, "attorney work-product is discoverable if the party seeking discovery can make a sufficient showing of necessity." *Id*. "The work-product privilege may be overcome only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." *Hobley v. Burge,* 433 F.3d 946, 949-50 (7th Cir. 2006) (citations and quotations omitted).

*Brady* always trumps both Jencks and Rule 16. *Safavian*, 233 F.R.D. 12 at 16 (citing *United States v. Tarantino*, 269 U.S. App. D.C. 398 (D.C. Cir. 1988)); *see also Poindexter,* 727 F. Supp. at 1485 ("The *Brady* obligations are not modified merely because they happen to arise in the context of witness statements."). The government cannot shield what would otherwise be *Brady* material behind claims of opinion work product privilege. *Trabelsi* at *16.

The court rejected this very argument in *Trabelsi*. The Government there attempted to withhold documents related to the defendant's extradition under the work product doctrine. The court found that any work product privilege could not shield the documents from production when the defendant had made a strong showing of both necessity and unavailability of the requested correspondence – "correspondence . . . sent between the United States and Belgium . . . addressing the charges in the initial and superseding indictments and whether the Extradition Treaty between the United States and Belgium may or may not permit extradition." *Trabelsi* at *16. The court did permit the government to prepare a privilege log, along with both redacted and unredacted copies of the relevant correspondence, to submit to the court for *in camera*

*review.*

The Government has broadly defined the requested materials as work product privileged under Fed. R. Crim. Pro. 16(a)(2) without further elaboration on their contents. The Government has not identified why the requested materials or privileged or attempted to produce redacted versions thereof. The requested materials cannot be withheld when Mr. Trevino has made a strong showing of necessity and has no other way to access the requested materials.

## CONCLUSION

For these reasons expressed above, Mr. Treviño respectfully requests that this Court grant Mr. Treviño's motion to compel discovery (ECF 797) and order the Government to produce the requested documents.

Respectfully submitted,

| | |
|---|---|
| *Michael McCrum* | *William B. Purpura* |
| Michael McCrum | William B. Purpura, Esquire |
| McCrum Law Office | Purpura & Purpura |
| 1659 Tx-46 W, Ste. 115 PMB 487 | 606 Baltimore Ave. |
| New Braunfels, Tx. 78132 | Suite 301 |
| Office 210.225.2285 | Towson, Maryland 21204 |
| Tx Bar No. 13493200 | Office 410-727-8550 |
| michael@mccrumlegal.com | wpurpura@purpuralaw.com |

**Counsel for Miguel Angel Treviño Morales**

### CERTIFICATE OF SERVICE

I, Michael McCrum, hereby certify that on April 27, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*Michael McCrum*
Michael McCrum

20